SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

J.H.C.                                          )
By his father and next friend:                 )
JOHN HARRISON CLARKE                            )
2424 Pennsylvania Avenue, NW                    )
Apartment 410                                   )
Washington, DC  20037                           )
                                                )
        Plaintiff,                              )
                                                )
            v.                                  )
                                                )
DISTRICT OF COLUMBIA GOVERNMENT                 )
Serve:  Mayor Muriel Bowser                     )
        1350 Pennsylvania Avenue, NW            )
        Washington, 20004                       )
                                                )
        and                                     )
                                                )
RICHARD TROGISCH                                )
2130 G Street, NW                               )
Washington, DC  20037,                          )        Civil Action No.  **2020 CA 002622 B**
                                                )
        and                                     )
                                                )
SILEAN EAVES                                    )
2323 N Street, NW                               )
Washington, DC  20037                           )
                                                )
        and                                     )
                                                )
NAELIS ERVIN                                    )
2323 N Street, NW                               )
Washington, DC  20037,                          )
                                                )
        and                                     )
                                                )
JANE DOE,                                       )
                                                )
        Defendants.                             )
_____ )

COMPLAINT
(Injunctive Relief, Violation of the First Amendment to the
United States Constitution, Violation of the DC Human Rights Act,
Defamation, Intentional Infliction of Emotional Distress, Civil Conspiracy)

Jurisdiction

1.      This Court has jurisdiction over this controversy under D.C. Code § 11-921.

Summary

2.      This case arises out of a concerted effort by a teacher, her mother, and other
school personnel, to undermine, deflect attention away from, and retaliate against, three
students for their submissions of written accounts regarding a black teacher's misconduct,
by falsely accusing all three students of racial animus.

Parties

3.      Plaintiff J.H.C. is a 14-year-old individual who is an Eighth grade student at
School Without Walls at Francis Stevens.   He has been a student at that School for a decade,
since Kindergarten.  As plaintiff is a minor, this action is brought by his "father and next
friend," and sole legal custodian, John Harrison Clarke, who is hereinafter referred to as
"the undersigned," or "counsel."  Plaintiff is hereinafter referred to "J.H.C." or "plaintiff."
Other witnesses who have not reached the age of majority are hereinafter referred to by
initials, and the names of all minors have been redacted from the exhibits submitted
herewith.

4.      The District of Columbia Public Schools ("DCPS") is an agency of defendant
District of Colombia.   The mission of DCPS is to "ensure that every school guarantees
students reach their full potential through rigorous and joyful learning experiences
provided in a nurturing environment."

5.      Defendant Richard Trogisch is an individual employed by DCPS.  He holds the position of Principal at School Without Walls High School (hereinafter "High School"), a public magnet high school located at 2130 G Street, NW.  Since 2014, Mr. Trogish has also simultaneously served as Principal at School Without Walls at Francis Stevens (hereinafter "the School"), which serves students from pre-Kindergarten through the Eighth grade, at 2425 N Street, NW, Washington, DC.  Mr. Trogish is sued in both his individual and official capacities.   This defendant is hereinafter referred to as "defendant Trogish," or simply "defendant."

6.      Defendant Silean Eaves is an individual employed by DCPS, holding the position of Assistant Principal at the School.  As defendant Trogish's time is shared between the two schools, defendant Eaves' authority and duties at the School is more pronounced than it would be if she had been serving as an Assistant Principal at a school with a full–time Principal.  Defendant Eaves is sued in both her individual and official capacities.

7.      Defendant Naelis Ervin is defendant Eaves' daughter.   She is an individual employed as a theatre teacher at the School.  She also plans, organizes, and produces the School's annual theatre presentation held at the conclusion of Black History Month, which the School calls "Fade to Black."  Defendant Ervin is sued in both her individual and official capacities.

8.      The captioned defendant referred to as Jane Doe is one or more individuals committing overt acts identified below that are not yet attributed to an individual defendant.  Because plaintiff does not yet know whether all overt acts identified having been committed by defendant Doe were committed by the same individual, nor her or their

identities, this person or persons are hereinafter referred to in the singular as "defendant Doe."  Plaintiff will seek leave of Court to amend his Complaint by substituting her or their true names and actions instead of the fictitious name Doe when the same has been ascertained.

### Facts

9.     On Tuesday morning, February 4, 2020, defendant Ervin had her theatre class prepare a skit, in which some of the students wore street clothes over their school uniforms.  Defendant Ervin gave DE, a friend of J.H.C.'s, a scarf to wear.  J.H.C. joked to DE, "You look very woke," meaning "pretentious" or "politically correct" (its usual use), which remark had been occasioned by DE's "wearing a scarf over his blue shirt," indoors.

10.     For reasons that still remain a mystery, defendant Ervin took the comment as "racist rhetoric."  She was outraged.  She berated J.H.C., screaming, "J.H.C., what makes you think it's okay to say what you said to DE?  Was it because he was sitting next to two black people?"  Stunned, and unaware of who DE had been sitting next to, J.H.C. responded, "No." Unconvinced, Ms. Irvin yelled, "Really?" and continued to berate J.H.C. "She was furious and yelling," J.H.C. wrote.  "The whole time my heart was thumping and racing.  A friend of mine who was right next to me later described me as 'looking like I was about to cry' and 'scared.'"  She ended her tirade with the declaration to the class, "Racist rhetoric will not be tolerated!"

11.     On Thursday morning, February 6, the substitute teacher in Ms. Ervin's class had the children play the game "telephone." The phrase went around, and morphed into "DE is woke" (through no fault of J.H.C.). Recalling Tuesday, a number of students found it very funny, whereupon three girls started jumping around and yelling at J.H.C. and four of his classmates; MI, ES, DE, and AL.

12.     Later in the day, defendant Ervin encountered J.H.C. in the hallway, angrily pulled him aside, and asked him and the other eighth graders present what had happened earlier in the day with the substitute teacher. Upon being informed, defendant Ervin said that if something like this happened again she would "give everyone zero's for the rest of the advisory," and, while looking at J.H.C. and classmates EZ and ES, said that if she heard any similar statements or comments she would "call the police for hate speech," and have the event placed on the students' "permanent records."

13.     After scolding the group some more, defendant Ervin said to ES that she was extremely disappointed for letting his classmates "say racist things." She continued, "You can't let them do that. I'm doing this because you're a brown, black body," and "Next time I will slap the sense into you." She continued, "Don't even try to do anything because I know the DCPS handbook inside and out." Then, reacting to ES's response, she threatened, "Don't roll your eyes at me ever again or I will knock your teeth out."

14.     Shortly after witnessing the threats, J.H.C. inquired in the School's office whether teachers were permitted to threaten students. An administrator asked what had happened, and J.H.C. relayed the threats made to ES, and provided five names of witnesses to the incident. Later in the day, J.H.C. told ES that he had reported defendant Irvin. ES

approved, and the two decided to return to the School's office at dismissal time to report a
number of threats made by defendant Ervin.

15.     Another classmate witness, EZ, joined J.H.C. and ES in the office after school
to report the threats.  They told defendant Trogish and Assistant Principal Young about
what happened.  Defendant Trogish instructed them to reduce their accounts to writing.

16.     The next morning, Friday, February 7, before school, EZ, ES and J.H.C. all
submitted their written accounts of the aforementioned threats, and other threats of
physical ham, as well as other of defendant Ervin's bizarre behavior.

17.     EZ wrote that Ms. Irvin "will randomly have outbursts in the classroom,"
which were "aggressive towards individuals" who she opines are racist.  She makes
students "very uncomfortable."  "Many students in this class have felt harassed," and "many
students feel threatened to come to class."

18.     For good reason.  EZ related that defendant Ervin had threatened to break his
fingers, saying, "if you draw another picture like that I'll make sure you'll never hold a
pencil again.  He also reported the threats to "slap," and "knock your teeth out."  Reported
non-physical threats included to "file a police report for hate crimes," and collective
punishment by "dropping all students' grades to an F for anger towards certain students."

19.     EZ wrote that Ms. Irvin has a history of "exaggerating the term 'racist' and
has been throwing this term out of proportion."  She "jumps straight to conclusion and
portrays something that was not intended to be hate speech a form of hate speech."  EZ
provided these instances:

(a)     Defendant Ervin's "mistaken" belief that the word "woke" had been "racially offensive;"

(b)     Her opinion that a sketch of Martin Luther King, Jr., had depicted him with monkey-like ears, notwithstanding that in all of EZ's drawings, the ears were the same; and

(c)     Her belief that a student who said that three girls had "jumped around like monkeys" had been meant as a racist remark, even after the student, who is black, explained otherwise.

20.     "This teacher all in all," EZ concludes, "has been aggressive to the point where students are intimidated to the point of oppression."

21.     ES, who had also been threatened, wrote that he personally does "not feel safe in the theater class anymore because of the many threats that were told to me and my classmates by the teacher."

22.     ES recounted when Ms. Ervin accused J.H.C. of racism by his use of the word, "woke," and that, after the word's resurgence two days later, he was explaining to the girls who became upset he and the other students were not laughing at the word, but rather, at their reaction:

> On Tuesday J.H.C. said to DE are you woke and Ms. Ervin... started to say stuff about how J.H.C. was being racist and asked, "Did you say that because DE is in between two black people." J.H.C. said he did not mean it that way but she didn't believe him and continued with a lot more accusation.
>
> Then when we were going down the stairs to go to the auditorium I told the girls that we were not laughing at the racist comment but at you, "How they were jumping around like monkeys," but right after I realized what I said was not right in that situation. I said sorry and that I didn't mean it in that racist way and that I meant it in a way off like very jumpy and moving around too much. Also I am black so I know of all those racist comments that were directed to our kind so I would never mean it in that way.

23.     And ES described when Ms. Ervin had threatened him:

> I was in the gym and was called out to go upstairs to talk to Ms. Ervin... She was very loud and was asking me what I thought and asked what racist stuff was I saying and I said what because I forgot what happened in the stairs because I thought we already resolved that....

> I told Ms. Ervin that I didn't mean it in that way and she said, "Yeah right you
> know what you meant," and I rolled my eyes and she said don't roll your eyes
> at me ever again or I will knock your teeth out in like a threat at least that is
> how it felt... Then when she dismissed everyone and she held me literally
> and said wait. She asked, "Do you let them talk to you like that in a racist
> way" (them as in white people) and I said no then she said that you should
> not support it and I said I don't. Then she went in the class and said don't
> allow anyone to say the "n-word" and said I wish anyone would say the "n-
> word" around me I will knock their teeth out.

24.     The facts recounted in J.H.C.'s submission corroborated EZ's and ES's reports

of the threats, except that J.H.C. included an instance of when Ms. Ervin had "threatened to

stab a child with scissors while making a stabbing motion."

25.     On Friday, February 7, at 9:10 a.m., J.H.C. was summoned to the School office,

where ES and EZ were waiting, in the outer office. At around 9:40, Ms. Vest said these are

serious allegations and to remember to tell the truth. "That gave me confidence because

we were telling the truth and I reminded everyone to stick to the truth," according to

J.H.C.'s written account.

26.     By the time the first student was called into the inner office, at around 11:00,

it had been two hours since the three whistleblowers had been summoned to the outer

office, and two-and-a-half hours after the three had submitted their accounts of teacher

misconduct. EZ was first. Present were four administrations, defendant Principal Richard

Trogish, defendant Assistant Principal Silean Eaves, Assistant Principal Shanna Young, and

Ms. Stephanie Beer. Ms. Eaves typed notes, and Ms. Young wrote onto a notepad.

Defendants had read, and studied, the students' accounts, which had been submitted by

8:30 a.m.

27.     Unbeknownst to the students who were waiting, they all thought, to be interviewed regarding defendant Ervin's misconduct, teacher malfeasance was not among the subjects of the interviews, or, more accurately, interrogations

28.     Forty-five minutes before the first interrogation began, at 10:15, defendant Trogisch called the undersigned and said that he would be conducting two separate investigations, one into the conduct of defendant Ervin, and one into J.H.C.'s conduct. Defendant read from an email that had been sent to him the previous evening by the parent of one of J.H.C.'s classmates.  "My child reports," defendant read, "that J.H.C. says nigger all the time, says that slavery is the best thing that ever happened to this country, that it should be brought back, and says his black classmates look like monkeys."  Incredulous, counsel asked whether defendant had any corroboration.  Defendant Trogisch responded, "Not yet."

29.     The School had no plans to query the students about Ms. Ervin's misconduct. Rather, over the course of *over three hours* of grueling, separate, surprise interrogations, the school accused each of racist behavior, lied to each that their classmates had called them racist, and tried over and over again to have one inculpate the others.  Defendants accused each of racist misconduct which they knew to be false.  Defendants sought to:

(a)     Undermine and neutralize the students' accounts of teacher misconduct as untrue and having been motivated by racial animus;

(b)     Deflect attention away from the teacher's threats of physical harm; and

(c)     Retaliate against the three for their written explanations of what events had occurred.
.

30.     EZ's interrogation lasted about an hour.  He reports that they had called him, and J.H.C. and ES, racists, and specifically referred to J.H.C. as a racist.  They repeatedly asked him, "Why are you lying?"  Throughout the interrogation, the questioners pressured

EZ to incriminate himself, J.H.C., and ES, as racists.  They asked, over and over again, whether he was aware that his classmates think he's a racist, why he thinks they may have said that, and why he would associate with J.H.C. the racist.  The interrogators claimed that his answers were "fiction."  "Did ES and J.H.C. pressure you to write what you wrote?" defendant asked.  "Why are you protecting racists?"

31.     And they queried him about his having sketched Martin Luther King, Jr., with big ears.  But defendants Trogisch and Eaves knew that EZ had explained in his written statement that all his sketches of historical figures had big ears.  Ms. Young declared that she had been "personally offended" by the drawing.

32.     Dissatisfied with his repeated denials, defendant threatened to expel EZ.  But, he continued, if EZ would cooperate, things would go easier on him.  "What about Ms. Ervin?" EZ pleaded.   "We will talk to her," defendant perfunctorily responded.  Defendants asked not a single question about Ms. Ervin's misconduct.

33.     ES was next.  This confrontation lasted just under an hour.  The subject of Ms. Irvin's threats were discussed only at ES's insistence, and here too the only response was, "We will speak with Ms. Ervin."  Defendants accused ES of having called the girls who were upset over the telephone game's end-product, "DE is woke," as having "looked like monkeys."  But here too defendants had read ES's written account that he had not meant it as a racial slur.  He repeatedly explained that he said they were "acting like monkeys."  In ES's view, the statement "looked like monkeys" would have been racist, but "acting like monkeys" is not.  In any event, he explained, he did not mean it in any way to be racist, and he had already explained that to the girls, and had apologized to them.  Defendants

challenged his account of having apologized.  He too was repeatedly confronted with the

claim that his friends call him racist, and asked to explain why.

34.     Defendants knew full-well that the accusations against both EZ and ES were

frivolous.

35.     J.H.C. was last to be interviewed.  It began after he had been waiting in the

outer office for five hours.  It began at around 1:00 p.m., and lasted about an hour.  Here too

defendant knew full-well that the accusations against J.H.C. were frivolous, and here too

proceeded as if he were conducting an otherwise well-founded racism probe.  It was

traumatic.  Parts of that exchange went something like this.

| | |
|---|---|
| Mr. Trogish: | Well your friends say "yeah that's just J.H.C. he's racist."  A friend of yours said "well one time he said something racist and I wanted to punch him right in the face, but I didn't because that's not the right thing to do."  Your own friends are saying that they want to punch you because your being racist. |
| J.H.C.: | (Crying)  One of my friends said that?  Well don't you think that if my friends thought I was a racist they wouldn't want to be friends with me? |
| Ms. Eaves: | Well I disagree, I think they would just accept you're a racist and try to look past it. |
| Mr. Trogish: | One of them even said J.H.C. that said "slavery was the best thing to happen to America" and that we should "bring it back."  J.H.C. also called black girls "monkeys and says nigger all the time." |
| J.H.C.: | (Crying)  And you're sure that it was one of my friends? |
| Mr. Trogish: | Well I can't really disclose that information. |
| Mr. Trogish: |  Are you saying that you didn't say any of this? |
| J.H.C.: | (Crying) Yes. |
| Mr. Trogish: | So why do you think they said this? |
| J.H.C.: | (Crying) Maybe it's because they don't like me… |
| Mr. Trogish: | Let me grab the complaint here.  I'm showing this to you because you need to see it, not to hurt you. |
| J.H.C.: Okay. | |
| Mr. Trogish: | This was filed by a parent.  "My child has brought to my attention that J.H.C. has said such words and phrases as 'slavery was the best thing to happen to America,' 'We should bring slavery back,' says "nigger" all the time, laughed at a racially charged statement about being woke, and called some African American students monkeys.  I don't feel that my child is safe around him. |

| | |
|---|---|
| Ms. Young: | So you're making it so they don't feel safe around you. |
| Ms. Eaves: | So you see that you laughing that DE is woke was racist. |
| Mr. Trogish: | Did you ever say that fade to black is bad or that we spend too much time on black history? |
| J.H.C.: | No.  I might have said that we don't spend enough time on some important things. |
| Mr. Trogish: | What do you mean? |
| J.H.C.: | Well we didn't go over a single word of the constitution till eighth grade. |
| Mr. Trogish: | We are also worried about your safety, we don't want you to be hurt, beat up, or jumped.  For your safety, we might need to see if you need to go to another school. |

36.     Defendant knew that it had not been J.H.C. who had been accused of the "monkeys" remark, and that if J.H.C. had, in fact, used the N-Word "all the time," there would be some corroboration.  So too with the accusation that he said that "slavery is the best thing that ever happened to this country, and it should be brought back."  Yet, defendant announced his intention to suspend J.H.C., as if he believed that accusations of racist misconduct was a fact, and not a fiction.

37.     That Friday afternoon, February 7, defendant Ervin told her entire afternoon class that J.H.C., EZ, and ES are all against the school's celebration of Black History Month.

38.     On Saturday, February 8, J.H.C. took his entrance examination to the High School.  He believes that he performed well.

<u>CARE Investigation</u>

39.     On Monday, February 10, counsel emailed a letter to the General Counsel District of Columbia Public Schools, its Deputy General Counsel, and defendants Trogish and Eaves.  That nine-page letter included the facts as set forth above, as well as copies of the written accounts of EZ, ES, and J.H.C..  A copy of this correspondence is attached hereto as Exhibit 1.  It includes:

> One reason that I have included the DCPS Office of General Counsel lawyers as recipients of this letter is that I am requesting that it consider sending someone over to the school to investigate. The conduct of the current investigators in this case is among the issues to be resolved, so an independent fact finder would seem appropriate.

40.   The General Counsel acceded to the request, and two investigators from the DCPS Comprehensive Alternative Resolution & Equity Team, or "CARE," investigated.

41.   On April 29, 2020, CARE issued its Response to Grievance No. 3686, a copy of which is attached as Exhibit 2.

42.   J.H.C.'s grievance alleges that the genesis of the matter was a concerted effort by a teacher, her mother, and other school personnel, to undermine, deflect attention away from, and retaliate against, three students for their submissions of written accounts regarding a black teacher's misconduct, by falsely accusing all three students of racial animus. Yet, CARE purports to have investigated civil rights violations; Title VI of the Civil Rights Act of 1964, and the DC Human Rights Act of 1977. CARE's statement of what it was investigating:

> The grievance alleges that School Without Walls at Francis-Stevens (SWWFS) student, J.C., has made racist comments to and about his classmates including, but not limited to, using the "N-word," stating that slavery was good for America's economy and that it should be brought back, and stating another student was "woke."

43.   This statement does not respond to J.H.C.'s grievance. This is not civil rights case. It is a whistleblower action.

44.   CARE's response does, however, address whether J.H.C. did, in fact, espouse racist, white supremacist rhetoric. All told, J.H.C. stands accused of:

(1)   Stating that another student looked "woke;"
(3)   Stating that African-American classmates "look like monkeys;"
(2)   Using the "N-word;"
(4)   Championing slavery;

(5)     Championing Trayvon Martin's death; and
(6)     Opposing Black History Month.

45.     CARE's Report concluded that all charges were "valid and reliable." While the "racial slurs," were not "consistent" or "pervasive enough" to constitute a civil rights violation, according to the Response, "DCPS will implement a progressive discipline approach" if he does it again.

46.     However, each and every charge is, on its face, incredible.

47.     *Woke*.  This is the first of CARE's 10 *Findings of Fact*:

> Finding 1
> On February 4, 2020, Teacher N.E.'s theatre class was conducting a lesson unit entitled "Culture Shock," which is a unit designed to analyze how different groups of people are presented in the media.  During the class discussion, Student E was sitting next to two students of color.  Student J.C. stated that Student E looked "woke."  Use of this term was corroborated by thirteen of the students interviewed.

48.     The genesis of the belief that the "woke" comment had been racist was Ms. Ervin's indignation at what she declared to the class was "racist rhetoric."  The undersigned has twice sought defendants to proffer their theory of how saying that someone looks woke could possibly have been be racist rhetoric.  DCPS has yet to respond.

49.     *Monkeys*.  Defendants knew from reading the written accounts from EZ and ES, as well as from ES's interview, that it was ES who had made this comment, that it had been "acting like," not "look like," and that it had not been racist.  But that did not diminish defendants Trogisch and Eaves from prosecution of this charge against J.H.C., or ES.  CARE entirely omitted this accusation from its *Finding of Fact*.

50.     *N-Word*.  This allegation was made by the same student who had lied about the monkeys comment, in the same email.  Defendants were well aware of this fact, but ignored that one false charge obviously impugns the veracity of the two others made by the

same student.  CARE interviewed 15 students and two teachers, posits that J.H.C. used the

"N-word"  "all the time," but only one student is said to have ever heard it.  The student

never told anyone until shortly after Ms. Ervin had declared to the class that J.H.C. had

uttered "racist rhetoric" and J.H.C. had reported defendant Ervin's various misconduct.

51.     ***Slavery***.  Numbers 4, 5, and 6 in CARE's *Findings of Fact* accuse J.H.C. of

championing slavery.

52.     CARE's Findings 4 and 5:

> Finding 4
> At least three students stated J.C. made comments along the lines of "slavery
> was good for America and should be brought back."  All three students stated
> this happened in Teacher E.F.'s English Language Arts classroom.
>
> Finding 5
> Teacher C.O. also stated J.C. has made a comment similar to "slavery was
> good for America" during class, which prompted a class discussion about
> slavery being a human rights issue.

53.     CARE was tasked with determining what J.H.C. said.  These are ostensibly

*Findings of Fact*.  "Made comments along the lines of," and "made a comment similar to,"

are not facts.  They are opinions.  Moreover, J.H.C. could not have advocated for bringing

slavery back without uttering the words, "slavery should be brought back."  Where an

individual is accused of espousing white supremacist rhetoric, due process requires more

than opinions of three listeners.  It requires the facts of what the accused is alleged to have

said.

54.     Findings 4 and 5 regard two separate class discussions, in two separate

classes, English and Geography.  Class discussions are group communications, among more

than 25 people, over half of whom CARE interviewed.  CARE reports in Finding 4, the

English class discussion, that J.H.C. had "made comments along the lines of" slavery should

be brought back, but only three recall it, none of them remember what he said, and none of

them, or anyone else, reported it, to anyone.   CARE declined to interview the teacher, Mr.

Felinger.

55.   In Geography, here too, of the 15 witnesses interviewed, only Ms. Ogunshakin

is said to have recalled J.H.C. saying that slavery was good for America, she too does not

recall exactly what he said, but, whatever it was, it was a "comment similar to."  EZ had

sketched Martin Luther King, Jr. in Geography, and Ms. Ogunshakin had showed the "racist"

drawing to defendant Ervin, and to Ms. Young.   And the "class discussion about slavery"

was a follow-up to a homework assignment, and was not "prompted" by anything that J.H.C.

had said.

56.   Finding 6 at least has a specific assertion, rather than "made comments along

the lines of" or "made a comment similar to."  It relates that a group of students, J.H.C.

among them, had opined that "slavery was good for the beginning of America's economy."

But only J.H.C. meant it to be racist, in DCPS's official view.  The other students, but not

J.H.C., "prefaced that... slavery, in and of itself, was not right:"

> Finding 6
> One student stated that other students in addition to J.C. have stated that
> slavery was good for the beginning of America's economy; however, they
> prefaced that the other students have stated that slavery, in and of itself, was
> not right.  At least four students state they had not heard J.C. make comments
> regarding slavery being good for America's economy. J.C. denies making this
> statement.

57.   And J.H.C. did not deny making this statement because he was never asked.

The undersigned listened in on his interviews and CARE did not ask any such question.

58.   CARE interviewed 14 students besides J.H.C., and asked each whether they

had heard J.H.C. champion slavery.  Yet, it reported that "four students state they had not

heard" the comments, omitting whether the other 10 students had also denied having heard any such thing.

59.    ***Trayvon Martin.***

Finding 7
At least two students stated they have heard J.C. make comments along the lines of "Trayvon Martin was a disappointment" or "Trayvon Martin was a thug and that he should have been shot."

60.    Contrary to DCPS's recitation, J.H.C.'s remarks about the Trayvon Martin case were made in front of around 25 other students and his English teacher Eric Felinger, not "at least two students."  During that class discussion, J.H.C. read from the police report from a book that he had been reading that he happened to have in his backpack at the time, showing that, before Martin had been shot, Zimmerman had suffered injuries, which had been sufficient to prove in his criminal trial his defense of self-defense.  Big mistake.

61.    J.H.C. did not say anything "along the lines of" Martin "was a thug and that he should have been shot."  Rather, he opined that Zimmerman had acted in self-defense.  If CARE even asked the other 12 witnesses that it interviewed, or Mr. Felinger, what J.H.C. had said during that class discussion, it did not share those results.  J.H.C. did not say that "Trayvon Martin was a disappointment," and he does not know what that statement means, or refers to.

62.    CARE interviewed 14 students besides J.H.C., and asked each whether they had heard J.H.C. champion Martin's death, and two students stated that he had.  Here too CARE omits the accounts of the other 12 students.

63.    CARE prefaces all student witness numbers with the clause, "at least." This is a curious insertion in a *Findings of Fact.*  Finding 4 is "at least three students," and Findings 7 and 9 are "at least two students."  CARE interviewed each student to corroborate the

charges, took notes, but does not disclose how many of the 14 classmates did, or did not, corroborate.  Apparently, "at least two" means two.

> 64.  ***Black History Month.***
> Finding 9
> At least two students stated that J.C. has outwardly questioned why there is a Black History Month.

65.  The undersigned has heard J.H.C. complain about Black History Month.  So too regarding English class, math, geography, history, art, physical education, and the dress code.  The "at least" two students would appear to have believed that J.H.C.'s "outwardly questioning" was founded on a racial animus, as CARE concluded.  This charge is wholly founded on the notion is J.H.C. is a racist.  But he is not, contrary DCPS's official position.

66.  DCPS's final *Finding of Fact* charge is devoid of facts:

> Finding 10
> One student stated that J.C. has made other racially insensitive and/or offensive comments in the past and added "we let things slide."  Additionally, the student stated that they "let things slide" because they have "experienced worse" behavior by other people.

67.  "Other racially insensitive and/or offensive comments" is a characterization, only.  Again, CARE declines to disclose what J.H.C. said that had been interpreted as "racially insensitive and/or offensive"—a flagrant due process violation, again.

68.  CARE wrote that "there was a total of 15 students interviewed," which it numbered at the beginning of its Response.  But it does not identify by number which witnesses it cites in any of its 10 *Findings of Fact*.  The largest number of corroborating witnesses in any Finding is in number 4—three students.  Findings 7 and 9 related the accounts of two students, and 6, 8, and 10 rely on one.  But CARE declines to state how many of its *Findings of Fact* are based on the statements made by the same witness.  Are the only accusers the "three Black students who became upset" at the "woke" comment in Ms.

Ervin's class, after she had misinformed them that it was a racial slur (one of whom lied to her parent that J.H.C. "regularly used" the "N-word," as well as having said his black classmates "look like monkeys")?

69.    CARE did not even disclose the total number of accusing students.

70.    Not one of DCPS's accusations are true:

| (1) | Stating that African-American classmates "look like monkeys" | FALSE |
|---|---|---|
| (2) | Stating that another student looked "woke" | NOT RACIALLY MOTIVATED |
| (3) | Using the "N-word" | FALSE |
| (4) | Championing slavery | FALSE |
| (5) | Championing Trayvon Martin's death | FALSE |
| (6) | Opposing Black History Month | NOT RACIALLY MOTIVATED |

71.    Conspicuously absent from CARE's Response is any mention of Ms. Irvin's tirade to the class at J.H.C.'s having made the "woke" comment.

72.    Conspicuously absent from CARE's Response is any mention of what defendants Trogisch and Ervin had said, who it listed as among the witnesses it interviewed.

73.    Conspicuously absent from CARE's Response is any mention of the existence of a second email, this one sent to defendant Trogisch about two weeks later, while CARE was conducting interviews.  It was from a parent of classmate BW .  It accused J.H.C. as having had said, verbatim, "Slavery was good for America," to BW, only.  So, CARE interviewed J.H.C. a second time.  BW had claimed that J.H.C. voiced this white supremacist rhetoric to her while sitting next to him in Geography.  CARE learned that BW's assigned seat was not at J.H.C.'s table, so this allegation had been discredited, seemingly.

74.     While CARE was tasked with reporting what J.H.C. said, the only two verbatim quotes it relates are the "N-Word," and "woke."   The first is a patent lie, and the second simply cannot be interpreted as racist.

75.     Here, the email had accused plaintiff of (1) the "monkeys" comment, (2) the use of the "N-word," and (3) championing slavery.  Defendants knew from the get-go that the first two were false.  CARE conspicuously omits any mention the first charge, purports to have established "N-word" charge on the word of one student, and claims that the slavery charge was true, based on the accounts of just three of the several dozen witnesses who would have heard it.  None of the three remembered what plaintiff said, except that one did recall that plaintiff had been among a group of students who had all opined that it may have been "good for the beginning of America's economy."  CARE included defendant Trogish's initial charges of (1) opposing Black History Month and (2) having made some sort of "racially insensitive and/or offensive comment" that the listener had "let slide.'"  And CARE added championing Trayvon Martin's death, based on the accounts of just two of the several dozen witnesses who would have heard that.  In its *Finding of Fact* 1, by contrast, CARE related that "the use of this term [woke] was corroborated by thirteen of the students interviewed."

76.     Here, EZ wrote that defendant Ervin "jumps straight to conclusion and portrays something that was not intended to be hate speech a form of hate speech," and provided the examples of (1) the use of the word, "woke," (2) his drawing of Martin Luther King, Jr., and (3) the "monkeys" charge.  *Infra* ¶ 19.  Undaunted, defendants Trogish and Eaves prosecuted all three of these items as hate speech.

77.     Here, there were no reports of racism against any Eighth grade students until February 7, the very day that three students—J.H.C., ES, and EZ—each submitted to defendant Trogisch written reports of teacher misconduct against a black teacher who had announced to the class, falsely, that J.H.C. had uttered "racist rhetoric."  The charges were levelled only against J.H.C., ES, and EZ.  Prior to this time, in DCPS's view, J.H.C. had been spewing white supremacist rhetoric for some time, but there had been no reaction whatsoever, from anyone, until J.H.C. said, "woke." No student had complained to any authority at the school, there had been no complaints to, or by, any teacher, or to the Principal, or to the Assistant Principal, or to the counselor, or to any parents, including the undersigned.

78.     The sudden emergence of the patently false racism charges, made only against J.H.C., EZ and ES, occurred on the very day that they each had submitted written accounts of a black teacher's misconduct, as defendant had instructed.  This was no coincidence.  By the close of school day on February 6, defendants Trogisch, Eaves, and Ervin all knew that J.H.C., EZ and ES, were to submit written accounts of Ms. Ervin's threats, the next morning.  Given this chronology of events, plaintiff avers, upon information and belief, that the charging email had been made at the behest of defendants Trogisch, Eaves, and Ervin, or some combination of these defendants.

79.     While plaintiff knows the genesis of the false charges, he does not yet know who initiated them, or the particulars of that communication, including which named defendant had made the request to the reporting student, or to her parent.  Plaintiff will seek leave to amend his Complaint by specifying those particulars when the same has been

ascertained, and may substitute the names of other actors in the place and stead of the fictitious name, Jane Doe.

80.     ***Bifurcation***.  Here, according to DCPS, the veracity of the racism allegations has nothing to do with the reports of teacher misconduct.   They are wholly unrelated, in its view, and it bifurcated the matter into two, separate, grievances.  J.H.C. disagrees.  As he noted on February 10, this is one matter, not two:

> On Friday morning, February 7, Mr. Trogisch called me and told me that he would be conducting two separate investigations, one into the conduct of theater teacher Ms. Naelis Ervin, and one into the conduct of my son, J.H.C....  Both matters are serious.  But they are not "separate."

81.     CARE followed defendant's approach.  In its Response to Grievance No. 3682, a copy of which is attached as Exhibit 3, CARE states the purview of this investigation:

> It is alleged that on February 6, 2020, School Without Walls at Francis-Stevens Teacher N.E. made threats to Student J.C., Student B, and Student C, including, "next time I will slap some sense into you" and "don't roll your eyes at me again or I'll knock your teeth out" when approaching the students about allegedly making racist comments.  Additionally, it is alleged that Principal R.T. used questionable methods to investigate the alleged comments, such as interrogating Student J.C., Student B, and Student C for up to five hours, falsely reporting that the students' peers described them as racist, threatening to expel, and failing to interview witnesses.

82.     J.H.C.'s charge is that defendant *knowingly and falsely accused* three students of racist misconduct, to cover up teacher wrongdoing, but that is not apparent in CARE's statement.

83.     Moreover, the facts as stated are false and misleading.  Defendant was not investigating Ms. Ervin's "alleged comments."  All but a few minutes of the three hours of interrogations were entirely devoted to racism accusations against the three reporting students.  Teacher misconduct was addressed only at the students' insistence, each of whom pleaded during interrogations, "What about Ms. Ervin?"  And CARE recites that "it is

alleged" that Ms. Ervin threatened J.H.C..  No, it is not.  Only defendant Trogisch threatened
J.H.C., with expulsion.

84.    On May 6, 2020, J.H.C. administratively appealed the two Responses to his
single grievance.  A copy of that appeal attached hereto as Exhibit 4.

85.    ***High School Admission***.  "What is so disastrous here," the undersigned wrote
on February 10, "is J.H.C.'s exposure to being denied admission to School Without Walls
High School."

> After ten years at the school, with an excellent chance of acceptance into the
> feeder, the day before he takes the entrance exam for the High School, J.H.C.
> is wrongfully accused of being a racist, spewing racial epithets, and
> threatened with expulsion.

86.    DCPS denied J.H.C. access to the High School.  He placed 80th on a waitlist of
89.  This was further retaliation for his having reported teacher misconduct.  He should
have been accepted into the High School:

(a)    J.H.C. and two other advanced eighth graders take classes at the High
       School.  Every year since 2014 every other such student had been
       admitted to the High School.
(b)    He was admitted to the other magnet high school, Benjamin
       Banneker, which has the same entrance standards.
(c)    J.H.C. tests as reading above an 11th grade level.
(d)    He is almost a straight-A student.
(e)    J.H.C. did well on the High School admission written test, and his
       interview went fine.

Count I
Injunctive Relief
(Defendant District of Columbia)

87.    Plaintiff restates paragraphs one through 86 as if fully repeated here.

88.    DCPS is obligated to admit or deny admissions to its magnet educational
institutions based solely on individual merit.  Had it done so, plaintiff would have been
admitted to School Without Walls High School.

89.    Instead, DCPS denied plaintiff admission to the High School, in retaliation for plaintiff's having reported teacher misconduct.

90.    Plaintiff has no adequate remedy at law, and prays that the Court order defendant District of Columbia to admit plaintiff to the magnet college preparatory institution, School Without Walls High School, prior to the start of the next school year.

## Count II
## Violation of the First Amendment
## of the United States Constitution
### (Defendants District of Columbia, Trogisch, Eaves, and Ervin)

91.    Plaintiff restates paragraphs one through 90 as if fully repeated here.

92.    Constitutionally intolerable speech-based animus was at the core of government's probe.  From its inception, DCPS's targeting of plaintiff with threat of expulsion for having espoused white supremacist views was undertaken in bad-faith.  It subsequently disseminated false and misleading facts in its Response to plaintiff's grievance.  Defendants' misconduct was undertaken to undermine plaintiff's account of defendants' malfeasance, and to retaliate against him for reporting teacher threats, which report had been consistent with his understanding of his duties as a good citizen.

93.    Defendants' conduct was in willful, wonton, and reckless disregard of plaintiff's rights guaranteed by the First Amendment to the United States Constitution.

## Count III
## Violation of the DC Human Rights Act
### (Defendants District of Columbia, Trogisch, and Eaves)

94.    Plaintiff restates paragraphs one through 93 as if fully repeated here.

95.    Defendants targeted plaintiff for his having made a charge against Ms. Ervin.

96.    CARE investigated, *inter alia*, violations of the DC Human Rights Act of 1977.

97.     The DC Human Rights Act, D.C. Code § 2-1402.61(b), *Coercion or retaliation*, prohibits "any person to require, request, or suggest that a person retaliate against... a person, because that person... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing authorized under this chapter."

Count IV
Defamation
<u>(All Defendants)</u>

98.     Plaintiff restates paragraphs one through 97 as if fully repeated here.

99.     Defendant Ervin's pronouncement to the class that plaintiff had uttered "racist rhetoric" was false, and defamatory, and constitutes slander *per* se.  Her announcement to her afternoon class that J.H.C. and the other two reporting classmates had been opposed to the School's celebration of Black History Month was false, slanderous, and made to further DCPS's position that the reports of defendant Ervin's misconduct were false and motivated by racial animus.

100.     All three charges levelled in the February 6 email were false, and libel *per se*.

101.     All charges in CARE's Response to plaintiff's grievance are false, and each constitutes libel *per se*.  Most, if not all, of J.H.C.'s classmates, and probably most of the School's administration, are well aware that DCPS charged plaintiff with voicing white supremacist rhetoric.  Absent the imposition of remedial measures, plaintiff can expect the scorn of his contemporaries, or at least those who do not know him very well.

`     102.     Plaintiff 14 years old.  He should not have to bear the stain of having been adjudicated as a young man as being an ignorant, and despicable, white supremacist.

Count V
Intentional Infliction of Emotional Distress
(Defendants Trogisch, Eaves, and Ervin)

103.     Plaintiff restates paragraphs one through 102 as if fully repeated here.

104.     By virtue of and as a direct and proximate cause of defendants' intentional, outrageous, wonton, oppressive, wrongful conduct, plaintiff has suffered, continues to suffer, and probably will suffer in the future, severe emotional distress.

Count VI
Civil Conspiracy
(Defendants Trogisch, Eaves, Ervin, and Doe)

105.     Plaintiff restates paragraphs one through 104 as if fully repeated here.

106.     The continuous and persistent course of defendants' intentional wrongful conduct establishes that the entire course of conduct was a single continuing action.

107.     Wrongful acts alleged herein were overt acts of two or more defendants in furtherance of the common goal of undermining plaintiff's report as untrue and having been motivated by racial animus.  The facts alleged constitute a civil conspiracy.

108.     Because plaintiff's' damages are the reasonably foreseeable, necessary or natural consequences of the conspiracy, each member of that conspiracy is liable for plaintiffs' damages simply by virtue of his or her participation in that conspiracy.

109.     Each defendant designated herein is responsible in some way for overt acts of his or her fellow conspirators.  Accordingly, each allegation against an individual named defendant should be read to be made against all defendants, and all defendants are jointly and severally liable for all of plaintiffs' compensatory damages.

WHEREFORE, plaintiff J.H.C. respectfully prays:

I.      That the Court schedule an evidentiary hearing to adjudicate the equitable relief sought, to be held prior to the start of the DCPS 2020-21 school year, and to thereafter order Defendant District of Columbia to admit Plaintiff into the freshman class at School Without Walls High School.

II.     That judgment be entered in Plaintiff's favor:
        A.      Against all Defendants, jointly and severally, compensatory damages in the amount of $100,000;  and
        B.      Against each Defendant, separately, punitive damages in the amount of $100,000.

III.    That the Court:
        A.      Award plaintiff reasonable attorney's fees and other costs associated with the prosecution of this action; and
        B.      Grant such other and further relief that the Court deems just and proper.

PLAINTIFF DEMANDS TRIAL BY JURY.


DATE: May 27, 2020.

                        Respectfully submitted,


                        _____/s/_____
                        John H. Clarke   Bar No. 388599
                        1629 K Street, NW
                        Suite 300
                        Washington, DC  20006
                        (202) 344-0776
                        johnhclarke@earthlink.net

Law Office
**John H. Clarke**
1629 K Street, NW
Suite 300
Washington, DC  20006

**(202) 344-0776**

John@JohnHClarkeLaw.com

Also Admitted in Virginia
and Maryland

FAX:  (202) 332-3030

February 10, 2020

<u>By email scott.barash@k12.dc.gov</u>
D. Scott Barash, Esquire
  General Counsel
District of Columbia Public Schools

<u>By email quinne.harris/lindsey@k12.dc.gov</u>
Quinne Harris-Lindsey, Esquire
  Deputy General Counsel
District of Columbia Public Schools

<u>By email richard.trogisch@k12.dc.gov</u>
Richard Trogish, Principal
School Without Walls at Francis Stevens
425 N Street, NW
Washington, DC  20037

<u>By email sileaneaves@k12.dc.gov</u>
Ms. Silean Eaves, Assistant Principal
School Without Walls at Francis Stevens
425 N Street, NW
Washington, DC  20037

   Re:  █████ ████
       <u>Racism charges at School Without Walls at Francis Stevens</u>

Dear Mr. Barash, Ms. Harris-Lindsey, Mr. Trogish, and Ms. Eaves:

  On Friday morning, February 6, Mr. Trogish called me and told me that he would be conducting two separate investigations, one into the conduct of theater teacher Ms. Naelis Ervin, and one into the conduct of my son, █████ Ms. Ervin's matter regards reports of threatening behavior toward students, and █████ is in response to a written complaint from a parent reporting that his or her child had recounted that █████ had regularly used the "n word," had said that "slavery is the best thing that ever happened to this country," and remarked that some of his African-American classmates that they "look like monkeys."

████ **Exhibit 1**

Both matters are serious.  But they are not "separate."  Mr. Trogish and Ms. Eaves, kindly let me know if you believe that there are any factual errors in the following account of the events of Tuesday February 4, Thursday, February 6, and Friday, February 7.

———————————————

On Tuesday, Ms. Ervin had her the class rehearse a skit about instances of the use of "blackface."  Ms. Ervin gave █████ a friend of █████ a scarf to wear. █████ remarked to █████ "You look very woke." A few minutes later, Ms. Ervin stopped the rehearsal and said, "I need to remember that I am a teacher first." The balance of the exchange went something like this.

Ms. Ervin:       █████ What makes you think it's okay to say what you said
                 to █████ What did you say to █████
    █████        I said '█████ you look very woke."
Ms. Ervin:       Why did you say that to █████ Was it because he was
                 sitting next to two black people?
    █████        No.
Ms. Ervin:       Really?  Well then what was it?
    █████        Well like a person who cares a lot about being politically
                 correct, uh, uh, and like...

After Ms. Irvin berated █████ some more, █████ read the definition aloud. Ms. Ervin repeated the definition.

Ms. Ervin:       Alert to injustice in society, especially racism. (Emphasis on
                 racism).  I'm alert to injustice in society especially racism.  I am
                 very woke.  Now next time you should know what a word
                 means before you call someone that!  (To █████ I'm so sorry
                 that he said that to you.  (To the class) Racist rhetoric will not
                 be tolerated.

On Thursday, February 6, the substitute teacher in Ms. Ervin's class had the children play the game "telephone."  The phrase went around, █████ said to his immediate neighbor, "Iraq is doomed," and the last person, revealed that the phrase had morphed into '█████ is woke." Recalling Tuesday, █████ found it very funny and started laughing, along with others.  Shortly thereafter five or six girls started jumping around and yelling at █████ █████ █████ █████ and █████ among others. At one point, the girls yelled at █████ that it wasn't funny and to stop laughing. █████ stopped laughing, but others did not. █████ laughed some more, perhaps the result of its contagious nature.

Later in the day, Ms. Irvin encountered ▇▇▇ in the hallway, angrily pulled him aside, and asked him and the other eighth graders present what had happened earlier in the day with the substitute teacher. Upon being informed, Ms. Irvin said that if something like this happened again she would "give everyone zero's for the rest of the advisory," and, while looking at ▇▇▇ Ezikiel, and ▇▇▇ said that if she heard any similar statements or comments she would "call the police for hate speech," and have the event placed on the students' "permanent records."

After scolding the group some more, Ms. Irvin said to ▇▇▇ that she was extremely disappointed for letting his classmates "say racist things." She continued, "You can't let them do that." She also said, "I'm doing this because you're a brown, black body," and something like, "Next time I will slap the sense into you." And she said, "Don't even try to do anything because I know the DCPS handbook inside and out." Then, reacting to ▇▇▇ response, she said, "Don't roll your eyes at me ever again or I will knock your teeth out."

Shortly after witnessing the threats, ▇▇▇ inquired in the School's office and asked whether teachers were permitted to threaten students. Another administrator asked what happened, and ▇▇▇ relayed the threats made to ▇▇▇ and provided five names of witnesses to the incident. Later in the day, ▇▇▇ told ▇▇▇ that he had reported Ms. Irvin. ▇▇▇ approved, and the two decided to return to the School's office at dismissal time to report it again.

Another classmate witness, ▇▇▇ joined ▇▇▇ and ▇▇▇ in the office after school to report the aforementioned threats as well as some others. They told Mr. Trogish and Ms. Young about what happened, and Mr. Trogish instructed them to reduce their accounts to writing. They all did, and submitted them Friday morning. Copies of all three accounts are attached.

On Friday, February 7, shortly at approximately 9:10 a.m., ▇▇▇ was summoned to the office, where ▇▇▇ and ▇▇▇ were waiting, in the outer office. At around 9:40, Ms. Vest said these are serious allegations and to remember to tell the truth. Of course, the three thought that the inquiry was about Ms. Irvin. "That gave me confidence because we were telling the truth and I reminded everyone to stick to the truth," in ▇▇▇ words.

At around 11:00, the first interrogation, of ▇▇▇ began. Present for all interrogations were four administrations, Principal Richard Trogish, Assistant Principal Silean Eaves, Ms. Shanna Young, and Ms. Stephanie Beer. Ms. Eaves typed notes, and Ms. Young wrote onto a notepad. ▇▇▇ writes, '▇▇▇ told me that they called him in there to call him a racist and call us racists. He told me that they

4

specifically referred to me as a racist, and asked him "why are you lying?" Throughout the interrogation, the questioners pressured ████ to incriminate himself, ████ and ████ as racists.  They asked, over and over again, whether he was aware that his classmates think he's a racist, why he thinks they may have said that, and why he would associate with ████ the racist.  The interrogators claimed that his answers were "fiction."

And they queried him about his having sketched a drawing of Martin Luther King, Jr., with big ears.  Ms. Young declared that she was "personally offended" by the drawing.  (████████ father saw the drawing and thought the allegation was silly.)

"Did ████ and ████ pressure you to write what you wrote?" Mr. Trogish asked.  "Why are you protecting racists?"  Apparently dissatisfied with his denials, Mr. Trogish threatened to expel ████   But, he continued, if ████ would cooperate, things would go easier on him.

It lasted about an hour.

████ was next.  This confrontation lasted just under an hour.  The subject of Ms. Irvin's threats were discussed for less than five minutes, just like ████ interrogation.  ████ was charged with having called the girls who were upset over the telephone game's end-product, '████ is woke," as having "looked like monkeys."  He repeatedly explained that he said they were "acting like monkeys."  In ████ view, the statement "looked like monkeys" would have been racist, but "acting like monkeys" is not.  In any event, he explained, he did not mean it in any way to be racist, and he had already explained that to the girls, and had apologized to them.  His account of having apologized was challenged.

He too was repeatedly confronted with the claim that his friends call him racist, and asked to explain why.

████ was next.  It began around 1:00 p.m., and lasted around an hour.  It was traumatic.   Parts of that exchange went something like this.

Mr. Trogish:   Well your friends say "yeah that's just ████ he's racist."  A friend of yours said "well one time he said something racist and I wanted to punch him right in the face, but I didn't because that's not the right thing to do."  Your own friends are saying that they want to punch you because your being racist.

██████          (Crying)  One of my friends said that?  Well don't you think that if my friends thought I was a racist they wouldn't want to be friends with me?

Ms. Eaves:      Well I disagree, I think they would just accept you're a racist and try to look past it.

Mr. Trogish:    One of them even said ██████ that said "slavery was the best thing to happen to America" and that we should "bring it back."  ██████ also called black girls "monkeys and says nigger all the time."

██████          (Crying)  And you're sure that it was one of my friends?

Mr. Trogish:    Well I can't really disclose that information.

Mr. Trogish:    Are you saying that you didn't say any of this?

██████          (Crying) Yes.

Mr. Trogish:    So why do you think they said this?

██████          (Crying) Maybe it's because they don't like me...

Mr. Trogish:    Let me grab the complaint here.  I'm showing this to you because you need to see it, not to hurt you.

██████          Okay.

Mr. Trogish:    This was filed by a parent.  "My child has brought to my attention that ██████ ████ has said such words and phrases as 'slavery was the best thing to happen to America,' 'We should bring Slavery Back,' says 'nigger' all the time, laughed at a racially charged statement about being woke, and called some African American students monkeys.  I don't feel that my child is safe around him.

Ms. Young:      So you're making it so they don't feel safe around you.

Ms. Eaves:      So you see that you laughing that ██████ is woke was racist.

| | |
|---|---|
| Mr. Trogish: | Did you ever say that fade to black is bad or that we spend too much time on black history? |
| ███ | No. I might have said that we don't spend enough time on some important things. |
| Mr. Trogish: | What do you mean? |
| ███ | Well we didn't go over a single word of the constitution till eighth grade. |
| Mr. Trogish: | We are also worried about your safety, we don't want you to be hurt, beat up, or jumped. For your safety, we might need to see if you need to go to another school. |

———————————————

I appreciate Mr. Trogish's quick reaction to the charges, and for letting me know within hours of his receipt of the parents' complaint. And I applaud his seeming willingness to lay down the law that the conduct alleged absolutely will not be tolerated. But I cannot have confidence in his approach in determining the facts. During our short conversation on Friday morning, he presented the matter to me as if it were fact. Not believing the classmate's account, I asked whether he had corroboration, and he responded, "Not yet."

A complete investigation would include separate interviews of all witnesses to the charges of the use of the n-word, as well as to the slavery remark—the same procedure employed for the interviews of ████ ████ and ████ These witnesses can be quizzed on the particulars of the statements—where each occurred, what was said exactly, the catalyst for the statement (what was said immediately prior), who heard it, what did the interviewee do or say in response, what did the other witnesses do or say in response, did the interviewee tell anyone and if so who, and those accounts should be corroborated via inquiries to any such recipients. And class schedules should be reviewed to corroborate the parties' locations when each statement is said to have been made. All witness statements should be compared to each other, just as should have been done using the extensive notes taken during Friday's interrogations of ████ ████ and ████

Additionally, Ms. Ervin's statements to Mr. Trogish shortly before the interrogations began (whatever she said) may need to be corroborated via interviews with students in the class.



The probe may also seek the accounts of ▆▆▆▆ friends. His best friend from Kindergarten through the Third grade is ▆▆▆ ▆▆▆ Currently his closest black friends are ▆▆▆▆▆▆, ▆▆▆▆▆▆▆▆, ▆▆▆ ▆▆▆ ▆▆▆▆▆▆, and ▆▆▆ ▆▆ If the fact finder would question whether ▆▆ may be more candid about his "racist" leanings to his white friends, interview ▆▆ ▆▆ ▆▆ ▆▆ ▆▆ ▆▆ ▆▆ and ▆▆ ▆▆

I for one have never heard ▆▆▆ make any remark that could possibly be interpreted as racist or disparaging regarding any minority. Hence my initial question to Mr. Trogish of whether there had been any corroboration, a question which has not yet been answered.

Here, the chronology of these matters begs scrutiny. Ms. Ervin threatened students with bodily harm, the genesis of which is her mistaken belief that the students had engaged in racist behavior. On Thursday, three students complained to the administration about the threats. They are told to put it in writing. They did, and provided the accounts the next day, Friday, at which time the administration wrongfully accused the three, and only those three, of racist misconduct. The school detained the students for up to five hours, during which time it surprised each with charges of racism in separate, hours-long interrogations, employing such tactics as falsely reporting to each that their friends had described them as racist and asking them to explain, repeatedly, and offering to plea bargain to avoid suspension if one would inculpate the others. The untoward appearance of these events is not helped by the fact that Ms. Eaves, an accuser and second-in-command at the school, is Ms. Ervin's mother.

When Mr. Trogish responded "not yet" to my question of whether he had obtained corroboration, at 10:35 Friday morning, ▆▆▆ ▆▆ and ▆▆▆ were in the outer office, waiting, they all thought, to be interviewed regarding Ms. Ervin's misconduct. Knowing that the charge of ▆▆▆ having made the "monkeys" comment was false from his interview with Ms. Ervin that morning, Mr. Trogish proceeded as if the other two charges had been established as fact, with no corroboration whatsoever. Mr. Trogish likely assumed that the student would not allege such a patently verifiable allegation—that ▆▆▆ regularly used the word "nigger"—unless it was true. If so, he was wrong.

I have heard Mr. Trogish speak in public, attended a meeting with him, and conversed with him a few times. We got along fine, and I liked him. But his approach in this matter does not engender confidence. One reason that I have included the DCPS Office of General Counsel lawyers as recipients of this letter is that I am requesting that it consider sending someone over to the school to investigate. The conduct of the current investigators in this case is among the issues to be resolved, so an independent fact finder would seem appropriate.

██████ should not have laughed when some of his classmates became upset over the use of the word "woke," particularly since the offended students thought that it was being used as racial slur, having been so misinformed by Ms. Irvin. That reaction was a thoughtless mistake, only. (I am still perplexed how Ms. Irvin, Mr. Trogish, and Ms. Eaves conclude that saying someone looks woke, or alert to injustice in society, is racist.)

In any event, I am confident that any objective review of the evidence will reveal that ██████ is not even slightly racist, he has never championed slavery, and he has *never* used the term nigger. Thus, I am not in the slightest bit concerned whether ██████ will be exonerated of these false, and despicable, charges.

And I am unconcerned with other aspects of the matter. I do not particularly care whether the reporting student is disciplined for his or her outrageous slander. I am unconcerned whether remedial measures are taken to prevent future misconduct by Ms. Irvin. I don't even care if she continues to threaten students. I don't care if racism at the school is real or merely perceived. And I don't care about the chilling effect that the School's actions might have on the likelihood of future reports by students of teacher misconduct.

What is so disastrous here is ██████ exposure to being denied admission to School Without Wall High School. In writing my letter to the Mayor in 2012 in support of the merger of Walls and Francis Stevens, I researched the School. Since Walls scrutinizes grades earned beginning the fourth quarter of the seventh grade, since then I have kept abreast of ██████ homework and drilled into him the importance of good grades in those quarters. I receive an email from Aspen every time ██████ receives below an A on any test or homework, we regularly review together his grades on Aspen, and I have consulted several times about his prospects for admission to Walls with his English teacher Mr. Fehlinger. So, after ten years at the school, with an excellent chance of acceptance into the feeder, the day before he takes the entrance exam for the High School, ██████ is wrongfully accused of being a racist, spewing racial epithets, and threatened with expulsion. ██████ has also applied to Walls.

And there is another quite troubling aspect of the charges—damage to reputation. I am open to any suggestions on how to ameliorate the damage to ██████ reputation. The sooner action is taken the better. The institutional rumor-mill is already quite active. It's only Monday and scores of people already know that ██████ has been charged with being a racist. On Friday Ms. Ervin told her entire afternoon class that ██████ ██████ and ██████ are responsible for her probably getting fired, and that all three of them are against the school's celebration of Black History Month.

While I am aware that the school is obligated to withhold the identity of the reporting student and his or her parents on privacy grounds, at least for now, due process mandates that the accused know the allegations against him.  So, please provide me with a copy of the parent's email, with all identifying information redacted.  And, going forward, since all documentation of both matters may at some point be subject to court-ordered disclosure, all relevant records should be kept complete.

I look forward to speaking with a lawyer from the DCPS Office of General Counsel.

Sincerely,

/s/
John H. Clarke

Enclosures

Dear SWWFS,

As a student at your school I do not feel safe in the theater class any more because of the many threats that were told to me and my classmates by the teacher. So How it started was that on Tuesday ▆ said to ▆ are you woke and Ms Ervin happened to hear what he said and got pretty pissed off. Then she started to say stuff about how ▆ was being racist and asked, "did you say that because ▆ is in between two black people." ▆ said he did not mean it that way but she didn't believe him and continued with a lot more accusation. Then on Thursday we were playing telephone with the substitute and so when that was happening a student changed it to I am woke. After that was passed on to the end, almost all the girls jumped up getting mad at ▆ even though ▆ did not say that. Then they started getting loud and started cursing at ▆ but I don't blame them because that was not right and very unethical even though it was not ▆ who said it that time. But what I did was stand between them and ▆ cause it was getting very intense. Then when we were going down the stairs to go to the auditorium I told the girls that we were not laughing at the racist comment but at you, "How they were jumping around like monkeys," but right after I realized what I said was not right in that situation. I said sorry and that I didn't mean it in that racist way and that I meant it in a way off like very jumpy and moving around too much. Also I am black so I know of all those racist comments that were directed to our kind so I would never mean it in that way. Then when it was lunch time for the first lunch I was in the gym and was called out to go upstairs to talk to Ms Ervin who just arrived at the school. There was a group of people outside of the class who Ms Ervin was talking to so I joined the circle. She was very loud and was asking me what I thought and asked what racist stuff was I saying and I said what because I forgot what happened in the stairs because I thought we already resolved that. Then she said do you guys have anything to say and I asked what did I say so racist and Skyler said what I said when we were going down the stairs. I told Ms Ervin that I didn't mean it in that way and she said, "yeah right you know what you meant," and I rolled my eyes and she said don't roll your eyes at me ever again or I will knock your teeth out in like a threat at least that is how it felt. She also said something about slapping us. Then when she dismissed everyone and she held me literally and said wait. She asked, "do you let them talk to you like that in a racist way" (them as in white people) and I said no then she said that you should not support it and I said I don't. Then she went in the class and said don't allow anyone to say the n word and said I wish any one would say the n word around me I will knock their teeth out. Then I went back to pe and here we are now.

Sincerely, ▆ ▆

I was told to give a written explanation of what events occurred and everything I knew about them, and how I felt. To the best of my knowledge and memory all of this is true.

On February 4th, I went to school like I always do. I walked inside the school, entered the auditorium, and spoke to my friends until our teacher came down. Ms. Naelis Ervin came down and picked us up and brought us to the classroom. We put our things away, organized chairs and sat down. She had us acting out a TMZ imitation skit about cases of blackface. We were wearing t-shirts over our uniform to appear as normal people. █████ a friend of mine, was given a scarf to wear over his blue shirt. We acted out our skit and another classmate, ███████ stopped it to fix her hair. I said "█████ He responded with "Yeah". I said "You look very woke". ████ could not hear me with all the chitchatter going on and so he said "Huh?". I then repeated myself two or three more times. Unknown to me at the time was that Ms. Ervin heard all of this. I just thought "ah forget it" and we continued the rehearsal.

We continued it but, about half way through Ms. Ervin stopped it to say,  "I need to remember that I am a teacher first.", as if to remind her to constrain herself. She then also said █████ What makes you think it's ok to say what you said to █████ "What?" I responded in a confused tone. "What did you say to █████?" she asked. I responded with " I said █████ you look very woke' ". "Why did you say that to █████ she said. "Uh..." I muttered. She then cut me off with "Was it because he was sitting next to two black people?". Which I believe she said to paint me as a racist. I said, "No".  "Really? Well then what was it?" she said. You have to understand when I said "woke" I meant it as the urban dictionary definition of woke being, "The act of being very pretentious about how much you care about a social issue". I have seen many videos of SJWs (social justice warriors) furiously yelling slogans and accusing with no evidence, very civil and polite citizens.

 I said "well he looked like what i imagine a really woke person looking like". Then she said "And what does woke mean to you!?". Startled and experiencing difficulty remembering the definition I said, "Well like a person who cares alot about being politically correct, uh..., uh... and like". She was furious and yelling.  The whole time my heart was thumping and racing . A friend of mine who was right next to me later described me as "looking like I was about to cry" and "scared". Right when she looked like she was beginning to calm down, █████ Do you want me to tell you the oxford definition of woke?". Ms. Ervin declined. A second later she changed her mind █████████ read it outloud. He read out "Alert to injustice in society, especially racism". Ms. Ervin then repeated him "Alert to injustice in society, especially racism" , with a strong emphasis on "especially racism". She said "I'm alert to injustice is society especially racism." and "I am very woke". She then resumed yelling at me at the top of her lungs, saying something like "now next time you should know what a word means before you call someone that". Then she walked over to █████ and said something along the lines of "I'm so sorry that he said that to you" still hostile. She then backed up, faced the whole class and said "Racist rhetoric will not be tolerated". She then sat down in her chair and resumed the class.

I was incredibly upset and angered inside from her implied accusations at that I am racist. She spent a lot of the class yelling at me unprovoked because I thought ██████ was dressed like a dumb rude college student. That was Tuesday.

On Thursday there was a sub. Precisely after engaging in SWW test preparations, in Mr.Felinger's room me and Caio walked to Ms.Ervin's room. We went there and saw the substitute teacher, who was unaware that she was supposed to grab the class from the auditorium. She was told of the procedure and we followed her down to pick up the class. Upon the class in the classroom I put my things away and grabbed a seat as usual. Three people the began leading everyone in reciting Ms. Ervin's mantra. After that ██████ tried to get everyone to perform the TMZ skit already filmed two days prior. Someone suggested telephone and then the substitute teacher said we were gonna play telephone. When the word got to the person beside me I heard the word "My"____ being shared to them and then the person next to me shared "Iraq is doomed". I assumed I just saw it being changed and said "My Iraq is doomed". Apparently ██████ changed it to "████ woke up". Then after it went the rest of the way around it was revealed to have become "████ is woke". Hearing this I found it very funny and started laughing. Shortly after this some 5 or 6 girls started yelling at people and jumping around. They were very angry that the telephone phrase became "████ is woke". They yelled at ████████ myself, ████ and I believe others as well. They harassed the new student, ████ telling him that he was an instigator. I told him something like "They don't matter" or " It doesn't matter" to try to get him to ignore them. Which one of them overheard and then they became angrier. They were yelling alot and sometimes jumping and making hand movements. I found all of this particularly funny and laughed alot. This made them angry.

Eventually ████ got them to calm down and then everyone went to the Auditorium for the Trivia event. Sometime while in Ms. Ervin's room I lost something of mine. During lunch I came up to try to study with Ms. Sunny Chang for the Walls test. On my way I was going to stop by Ms. Ervin's class to try to find the lost item. When leaving the stairwell I saw Ms. Ervin lecturing a group of 8th graders. Not wanting to interrupt I tried to walk past but upon seeing me Ms. Ervin angrily pulled me aside. She asked everyone there what happened earlier with the substitute. She said that if she got angry about something like this again she would "give everyone zero's for the rest of the advisory" she also said that if any similar statements or comments she would "call the police for hate speech" She said we would have these events be added to our permanent records. I seriously felt scared that she would change our permanent records and change our grades to whatever she feels like.

Shortly after those threats she scolded everyone some more and then turned to ████ She said that she was extremely disappointed for letting us "say racist things. You can't let them do that. I'm doing this because you're a brown, black body". Then she said something like " Next time I will slap the sense into you". After we went inside she threatened him again saying " Don't roll your eyes at me ever again or I will knock your teeth out". At a different time she threatened to stab a child with scissors while making a stabbing motion.

# Incident

Dear Principal,

     This incident today has affected many students. Many students in this class have felt harassed by the school theater teacher. According to students the school theater teacher has been over exaggerating the term "racist" and has been throwing this term out of proportion. This teacher has threatened and I quote "I will knock your teeth out". This teacher has also made many students feel threatened to come to class.

     The school theater teacher has mistaken the word "woke" to be a racially offensive term. She has threatened "file a police report for hate crimes." This teacher on many occasions has threatened the whole class with dropping their grades to an F for anger towards certain students.This teacher will randomly have outbursts in the classroom. This teacher has said "that's not your right and who do you think you are" for a student practicing their first amendment right and then proceeded to kick the student out the classroom.

     This teacher does not do her research and jumps straight to conclusion and portrays something that was not intended to be hate speech a form of hate speech. This teacher does not flat out call students racist but instead uses the term "microaggression". Another example of this is when a student who was bad at art singled out a drawing of a historical figure among other drawings.This teacher failed to mention that the other figures looked the same and only picked out the African American.

     She even proceeded to say " if you draw another picture i'll make sure you'll never hold a pencil again".   When the teacher wasn't physically present today the students were playing telephone and the message passed on was " ▮▮▮▮ is woke" and people took this as a racially insensitive term. This teacher then proceeded to call the students up to lunch and proceeded to yell at him which intimidated the student. Another prime example of this is when a student proceeded to say to a group of African Americans " you jumping around like a bunch of monkeys" which came out as a racially offensive term even though he did not intend for it to be that way. The student who said this was also of African descent. This teacher made the students feel very uncomfortable. Many students have felt she has been aggressive towards  individuals. This teacher all in all has been aggressive to the point where students are intimidated to the point of oppression. She has threatened to slap this individual.

- Anonymous



DISTRICT OF COLUMBIA
PUBLIC SCHOOLS
Office of the Chief Operating Officer

<u>BY EMAIL AND FIRST-CLASS MAIL</u>

April 29, 2020

Mr. John Clarke
2424 Pennsylvania Ave NW, Apt 410
Washington, DC 20037
johnhclarke@earthlink.net

RE:  Letter of Response for Grievance #3686 filed on February 10, 2020

Dear Mr. Clarke:

In accordance with Chapter 24 Subtitle 5-B, Section 2405 of the District of Columbia Municipal
Regulations and Chapter 4, Subtitle 5-E, Section 405 of the District of Columbia Municipal Regulations of
the District of Columbia Municipal Regulations, D.C. Public Schools (DCPS) Comprehensive Alternative
Resolution and Equity (CARE) team has completed its investigation of the above referenced written
grievance.

**Grievance Issues**

Based on a review of the information provided, the grievance raised the following issues under the
jurisdiction of this office:

1. **5-B DCMR Subtitle 2405.1(d)** & **2405.1(e)** where it is alleged that there has been a violation of
   Title VI of the Civil Rights Act of 1964 which prohibits discrimination on the basis of race, color
   and national origin; and the D.C. Human Rights Act of 1977 which, in part, prohibits
   discrimination on the basis of race and color.
   a. The grievance alleges that School Without Walls at Francis-Stevens (SWWFS) student,
      J.C., has made racist comments to and about his classmates including, but not limited to,
      using the "N-word," stating that slavery was good for America's economy and that it
      should be brought back, and stating another student was "woke."[1]

**Investigative Procedure**

The investigation included interviews with the following individuals:[2]

1. J.C., Student

---

[1]
 As defined by Merriam-Webster: aware of and actively attentive to important facts and issues (especially issues of
racial and social justice)
[2] There was a total of 15 students interviewed.

2. J.C., Student J.C.'s guardian
3. Student A
4. Student A's guardian
5. Student B
6. Student B's guardian
7. Student C
8. Student C's guardian
9. Student D
10. Student E
11. Student E's guardian
12. Student F
13. Student G
14. Student H
15. Student I
16. Student J
17. Student K
18. Student L
19. Student M
20. Student N
21. R.T., Principal at SWWFS
22. S.Y., Associate Principal at SWWFS
23. S.E., Assistant Principal at SWWFS
24. N.E., Teacher at SWWFS
25. C.O., Teacher at SWWFS

The investigation also included review of the following documents which were either submitted by the complainant, submitted by the school, or accessible via DCPS data systems:

1. Letter from Parent of J.C. to DCPS dated February 10, 2020

**General Findings of Fact**

The following findings of fact resulted from the investigation:

1. On February 4, 2020, Teacher N.E.'s theatre class was conducting a lesson unit entitled "Culture Shock", which is a unit designed to analyze how different groups of people are presented in the media. During the class discussion, Student E was sitting next to two students of color. Student J.C. stated that Student E looked "woke." Use of this term was corroborated by thirteen of the students interviewed.
2. One student stated they took slight offense to the word "woke" being used after realizing what it meant; however, they did not believe that J.C. meant it as a racist comment.
3. On February 6, 2020, during N.E.'s class, students participated in a game called "Telephone." This was corroborated by at least nine of the students interviewed. The final message at the end

of the game was "███ is woke." This caused at least three of the Black students to become upset.

4. At least three students stated J.C. made comments along the lines of "slavery was good for America and should be brought back." All three students stated this happened in Teacher E.F.'s English Language Arts classroom.

5. Teacher C.O. also stated J.C. has made a comment similar to "slavery was good for America" during class, which prompted a class discussion about slavery being a human rights issue.

6. One student stated that other students in addition to J.C. have stated that slavery was good for the beginning of America's economy; however, they prefaced that the other students have stated that slavery, in and of itself, was not right. At least four students state they had not heard J.C. make comments regarding slavery being good for America's economy. J.C. denies making this statement.

7. At least two students stated they have heard J.C. make comments along the lines of "Trayvon Martin was a disappointment" or "Trayvon Martin was a thug and that he should have been shot."

8. One student stated J.C. has used the "N-word" on multiple occasions. At least ten students stated they have not personally heard J.C. use the "N-word." J.C. stated he has never used the "N-word."

9. At least two students stated that J.C. has outwardly questioned why there is a Black History Month.

10. One student stated that J.C. has made other racially insensitive and/or offensive comments in the past and added "we let things slide." Additionally, the student stated that they "let things slide" because they have "experienced worse" behavior by other people.

**Discussion/Conclusion**

As a result of this review, DCPS has found the following:

DCPS finds that violations of **5-B DCMR Subtitle 2405.1(d)** & **2405.1(e)** are unable to be substantiated. DCPS found the reported claims to be valid and reliable; however, there are insufficient first-hand witness statements to corroborate the allegations that J.C. has consistently made racial slurs or used racially charged statements toward other individuals with the intent to create a hostile environment. J.C. also denied making some of the allegedly racially insensitive comments. While the comments that were made by J.C. were inappropriate, there is insufficient information to conclude that the behaviors were severe or pervasive enough to be a violation of the regulatory provisions cited above. Additionally, DCPS does not have direct evidence to determine that the comments made were done to intentionally discriminate.

Although DCPS could not substantiate regulatory violations, DCPS takes these issues extremely seriously and does not tolerate racially inappropriate behavior of any kind in its schools. DCPS will implement a progressive discipline approach under DCMR Chapter 25 §B 2502.1(c)(i)(3) if we find future evidence of J.C. communicating slurs based on actual or perceived race or color.

4

Additionally, in an effort to address what appear to be some issues of racial intolerance or hostility at SWWFS, DCPS has taken or will take the following actions to address this matter:

1. On February 13, 2020, SWWFS staff facilitated a restorative circle with Teacher N.E.'s 1st period class.
2. Before the start of school year 2020-21 student J.C. will participate in a reflective social emotional activity (Think, Feel, Choose, Do) with a designated member of the school staff.
3. Before the start of school year 2020-21, the entire SWWFS administration, teachers, and staff will participate in a Title VI training conducted by the DCPS CARE team.
4. The entire 8th grade class will participate in a virtual race and culture training conducted by the DCPS Central Office before the end of SY 19-20.
5. Upon receipt of consent from the parent/guardian, Student A will receive 10 hours of counseling from the school social worker to be completed by December 31, 2020.
6. Upon receipt of consent from the parent/guardian, Student B will receive 10 hours of counseling from the school social worker to be completed by December 31, 2020.
7. Upon receipt of consent from the parent/guardian, Student D will receive 10 hours of counseling from the school social worker to be completed by December 31, 2020.
8. Upon receipt of consent from the parent/guardian, Student N will receive 10 hours of counseling from the school social worker to be completed by December 31, 2020.

As a party to this matter, if you are not satisfied with the outcome, you have the right to file an appeal. Appeals must be submitted in writing and received within 10 calendar days of receipt of this notice. Please submit appeal requests to the Office of Integrity via U.S. Postal Mail to 1200 First St., NE, 10th Floor; Attn: CIO or via email at dcps.cio@k12.dc.gov. You may also contact the U.S. Department of Education, Office for Civil Rights (1-800-421-3481) to report any educational discrimination.

If you have further questions, please do not hesitate to contact us at dcps.care@k12.dc.gov or 202.442.5405.

Sincerely,

Anitra Allen, Director, CARE

Cc: Principal
Instructional Superintendent



DISTRICT OF COLUMBIA
PUBLIC SCHOOLS
Office of the Chief Operating Officer

<u>VIA EMAIL AND REGULAR MAIL</u>

April 29, 2020

John Clarke
2424 Pennsylvania Ave. NW, Apt. 410
Washington, DC 20037
johnhclarke@earthlink.net

RE: Letter of Response for Grievance #3682 filed on February 10, 2020

Dear Mr. Clarke,

In accordance with Chapter 24 Subtitle 5-B, Section 2405 of the District of Columbia Municipal Regulations, D.C. Public Schools (DCPS) Comprehensive Alternative Resolution and Equity (CARE) team has completed its review of the above referenced written grievance.

**Grievance Issues**

Based on a review of the information provided, the written grievance raised the following issue under the jurisdiction of this office:

1. **24 DCMR Subtitle 5-B, Section 2405.2(c): Where it is alleged that any student or group of students is being subjected to an arbitrary or unreasonable regulation, procedure, or standard of conduct**

It is alleged that on February 6, 2020, School Without Walls at Francis-Stevens Teacher N.E. made threats to Student J.C., Student B, and Student C, including, "next time I will slap some sense into you" and "don't roll your eyes at me again or I'll knock your teeth out" when approaching the students about allegedly making racist comments. Additionally, it is alleged that Principal R.T. used questionable methods to investigate the alleged comments, such as interrogating Student J.C., Student B, and Student C for up to five hours, falsely reporting that the students' peers described them as racist, threatening to expel, and failing to interview witnesses.

**Conclusion**

Exhibit 3

DCPS has taken the following action as a result of these allegations:

1. A referral was sent to Labor Management and Employee Relations (LMER) on February 28, 2020, for the review and investigation of these allegations. Their findings and any disciplinary actions will remain confidential due to employee privacy guidelines.

DCPS will review all available information related to this incident to determine whether employee misconduct has occurred. Although DCPS appreciates your need to know the results of its review, we are unable to share the results of personnel investigations, including any employee disciplinary action that may have been taken, because this information is contained in confidential employee records.

If you are not satisfied with the outcome, you have the right to file an appeal. Appeals must be submitted in writing and received within 10 calendar days of receipt of this notice. Please submit appeal requests to the Office of Integrity via U.S. Postal Mail to 1200 First St., NE, 11th Floor, Attn: CIO or via email at dcps.cio@k12.dc.gov. You may also contact the U.S. Department of Education, Office for Civil Rights (1-800-421-3481) to report any educational discrimination.

If you have further questions, please do not hesitate to contact us at dcps.care@k12.dc.gov or 202.442.5405.

Sincerely,

Anitra Allen-King, Director CARE

Cc:  Instructional Superintendent

Law Office
## John H. Clarke
1629 K Street, NW
Suite 300
Washington, DC  20006

**(202) 344-0776**

John@JohnHClarkeLaw.com

Also Admitted in Virginia
and Maryland

FAX:  (202) 332-3030

May 6, 2020

By email dcps.care@k12.dc.gov
cc:    richard.trogisch@k12.dc.gov, jerry.jellig@k12.dc.gov,
      Eric.Fehlinger@k12.dc.gov, Cicely.Ogunshakin@k12.dc.gov

Comprehensive Alternative Resolution & Equity (CARE) Team
Office of the Chief Operating Officer
Innovation and Systems Improvement
District of Columbia Public Schools
1200 First Street, NE
First Floor
Washington, DC  20002

      Re:  <u>Appeal of Response to Grievance No. 3686</u>

Dear Ladies and Gentlemen:

      CARE's April 29 letter responds to a grievance of violations of Title VI of the Civil Rights Act of 1964, and the DC Human Rights Act of 1977.  However, my February 10 letter, which was the only document that investigators reviewed, alleged no violations of Title VI of the Civil Rights Act, nor of the DC Human Rights Act.  I attach a copy of that grievance.

      It alleges that the genesis of the matter was a concerted effort by a teacher, her mother, and other school personnel, to undermine, deflect attention away from, and retaliate against, three students for their submissions of written accounts regarding a black teacher's misconduct, by falsely accusing all three students of racial animus.  The grievance has nothing to do with Title VI of the Civil Rights Act, and the actions alleged do not implicate any of the DC Human Rights Act's anti-discrimination provisions.  Rather, my complaint alleges retaliation, First Amendment violations, and defamation, and is akin to a whistleblower protection grievance.

## Exhibit 4

***Investigative jurisdiction***.   CARE's statement of what it was investigating:

> The grievance alleges that School Without Walls at Francis-Stevens (SWWFS) student, J.C., has made racist comments to and about his classmates including, but not limited to, using the "N-word," stating that slavery was good for America's economy and that it should be brought back, and stating another student was "woke."

Again, this would not appear to be referring to ███████ grievance.

CARE's Report addresses five of the six charges against ██████ and concluded that all were "valid and reliable."  While the "racial slurs," were not "consistent" or "pervasive enough" to constitute a civil rights violation, "DCPS will implement a progressive discipline approach" if he does it again.  The allegations are:

    (1)    Stating that African-American classmates "look like monkeys;"
    (2)    Stating that another student looked "woke;"
    (3)    Using the "N-word;"
    (4)    Championing slavery;
    (5)    Championing Trayvon Martin's death; and
    (6)    Opposing Black History Month.
            (These last two would appear to be encompassed by the statement's "including but not limited to" language).

**(1)    African-American classmates "look like monkeys"**

My grievance recounts that on Friday morning, February 6, Principal Trogisch read to me the charges that had been emailed to him.

> On Friday morning, February 6, Mr. Trogisch called me and told me that he… had a written complaint from a parent reporting that his or her child had recounted that ██████ had regularly used the "n word," had said that "slavery is the best thing that ever happened to this country," and remarked that some of his African-American classmates that they "look like monkeys."

CARE entirely omitted from its Report the "look like monkeys" charge.  But it is relevant.

That matter was addressed in my grievance:

> ██████ was next.  This confrontation lasted just under an hour.  The subject of Ms. Ervin's threats were discussed for less than five minutes, just like ██████ interrogation.  ██████ was charged with having called the girls who were upset over the telephone game's end-product, '██████ is woke," as having "looked like monkeys."  He repeatedly explained that he said they were "acting like monkeys."  In ██████ view, the statement "looked like monkeys" would have been racist, but "acting like monkeys" is not.  In any event, he explained, he did not mean it in any way to be racist, and he had already explained that to the girls, and had apologized to them.

Mr. Trogisch instructed ██████ to put his account of threatening behavior in writing.  ██████ included:

> Then when we were going down the stairs to go to the auditorium I told the girls that we were not laughing at the racist comment but at you, "How they were jumping around like monkeys," but right after I realized what I said was not right in that situation. I said sorry and that I didn't mean it in that racist way and that I meant it in a way off like very jumpy and moving around too much.  Also I am black so I know of all those racist comments that were directed to our kind so I would never mean it in that way.

Before Mr. Trogisch commenced the surprise interrogations, he had read all three accounts of the teacher threats, including ██████  Thus, he knew that the "looked like monkeys" comment against ██████ was false, and misdirected, and that it was "acting like," not "look like."  Yet, that did not diminish his prosecution of this charge against ██████  Nor did he seem to recognize, or care, that one false charge impugns the veracity of the two others, at least where all accusations had been made by the same student.

Regarding the email, I wrote:

> While I am aware that the school is obligated to withhold the identity of the reporting student and his or her parents on privacy grounds, at least for now, due process mandates that the accused know the allegations against him.  So, please provide me with a copy of the parent's email, with all identifying information redacted.

DCPS initially agreed to provide that email, but was later changed its position.  DCPS has no basis to withhold that record, and it asserts none.

### (2)    Stating that another student looked "woke"

CARE's Report levels DCPS charges in ten, numbered, *General Findings of Fact*, all of which are, in its view, "valid and reliable."  The first two findings are accurate, but omit the most relevant reaction to the initial "woke" statement.  CARE writes:

1.   On February 4, 2020, Teacher N.E.'s theatre class was conducting a lesson unit entitled "Culture Shock", which is a unit designed to analyze how different groups of people are presented in the media. During the class discussion, Student E was sitting next to two students of color. Student J.C. stated that Student E looked "woke." Use of this term was corroborated by thirteen of the students interviewed.
2.   One student stated they took slight offense to the word "woke" being used after realizing what it meant; however, they did not believe that J.C. meant it as a racist comment.

The remark had been occasioned by ██████ wearing a scarf, indoors.  While "one student" may have taken "slight offense" over ██████ having remarked, "██████ you look very woke," as DCPS relates, it declined to reveal that Ms. Ervin was outraged.  *See* grievance:

Ms. Ervin stopped the rehearsal and said, "I need to remember that I am a teacher first."  The balance of the exchange went something like this.

| | |
|---|---|
| Ms. Ervin: | ██████ What makes you think it's okay to say what you said to ██████ What did you say to ██████ |
| ██████ | I said "██████ you look very woke." |
| Ms. Ervin: | Why did you say that to ██████ Was it because he was sitting next to two black people? |
| ██████ | No. |
| Ms. Ervin: | Really?  Well then what was it? |
| ██████ | Well like a person who cares a lot about being politically correct, uh, uh, and like… |

After Ms. Ervin berated ██████ some more, ██████ read the definition aloud.  Ms. Ervin repeated the definition.

Ms. Ervin:     Alert to injustice in society, especially racism.
               (Emphasis on racism). I'm alert to injustice in society
               especially racism.  I am very woke.  Now next time you
               should know what a word means before you call
               someone that! (To ████ I'm so sorry that he said that
               to you.  (To the class) Racist rhetoric will not be
               tolerated.

████ written account to Mr. Trogisch of the berating:

She was furious and yelling.  The whole time my heart was thumping
and racing.  A friend of mine who was right next to me later described
me as "looking like I was about to cry" and "scared."

Thus, the genesis of the belief that ████ had made a racist comment was
Ms. Ervin's indignation at what she declared to the class was "racist rhetoric."  As I
related on February 8, "I am still perplexed how Ms. Ervin, Mr. Trogisch, and Ms.
Eaves conclude that saying someone looks woke, or alert to injustice in society, is
racist."  CARE wrote, "As defined by Merriam-Webster: aware of and actively
attentive to important facts and issues (especially issues of racial and social
justice)."

But that does not respond to the question.  By what reasoning is that racist?
Media pundits use the word in a derogatory context, meaning myopic, or misguided,
or pretentious.  Progressives describe as woke Democrats who advocate social
justice issues while ignoring economic justice, while their conservative counterparts
use the term in disparaging the importance of social issues.  My inability to discern
by what theory the comment was racist implicates due process.  Again, by either its
dictionary definition, or in its conversational use, by what reasoning is saying
someone looks woke "racist rhetoric"?

In an "effort to address what appear to be some issues of racial intolerance or
hostility," CARE reports, "[o]n February 13, 2020, SWWFS staff facilitated a
restorative circle with Teacher N.E.'s 1st period class," where students were
encouraged to share their feelings about recent events beginning with ████
having used the word "woke."  ████ remained silent, on advice of counsel.  "Maybe
it was just the way he was raised," one student surmised.  Three adults in the room
and it occurred to none to raise the question of how or why "you look woke" could
possibly have been racist.

<u>Finding 3</u>
On February 6, 2020, during N.E.'s class, students participated in a game called "Telephone." This was corroborated by at least nine of the students interviewed. The final message at the end of the game was '█████ is woke." This caused at least three of the Black students to become upset.

The three girls upset by the word's resurgence had accepted Ms. Ervin's pronouncement that it was racist rhetoric.

**(3)     Use of "N-word"**

<u>Finding 8</u>
One student stated J.C. has used the "N-word" on multiple occasions. At least ten students stated they have not personally heard J.C. use the "N-word." J.C. stated he has never used the "N-word."

Here, DCPS posits that █████ used the "N-word on multiple occasions," or "regularly" according to her parent's email, to one student, but not one of their 25 classmates ever heard it, even once. The witness never told anyone until the evening of the very day that Ms. Ervin had announced to the class that █████ had uttered "racist rhetoric." This claim was in the same email that had alleged that █████ had said that his African-American classmates "look like monkeys," which had been known from the get-go to have made by █████ not █████ and actually had been "act like monkeys." And why did CARE write that the ten students had not "personally" heard █████ say it? Is it saying that any of the ten had heard from others that █████ had used this epithet?

I wrote, "Perhaps Mr. Trogisch assumed that the student would not allege such a patently verifiable allegation unless it was true... Not believing the classmate's account, I asked whether he had corroboration, and he responded, 'Not yet.'"

I for one have never heard █████ make any remark that could possibly be interpreted as racist or disparaging regarding any minority. Hence my initial question to Mr. Trogisch of whether there had been any corroboration, a question which has not yet been answered.

CARE's *General Finding of Fact* includes the answer: No corroboration whatsoever.

**(4)    Championing slavery**

<u>Finding 4</u>
At least three students stated J.C. made comments along the lines of "slavery was good for America and should be brought back." All three students stated this happened in Teacher E.F.'s English Language Arts classroom.

This is ostensibly a finding of fact.  CARE was tasked with determining what ▮▮▮▮ said.  "Made comments along the lines of" is not a fact.  It is an opinion, a characterization.  Would saying that white southern landowners prospered under slavery be "along the lines of" saying that it was good for America?  No.  Would some listeners characterize that as being along the lines of slavery was good for America?  Yes.  And what could anyone have said to advocate for bringing slavery back without uttering the words, "slavery should be brought back."  Is that what CARE alleges?  CARE finds racial animus based on the opinion of three listeners.  Again, what did ▮▮▮▮ say?

Findings 4 and 5, both of which allege championing slavery, regard two separate class discussions, in two separate classes, English and Geography.  Class discussions are group communications.  They were among 25 or so people, over half of whom CARE interviewed.  CARE reports in Finding 4, the English class discussion, that ▮▮▮▮ had said that slavery should be brought back, but only three recall it, and none of them, or anyone else, reported it, to anyone?  If I had heard anyone that I knew say something like that I would remember, and I would recall exactly what he said.  But here, according to CARE, all three witnesses recall only that ▮▮▮▮ "made comments along the lines of."  What about the teacher?  CARE did not ask Mr. Felinger.

CARE was not able to compare the specifics of one witness's account with two others, because none remember what ▮▮▮▮ said, only that his "comments were along the lines of."  Did all three remember that ▮▮▮▮ had said something "along the lines of" slavery had been "good for America," and that it "should be brought back," or do these two charges differ among the three?  Did CARE ask whether these witnesses had spoken each other about what they were to say when interviewed?

CARE wrote that "there was a total of 15 students interviewed," which it numbered at the beginning of its Response.  But it does not identify by number which witnesses it cites in any of its 10 Findings.   The largest number of corroborating witnesses in any Finding is in number 4—three students.  Findings 7 and 9 related the accounts of two students, and 6, 8, and 10 rely on one.  But CARE declines to state how many of its Findings are based on the statements made by the same witness.  Are the only accusers the "three Black students who became upset" at the "woke" comment in Ms. Ervin's class, after she had misinformed them that it was a racial slur (one of whom lied to her parent that ███ "regularly uses the N-word" and said his black classmates "look like monkeys")?  CARE should have identified its witnesses by the number it assigned to them, and disclosed the total number of accusing students.

Nor Did CARE ask whether any of these three witnesses whether they were aware that three of their classmates had visited the office twice during that school day to report Ms. Ervin's behavior, and had all been told to put it in writing.  CARE listed Ms. Ervin, Ms. Eaves, and Mr. Trogisch as among the witnesses it interviewed, but CARE's Report does not mention anything that any of them said.  When did Ms. Ervin first learn from her mother, Assistant Principal Eaves, that Mr. Trogisch had told the three reporting students to reduce their statements in writing?  Are Ms. Ervin or Ms. Eaves friends with the author of the accusing email, or friends with the parents of the other two of Finding 4's witnesses?

Nor did CARE employ even the most rudimentary investigative techniques, as I had asked:

> A complete investigation would include separate interviews of all witnesses to the charges of the use of the n-word, as well as to the slavery remark—the same procedure employed for the interviews of ███ ███ and ███   These witnesses can be quizzed on the particulars of the statements—where each occurred, what was said exactly, the catalyst for the statement (what was said immediately prior), who heard it, what did the interviewee do or say in response, what did the other witnesses do or say in response, did the interviewee tell anyone and if so who, and those accounts should be corroborated via inquiries to any such recipients...  All witness statements should be compared to each other...

And what about the second email?  Two weeks after my February 8 letter, Mr. Trogisch called me a second time, relating that he had just received another email, this one from ███ ███ parent, relating that ███ had said, verbatim,

"Slavery was good for America," to ███████ only.  Mr. Trogisch provided the email to the CARE personnel who were there that day interviewing witnesses.  So, CARE interviewed ███████ a second time.

███████ had claimed that ███████ voiced this white supremacist rhetoric to her while sitting next to him in Geography.  CARE learned that ███████ assigned seat was not at ███████ table, so this allegation had been discredited, seemingly.  But CARE omitted this charge from its Report, just like the "monkeys" allegation.  Absent word from DCPS to the contrary, I will assume that it also declines to disclose this email to me, at least until compelled by the court to do so.

CARE prefaces all is student witness numbers with the clause "at least."  This is a curious insertion in a *Finding of Fact*.  Finding 4 is "at least three students," and Findings 7 and 9 are "at least two students."  CARE interviewed each student to corroborate the charges, took notes, but does not know exactly how many of the 15 students corroborated?  Is "at least" meant to bolster its Findings?  Does "at least two" mean two?

> Finding 5
> Teacher C.O. also stated J.C. has made a comment similar to "slavery was good for America" during class, which prompted a class discussion about slavery being a human rights issue.

Regarding the class discussion in Geography, here too, of the fifteen witnesses interviewed, only Ms. Ogunshakin is said to have recalled ███████ saying that slavery was good for America, she too does not recall exactly what he said, but, rather, he "made a comment similar to."  Also, the "class discussion about slavery" was a follow-up to a homework assignment, and was not "prompted" by anything that ███████ had said.

> Finding 6
> One student stated that other students in addition to J.C. have stated that slavery was good for the beginning of America's economy; however, they prefaced that the other students have stated that slavery, in and of itself, was not right.  At least four students state they had not heard J.C. make comments regarding slavery being good for America's economy.  J.C. denies making this statement.

Finding 6 at least has a specific assertion, rather than "made comments along the lines of," or "made a comment similar to."  It relates that a group of students, ███ among them, had opined that "slavery was good for the beginning of America's economy."  But only ███ meant it to be racist, in CARE's view.  The other students, but not ███ "prefaced that... slavery, in and of itself, was not right."

And ███ did not deny making this statement because he was never asked. I listened in on his interviews and CARE did not ask any such question.

CARE interviewed 14 students besides ███  Why did it report that "at least four students state they had not heard" the comments?  Why didn't it ask the other 10?

**(5)   Championing Trayvon Martin's death**

<u>Finding 7</u>
At least two students stated they have heard J.C. make comments along the lines of "Trayvon Martin was a disappointment" or "Trayvon Martin was a thug and that he should have been shot."

Contrary to CARE's recitation, ███ remarks about the Trayvon Martin case was made in front of around 25 other students and his English teacher Eric Felinger, not "at least two students."  During that class discussion, ███ read from the police report from a book that he had been reading that he happened to have in his backpack at the time, showing that, before Martin had been shot, Zimmerman had suffered injuries, which had been sufficient to prove in his criminal trial his defense of self-defense.

███ did not say anything "along the lines of" Trayvon "was a thug and that he should have been shot."  Rather, he opined that Zimmerman had acted in self-defense.  If CARE asked the other 12 witnesses that it interviewed, or Mr. Felinger, what ███ had said during that class discussion, it did not share those results. ███ relates that he did not say that "Trayvon Martin was a disappointment," and he does not know what that statement means, or refers to.  I don't know either.

How did ███ and her two friends, feel about ███ defending Trayvon Martin's killer?  What did Ms. Ervin think when she learned of it?  Did this solidify accusing students' belief that ███ was a racist?  Did that belief influence their other allegations?  CARE made no inquiry.

**(6)       Opposition to Black History Month**

<u>Finding 9</u>
At least two students stated that J.C. has outwardly questioned why there is a Black History Month.

My letter addresses ▮▮▮▮ response to this claim during his interrogation:

| | |
|---|---|
| Mr. Trogisch: | Did you ever say that fade to black is bad or that we spend too much time on black history? |
| ▮▮▮▮ | No.  I might have said that we don't spend enough time on some important things. |
| Mr. Trogisch: | What do you mean? |
| ▮▮▮▮ | Well we didn't go over a single word of the Constitution 'till eighth grade. |

I have heard ▮▮▮▮ complain about Black History Month.  I have also heard him complain about English class, math, geography, history, art, physical education, and the dress code.  Did either of these "at least" two students believe that ▮▮▮▮ "outwardly questioning" was founded on a racial attitude, as CARE posits?  This charge is wholly founded on the notion is ▮▮▮▮ is a racist.  But he is not, contrary DCPS's official position.

<u>Finding 10</u>
One student stated that J.C. has made other racially insensitive and/or offensive comments in the past and added "we let things slide." Additionally, the student stated that they "let things slide" because they have "experienced worse" behavior by other people.

This finding of fact is devoid of facts.   "Other racially insensitive and/or offensive comments" is a characterization, only.  Once again, what did ▮▮▮▮ say that was racially insensitive, "and/or" offensive?

_____

CARE's findings of *General Finding of Fact* are not "verified and reliable." Rather, they are all false:

| | | |
|---|---|---|
| (1) | Said African-American classmates "look like monkeys" | False |
| (2) | Said that another student looked "woke" | Not racist |
| (3) | Using the "N-word" | False |
| (4) | Championing Trayvon Martin's death | False, championed Zimmerman's defense |
| (5) | Opposing Black History Month | Not racially motivated |

The remaining accusation, championing slavery, is alleged to have been made during the course of two class discussions, in separate classes, each attended by around 25 people, yet CARE could find only three students to corroborate, none of whom remember what ███ said, except that one did describe a discussion of the economic aspects of slavery, wherein several students opined that it had been good for the economy, but only ███ view had been racist.

CARE was tasked with determining whether ███ had, in fact, spewed racial epithets and other white supremacist views.  It purports to have determined that he did.  But in ten *Findings of Fact*, CARE provides only two verbatim quotes— the "N-word" and "woke."  The first is a patent lie, and the second simply cannot be construed as racist.

Here, there were no reports of racism against any eighth grade students until February 5, the very day that three students, ███ and ███ each submitted to Mr. Trogisch written reports of teacher misconduct against a black teacher who had announced to the class that ███ had used "racist rhetoric."  The charges were levelled only against ███ ███ and ███.

Prior to this time, in DCPS's view, ███ had been spewing white supremacist rhetoric for some time, but there had been no reaction whatsoever, from anyone, until ███ said "woke." No student had complained to any authority at the school, there had been no complaints to, or by, any teacher, or to the Principal, or to the Assistant Principal, or to the counselor, or to any parents, including me.

The charges levelled against ███ and ███ were equally frivolous. ███ was charged with saying that his classmates "looked like monkeys."  But ███ interrogators were well aware that he had been explaining to the girls that "we were

not laughing at the racist comment but at you... jumping around like monkeys, but right after I realized what I said... I said sorry."

██████ was charged with having sketched Martin Luther King, Jr., with big ears. "I was personally offended," said Ms. Young. "Why would you associate with ██████ the racist?" Mr. Trogisch asked. Ms. Ogunshakin, in whose class the sketch had been drawn, had shown the "racist" drawing to Ms. Ervin. Perhaps Ms. Ervin is not the only teacher who sees racism in the shadows. Ms. Ogunshakin, the only adult among ██████ accusers, doesn't remember what ██████ had said in her class, but whatever it was it was a "comment similar to" slavery being good for America.



**Denial of Admission to School Without Walls High School**

"What is so disastrous here," I wrote, "is ██████ exposure to being denied admission to School Without Walls High School."

> After ten years at the school, with an excellent chance of acceptance into the feeder, the day before he takes the entrance exam for the High School, ██████ is wrongfully accused of being a racist, spewing racial epithets, and threatened with expulsion.

Eighth grade students who are advanced two years ahead of grade level in mathematics take that class at the High School ("Walls"). Last year, all of the advanced math students were accepted into Walls. This year, only one of the three was not accepted, ██████ He is 80th on a wait list of 86. He was accepted to the other magnet high school, Benjamin Banneker, which has the same entrance standards as Walls. He is almost a straight-A student, tested as reading above an 11th grade level in DCPS testing, did well on his written test, and his interview went fine.

In February I wrote that I was "confident that any objective review of the evidence will reveal that ██████ is not even slightly racist, he has never championed slavery, and he has *never* used the n-word. Thus, I am not in the slightest bit concerned whether ██████ will be exonerated of these false, and despicable, charges." In asking DCPS lawyers to send someone to the school to investigate, I observed that "the conduct of the current investigators in this case is among the

issues to be resolved, so an independent fact finder would seem appropriate." Nothing has changed, except for adding the issue of whether retaliation was a contributing factor in DCPS's rejection of ███ from Walls, where Mr. Trogisch is also the Principal.

**Appeal of Grievance No. 3682**

CARE's statement of this investigation:

> It is alleged that on February 6, 2020, School Without Walls at Francis-Stevens Teacher N.E. made threats to Student J.C., Student B, and Student C, including, "next time I will slap some sense into you" and "don't roll your eyes at me again or I'll knock your teeth out" when approaching the students about allegedly making racist comments. Additionally, it is alleged that Principal R.T. used questionable methods to investigate the alleged comments, such as interrogating Student J.C., Student B, and Student C for up to five hours, falsely reporting that the students' peers described them as racist, threatening to expel, and failing to interview witnesses.

Here too CARE completely misses the mark. My charge is that Mr. Trogisch *knowingly and falsely accused* three students of racist misconduct, but that is not apparent in CARE's statement.

Moreover, the facts stated are utterly false and misleading. Mr. Trogisch was not investigating Ms. Ervin 's "alleged comments." All but a few minutes of the three-plus hours of interrogations were entirely devoted to racism accusations against the three reporting students. Teacher misconduct was addressed only at the students' insistence, each of whom pleaded during interrogations, "What about Ms. Ervin?"

CARE states that "It is alleged" that Ms. Ervin threatened ███ No, it is not. Only Mr. Trogisch threatened ███ with expulsion. Nor did Ms. Ervin threaten "Student B," ███ He too was threatened with expulsion, unless he "cooperated." "Why are you protecting racists?" Mr. Trogisch queried ███

And the statement omits any review of the conduct of Ms. Eaves, Ms. Young, or Ms. Beer. Nor does it include the incident of Ms. Ervin's having made a threatening gesture to a student with scissors in hand, nor of her announcement to her afternoon class that ███ ███ and ███ were all opposed to the school's celebration of Black History Month.

As I noted on February 10, this is one matter, not two:

> On Friday morning, February 6, Mr. Trogisch called me and told me that he would be conducting two separate investigations, one into the conduct of theater teacher Ms. Naelis Ervin, and one into the conduct of my son, ████ Both matters are serious.  But they are not "separate."

Here, the final disposition of grievance No. 3686 should largely determine the outcome of grievance No. 3682.  Since DCPS is following Mr. Trogisch's lead in bifurcating ████ grievance, please also note his appeal in grievance No. 3682, and kindly include this correspondence, with its attachments, in the administrative record in that case.  The record in both matters should also include the two emails, ████ sketch, Ms. Eaves' typed notes during the three hours of interrogations, as well as Ms. Young's handwritten notes.

The Labor Management and Employee Relations review should at least be apprised of my view that DCPS employees falsely, and knowingly, accused three students of racism, to cover up their own wrongdoing, and to retaliate against them for reporting teacher malfeasance.  In the absence of a developed administrative record in the matter, as well as review of DCPS's statements of investigative jurisdiction, LMER might very well conclude that Mr. Trogisch and company had simply been too vigilant in their quest to prosecute an otherwise well-founded racism probe.  That is not true.

Absent word from DCPS to the contrary, I will assume that I have no choice but to seek redress in court to clear ████ of these despicable accusations, and to seek injunctive relief to gain his admission into Walls.

Sincerely,

/s/
John H. Clarke

Enclosures

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

### INFORMATION SHEET

J.H.C. By John Harrica et al

Case Number: _____ 2020 CA 002622 B _____

vs

District of Columbia, et al

Date: _____

☑ One of the defendants is being sued
in their official capacity.

**Name:** (Please Print)
John H Clarke

**Firm Name:**
Law Office John H Clarke

**Telephone No.:**         Six digit Unified Bar No.:
202-544-0778   388599

**Relationship to Lawsuit**

☑ Attorney for Plaintiff

☐ Self (Pro Se)

☐ Other: _____

TYPE OF CASE: ☐ Non-Jury       ☑ 6 Person Jury       ☐ 12 Person Jury

Demand: $ 500,000 _____       Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

**NATURE OF SUIT:**       *(Check One Box Only)*

**A. CONTRACTS**                                    **COLLECTION CASES**

☐ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 07 Personal Property
☐ 13 Employment Discrimination
☐ 15 Special Education Fees

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 27 Insurance/Subrogation
      Over $25,000 Pltf. Grants Consent
☐ 07 Insurance/Subrogation
      Under $25,000 Pltf. Grants Consent
☐ 28 Motion to Confirm Arbitration
      Award (Collection Cases Only)

☐ 16 Under $25,000 Consent Denied
☐ 18 OVER $25,000 Consent Denied
☐ 26 Insurance/Subrogation
      Over $25,000 Consent Denied
☐ 34 Insurance/Subrogation
      Under $25,000 Consent Denied

**B. PROPERTY TORTS**

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass

**C. PERSONAL TORTS**

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 10 Invasion of Privacy
☑ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☐ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☐ 16 Negligence- (Not Automobile,
      Not Malpractice)

☐ 17 Personal Injury- (Not Automobile,
      Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE       IF USED

CV-496/June 2015

# Information Sheet, Continued

## C. OTHERS

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

## II.

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

## D. REAL PROPERTY

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

5-28-20
_____
Date



**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

J.H.C By Father and Next Friend JOHN HARRISON CLARKE
_____
                                              Plaintiff

vs.

Case Number ____2020 CA 002622 B____

DISTRICT OF COLUMBIA GOVERNMENT, et al
_____
                                              Defendant

**SUMMONS**

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

John H. Clarke
_____
Name of Plaintiff's Attorney

1629 K Street, NW, Suite 300
_____
Address
Washington, DC  20006

(202)344-0776
_____
Telephone

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시요.        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

_Clerk of the Court_

By _____
                        Deputy Clerk

Date ____05/29/2020____

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                                                    Super. Ct. Civ. R. 4



**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

J.H.C By Father and Next Friend JOHN HARRISON CLARKE

_____
Plaintiff

vs.

Case Number ___2020 CA 002622 B___

RICHARD TROGISCH, et al.
_____
Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

John H. Clarke
_____
Name of Plaintiff's Attorney

1629 K Street, NW, Suite 300
_____
Address
Washington, DC  20006

(202) 344-0776
_____
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date ___05/29/2020___

如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화해주십시오    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

J.H.C By Father and Next Friend JOHN HARRISON CLARKE
_____
                                                    Plaintiff

vs.

## SILEAN EAVES, et al.                          Case Number ___2020 CA 002622 B___
_____
                                                    Defendant

### SUMMONS

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

John H. Clarke                                    _Clerk of the Court_
_____
Name of Plaintiff's Attorney

1629 K Street, NW, Suite 300           By _____
_____                      Deputy Clerk
Address
Washington, DC  20006

(202) 344-0776                        Date _____05/29/2020_____
_____
Telephone

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면,(202)879-4828로 전화주십시오     የአማርኛ  ትርጉም  ለማግኘት  (202) 879-4828  ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME_.

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

J.H.C By Father and Next Friend JOHN HARRISON CLARKE
_____
                                                    Plaintiff

                        vs.

                                                                    Case Number _____2020 CA 002622 B_____

NAELIS ERVIN, et al.
_____
                                                    Defendant

### SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

John H. Clarke
_____
Name of Plaintiff's Attorney

1629 K Street, NW, Suite 300
_____
Address
Washington, DC  20006
_____
(202) 344-0776
_____
Telephone

_Clerk of the Court_

By _____
                    Deputy Clerk

Date _____05/29/2020_____

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시오.        የአማርኛ ትርጉም ለማግኘት  (202) 879-4828  ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

JOHN HARRISON CLARKE
    Vs.                             C.A. No.     2020 CA 002622 B
DISTRICT OF COLUMBIA GOVERNMENT et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                         Chief Judge Robert E. Morin

Case Assigned to: Judge ROBERT R RIGSBY
Date:  May 29, 2020
Initial Conference: 10:00 am, Friday, September 11, 2020
Location:   Courtroom 201
               500 Indiana Avenue N.W.
               WASHINGTON, DC 20001

CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www:dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.  Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov.  *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles.  All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.  D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin