UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLOMBIA

| | | |
|---|---|---|
| J.H.C.<br>By his father and next friend:<br>JOHN HARRISON CLARKE | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| DISTRICT OF COLUMBIA<br>PUBLIC SCHOOLS, | ) ) ) | |
| and | ) ) | |
| THE DISTRICT OF COLUMBIA, | ) ) | |
| and | ) ) | Case No. 20-1761 (CRC) |
| RICHARD TROGISCH<br>Principal, in his Individual<br>Capacity, | ) ) ) ) | |
| and | ) ) | |
| SILEAN EAVES<br>Assistant Principal,<br>in her Individual Capacity, | ) ) ) ) | |
| and | ) ) | |
| NAELIS ERVIN<br>Teacher, in her Individual<br>Capacity, | ) ) ) ) | |
| and | ) ) | |
| JANE DOE, | ) ) | |
| Defendants. | ) ) | |

AMENDED COMPLAINT
Violation of the First, Fifth, and Fourteenth Amendments
to the United States Constitution under 42 U.S.C. § 1983,
Declaratory Judgment under 28 U.S.C. § 2201(a), Conspiracy

## Jurisdiction

1.      This is an action for declaratory relief and damages under 42 U.S.C. § 1983

based upon violations of Plaintiff's rights under the First Amendment to the United States

Constitution.  Jurisdiction exists under 28 U.S.C. § 1331 and 1343 based on 42 U.S.C. § 1983,

and questions of federal constitutional law.  Jurisdiction also exists under the Declaratory

Judgment Act, 28 U.S.C. § 2201(a).

## Summary

2.      This case arises out of a concerted effort by a teacher, her mother, and other

DCPS school personnel, to undermine, deflect attention away from, and retaliate against,

three students for their submissions of written accounts regarding a black teacher's

misconduct, by falsely accusing all three students of racial animus.  Defendants' conduct

violated freedom of speech clause of the First Amendment to the United States

Constitution, and violated procedural due process under the Fifth and Fourteenth

Amendments.

3.      Plaintiff suffered a deprivation of Constitutional right by virtue of the actions

of individuals acting under color of state law.  Thereafter, DCPS Comprehensive Alternative

Resolution & Equity Team adopted individual defendants' decision, and its wrongful basis.

## Parties

4.      Plaintiff J.H.C. is a 14-year-old individual who is an Eighth grade student at

School Without Walls at Francis Stevens.   He has been a student at that School for a decade,

since Kindergarten.  As plaintiff is a minor, this action is brought by his "father and next

friend," and sole legal custodian, John Harrison Clarke, who is hereinafter referred to as

"the undersigned," or "counsel."  Plaintiff is hereinafter referred to "J.H.C." or "plaintiff."

Other witnesses who have not reached the age of majority are hereinafter referred to by

initials, and the names of all minors have been redacted from the exhibits submitted

herewith.

5.      Defendant District of Colombia is a municipal body, and is a "person" under

42 U.S.C. § 1983.

6.      Defendant District of Colombia Public Schools ("DCPS") is a municipal body.

Its principle office is at 1200 First Street, NE, Washington, DC.  DCPS is a "person" under 42

U.S.C. § 1983.  The mission of DCPS is to "ensure that every school guarantees students

reach their full potential through rigorous and joyful learning experiences provided in a

nurturing environment."  This defendant is sometimes referred to as "CARE," the acronym

of DCPS's Comprehensive Alternative Resolution & Equity Team, which is tasked with

receiving, and resolving, claims of unfair treatment of a student.

7.      Defendant Richard Trogisch is an individual employed by DCPS.  He holds the

position of Principal at School Without Walls High School (hereinafter "High School"), a

public magnet high school located at 2130 G Street, NW.  Since 2014, Mr. Trogish has also

simultaneously served as Principal at School Without Walls at Francis Stevens (hereinafter

"the School"), which serves students from pre-Kindergarten through the Eighth grade, at

2425 N Street, NW, Washington, DC.  Mr. Trogish is sued in his individual capacity.   This

defendant is hereinafter referred to as "defendant Trogish," or simply "defendant."

8.      Defendant Silean Eaves is an individual employed by DCPS, holding the

position of Assistant Principal at the School.  As defendant Trogish's time is shared

between the two schools, defendant Eaves' authority and duties at the School is more pronounced than it would be if she had been serving as an Assistant Principal at a school with a full–time Principal.  Defendant Eaves is sued in her individual capacity.

9.     Defendant Naelis Ervin is defendant Eaves' daughter.   She is an individual employed as a theatre teacher at the School.  She also plans, organizes, and produces the School's annual theatre presentation held at the conclusion of Black History Month, which the School calls "Fade to Black."  Defendant Ervin is sued in her individual capacity.

10.     The captioned defendant referred to as Jane Doe is one or more individuals committing overt acts identified below that are not yet attributed to an individual defendant.  Because plaintiff does not yet know whether all overt acts identified having been committed by defendant Doe were committed by the same individual, nor her or their identities, this person or persons are hereinafter referred to in the singular as "defendant Doe."  Plaintiff will seek leave of Court to amend his Complaint by substituting her or their true names and actions instead of the fictitious name Doe when the same has been ascertained.

<u>Facts</u>

11.     On Tuesday morning, February 4, 2020, defendant Ervin had her theatre class prepare a skit, in which some of the students wore street clothes over their school uniforms.  Defendant Ervin gave DE, a friend of J.H.C.'s, a scarf to wear.  J.H.C. joked to DE, "You look very woke," meaning "pretentious" or "politically correct" (its usual use), which remark had been occasioned by DE's "wearing a scarf over his blue shirt," indoors.

12.     For reasons that still remain a mystery, defendant Ervin took the comment as "racist rhetoric."  She was outraged.  She berated J.H.C., screaming, "J.H.C., what makes you

think it's okay to say what you said to DE?  Was it because he was sitting next to two black people?"  Stunned, and unaware of who DE had been sitting next to, J.H.C. responded, "No."  Unconvinced, Ms. Irvin yelled, "Really?" and continued to berate J.H.C. "She was furious and yelling," J.H.C. wrote.  "The whole time my heart was thumping and racing.  A friend of mine who was right next to me later described me as 'looking like I was about to cry' and 'scared.'"  She ended her tirade with the declaration to the class, "Racist rhetoric will not be tolerated!"

13.     On Thursday morning, February 6, the substitute teacher in Ms. Ervin's class had the children play the game "telephone."  The phrase went around, and morphed into "DE is woke" (through no fault of J.H.C.).  Recalling Tuesday, a number of students found it very funny, whereupon three girls started jumping around and yelling at J.H.C. and at least four of his classmates; MI, ES, DE, and AL.

14.     Later in the day, defendant Ervin encountered J.H.C. in the hallway, angrily pulled him aside, and asked him and the other eighth graders present what had happened earlier in the day with the substitute teacher.  Upon being informed, defendant Ervin said that if something like this happened again she would "give everyone zero's for the rest of the advisory," and, while looking at J.H.C. and classmates EZ and ES, said that if she heard any similar statements or comments she would "call the police for hate speech," and have the event placed on the students' "permanent records."

15.     After scolding the group some more, defendant Ervin said to ES that she was extremely disappointed for letting his classmates "say racist things."  She continued, "You can't let them do that.  I'm doing this because you're a brown, black body," and "Next time I will slap the sense into you."  She continued, "Don't even try to do anything because I know

the DCPS handbook inside and out."  Then, reacting to ES's response, she threatened, "Don't roll your eyes at me ever again or I will knock your teeth out."

16.     Shortly after witnessing the threats, J.H.C. inquired in the School's office whether teachers were permitted to threaten students.  An administrator asked what had happened, and J.H.C. relayed the threats made to ES, and provided the names of five witnesses to the incident.  Later in the day, J.H.C. told ES that he had reported defendant Irvin.  ES approved, and the two decided to return to the School's office at dismissal time to report a number of threats made by defendant Ervin.

17.     Another classmate witness, EZ, joined J.H.C. and ES in the office after school to report the threats.  They told defendant Trogish and Assistant Principal Young about what happened.  Defendant Trogish instructed them to reduce their accounts to writing.

18.     The next morning, Friday, February 7, before school, EZ, ES and J.H.C. all submitted their written accounts of the aforementioned threats, and other threats of physical ham, as well as other of defendant Ervin's bizarre behavior.

19.     EZ wrote that Ms. Irvin "will randomly have outbursts in the classroom," which were "aggressive towards individuals" who she opines are racist.  She makes students "very uncomfortable."  "Many students in this class have felt harassed," and "many students feel threatened to come to class."

20.     For good reason.  EZ related that defendant Ervin had threatened to break his fingers, saying, "if you draw another picture like that I'll make sure you'll never hold a pencil again."  He also reported the threats to "slap," and "knock your teeth out."  Reported non-physical threats included to "file a police report for hate crimes," and collective punishment by "dropping all students' grades to an F for anger towards certain students."

21.     EZ wrote that Ms. Irvin has a history of "exaggerating the term 'racist' and has been throwing this term out of proportion."  She "jumps straight to conclusion and portrays something that was not intended to be hate speech a form of hate speech."  EZ provided these instances:

(a)     Defendant Ervin's "mistaken" belief that the word "woke" had been "racially offensive;"
(b)     Her opinion that a sketch of Martin Luther King, Jr., had depicted him with monkey-like ears, notwithstanding that in all of EZ's drawings, the ears were the same; and
(c)     Her belief that a student who said that three girls had "jumped around like monkeys" had been meant as a racist remark, even after the student, who is black, explained otherwise.

22.     "This teacher all in all," EZ concludes, "has been aggressive to the point where students are intimidated to the point of oppression."

23.     ES, who had also been threatened, wrote that he personally does "not feel safe in the theater class anymore because of the many threats that were told to me and my classmates by the teacher."

24.     ES recounted when Ms. Ervin accused J.H.C. of racism by his use of the word, "woke," and that, after the word's resurgence two days later, he was explaining to the girls who became upset he and the other students were not laughing at the word, but rather, at their reaction:

On Tuesday J.H.C. said to DE are you woke and Ms. Ervin... started to say stuff about how J.H.C. was being racist and asked, "Did you say that because DE is in between two black people."  J.H.C. said he did not mean it that way but she didn't believe him and continued with a lot more accusation.

Then when we were going down the stairs to go to the auditorium I told the girls that we were not laughing at the racist comment but at you, "How they were jumping around like monkeys," but right after I realized what I said was not right in that situation.  I said sorry and that I didn't mean it in that racist way and that I meant it in a way off like very jumpy and moving around too

much.  Also I am black so I know of all those racist comments that were directed to our kind so I would never mean it in that way.

25.    And ES described when Ms. Ervin had threatened him:

I was in the gym and was called out to go upstairs to talk to Ms. Ervin... She was very loud and was asking me what I thought and asked what racist stuff was I saying and I said what because I forgot what happened in the stairs because I thought we already resolved that....

I told Ms. Ervin that I didn't mean it in that way and she said, "Yeah right you know what you meant," and I rolled my eyes and she said don't roll your eyes at me ever again or I will knock your teeth out in like a threat at least that is how it felt... Then when she dismissed everyone and she held me literally and said wait.  She asked, "Do you let them talk to you like that in a racist way" (them as in white people) and I said no then she said that you should not support it and I said I don't.  Then she went in the class and said don't allow anyone to say the "n-word" and said I wish anyone would say the "n-word" around me I will knock their teeth out.

26.    The facts recounted in J.H.C.'s submission corroborated EZ's and ES's reports of the threats, except that J.H.C. included an instance of when Ms. Ervin had "threatened to stab a child with scissors while making a stabbing motion."

27.    On Friday, February 7, at 9:10 a.m., J.H.C. was summoned to the School office, where ES and EZ were waiting, in the outer office.  At around 9:40, Ms. Vest said these are serious allegations and to remember to tell the truth.  "That gave me confidence because we were telling the truth and I reminded everyone to stick to the truth," according to J.H.C.'s written account.

28.    By the time the first student was called into the inner office, at around 11:00, it had been two hours since the three whistleblowers had been summoned to the outer office, and two-and-a-half hours after the three had submitted their accounts of teacher misconduct.  EZ was first.  Present were four administrations, defendant Principal Richard Trogish, defendant Assistant Principal Silean Eaves, Assistant Principal Shanna Young, and

Ms. Stephanie Beer.  Ms. Eaves typed notes, and Ms. Young wrote onto a notepad.

Defendants had read, and studied, the students' accounts, which had been submitted by

8:30 a.m.

29.    Unbeknownst to the students who were waiting, they all thought, to be

interviewed regarding defendant Ervin's misconduct, teacher malfeasance was not among

the subjects of the interviews, or, more accurately, interrogations

30.    Forty-five minutes before the first interrogation began, at 10:15, defendant

Trogisch called the undersigned and said that he would be conducting two separate

investigations, one into the conduct of defendant Ervin, and one into J.H.C.'s conduct.

Defendant read from an email that had been sent to him the previous evening by the parent

of one of J.H.C.'s classmates.  "My child reports," defendant read, "that J.H.C. says nigger all

the time, says that slavery is the best thing that ever happened to this country, that it

should be brought back, and says his black classmates look like monkeys."  Incredulous,

counsel asked whether defendant had any corroboration.  Defendant Trogisch responded,

"Not yet."

31.    The School had no plans to query the students about Ms. Ervin's misconduct.

Rather, over the course of *over three hours* of grueling, separate, surprise interrogations,

the school accused each of racist behavior, lied to each that their classmates had called

them racist, and tried over and over again to have one inculpate the others.  Defendants

accused each of racist misconduct which they knew to be false.  Defendants sought to:

     (a)    Undermine and neutralize the students' accounts of teacher
              misconduct as untrue and having been motivated by racial animus;

     (b)    Deflect attention away from the teacher's threats of physical harm;
              and

     (c)    Retaliate against the three for their written explanations of what
              events had occurred.

.

32.    EZ's interrogation lasted about an hour.  He reports that they had called him,
and J.H.C. and ES, racists, and specifically referred to J.H.C. as a racist.  They repeatedly
asked him, "Why are you lying?"  Throughout the interrogation, the questioners pressured
EZ to incriminate himself, J.H.C., and ES, as racists.  They asked, over and over again,
whether he was aware that his classmates think he's a racist, why he thinks they may have
said that, and why he would associate with J.H.C. the racist.  The interrogators claimed that
his answers were "fiction."  "Did ES and J.H.C. pressure you to write what you wrote?"
defendant asked.  "Why are you protecting racists?"

33.    And they queried him about his having sketched Martin Luther King, Jr., with
big ears.  But defendants Trogisch and Eaves knew that EZ had explained in his written
statement that all his sketches of historical figures had big ears.  Ms. Young declared that
she had been "personally offended" by the drawing.

34.    Dissatisfied with his repeated denials, defendant Trogisch threatened to
expel EZ.  But, he continued, if EZ would cooperate, things would go easier on him.  "What
about Ms. Ervin?" EZ pleaded.   "We will talk to her," defendant perfunctorily responded.
Defendants asked not a single question about defendnat Ervin's misconduct.

35.    ES was next.  This confrontation lasted just under an hour.  The subject of Ms.
Irvin's threats were discussed only at ES's insistence, and here too the only response was,
"We will speak with Ms. Ervin."  Defendants accused ES of having called the girls who were
upset over the telephone game's end-product, "DE is woke," as having "looked like
monkeys."  But here too defendants had read ES's written account that he had not meant it
as a racial slur.  He repeatedly explained that he said they were "acting like monkeys."  In
ES's view, the statement "looked like monkeys" would have been racist, but "acting like

monkeys" is not.  In any event, he explained, he did not mean it in any way to be racist, and

he had already explained that to the girls, and had apologized to them.  Defendants

challenged his account of having apologized.  He too was repeatedly confronted with the

claim that his friends call him racist, and asked to explain why.

      36.    Defendants knew full-well that the accusations against both EZ and ES were

frivolous.

      37.    J.H.C. was last to be interviewed.  It began after he had been waiting in the

outer office for five hours.  It began at around 1:00 p.m., and lasted about an hour.  Here too

defendant knew full-well that the accusations against J.H.C. were frivolous.  It was

traumatic.  Parts of that exchange went something like this.

| | |
|---|---|
| Mr. Trogish: | Well your friends say "yeah that's just J.H.C. he's racist."  A friend of yours said "well one time he said something racist and I wanted to punch him right in the face, but I didn't because that's not the right thing to do."  Your own friends are saying that they want to punch you because your being racist. |
| J.H.C.: | (Crying)  One of my friends said that?  Well don't you think that if my friends thought I was a racist they wouldn't want to be friends with me? |
| Ms. Eaves: | Well I disagree, I think they would just accept you're a racist and try to look past it. |
| Mr. Trogish: | One of them even said J.H.C. that said "slavery was the best thing to happen to America" and that we should "bring it back."  J.H.C. also called black girls "monkeys and says nigger all the time." |
| J.H.C.: | (Crying)  And you're sure that it was one of my friends? |
| Mr. Trogish: | Well I can't really disclose that information. |
| Mr. Trogish: |  Are you saying that you didn't say any of this? |
| J.H.C.: | (Crying) Yes. |
| Mr. Trogish: | So why do you think they said this? |
| J.H.C.: | (Crying) Maybe it's because they don't like me... |
| Mr. Trogish: | Let me grab the complaint here.  I'm showing this to you because you need to see it, not to hurt you. |
| J.H.C.:  Okay. | |
| Mr. Trogish: | This was filed by a parent.  "My child has brought to my attention that J.H.C. has said such words and phrases as 'slavery was the best thing to happen to America,' 'We should bring slavery back,' says "nigger" all the time, laughed at a racially charged statement about being |

|              | woke, and called some African American students monkeys.  I don't feel that my child is safe around him. |
|--------------|---|
| Ms. Young:   | So you're making it so they don't feel safe around you. |
| Ms. Eaves:   | So you see that you laughing that DE is woke was racist. |
| Mr. Trogish: | Did you ever say that fade to black is bad or that we spend too much time on black history? |
| J.H.C.:      | No.  I might have said that we don't spend enough time on some important things. |
| Mr. Trogish: | What do you mean? |
| J.H.C.:      | Well we didn't go over a single word of the constitution till eighth grade. |
| Mr. Trogish: | We are also worried about your safety, we don't want you to be hurt, beat up, or jumped.  For your safety, we might need to see if you need to go to another school. |

38.     Defendant knew that it had not been J.H.C. who had been accused of the "monkeys" remark, and that if J.H.C. had, in fact, used the N-Word "all the time," there would be some corroboration.  So too with the accusation that he said that "slavery is the best thing that ever happened to this country, and it should be brought back."  Yet, defendant announced his intention to suspend J.H.C., feigning to believe the accusations of racist misconduct.

39.     That Friday afternoon, February 7, defendant Ervin told her entire afternoon class that J.H.C., EZ, and ES are all against the school's celebration of Black History Month.

40.     On Saturday, February 8, J.H.C. took his entrance examination to the High School.

<u>CARE Investigation</u>

41.     On Monday, February 10, counsel emailed a letter to the General Counsel District of Columbia Public Schools, its Deputy General Counsel, and defendants Trogish and Eaves.  That nine-page letter included the facts as set forth above, as well as copies of the written accounts of EZ, ES, and J.H.C..  A copy of this correspondence is attached hereto as Exhibit 1.  It includes:

> One reason that I have included the DCPS Office of General Counsel lawyers
> as recipients of this letter is that I am requesting that it consider sending
> someone over to the school to investigate.  The conduct of the current
> investigators in this case is among the issues to be resolved, so an
> independent fact finder would seem appropriate.

42.     The General Counsel acceded to the request, and two investigators from the

DCPS Comprehensive Alternative Resolution & Equity Team, or "CARE," investigated.

CARE's responsibility includes receiving claims of unfair treatment a student, and to

resolve the issue in an equitable manner.

43.     On April 29, 2020, CARE issued its Response to Grievance No. 3686, a copy of

which is attached as Exhibit 2.

44.     J.H.C.'s grievance alleges that the genesis of the matter was a concerted effort

by a teacher, her mother, and other school personnel, to undermine, deflect attention away

from, and retaliate against, three students for their submissions of written accounts

regarding a black teacher's misconduct, by falsely accusing all three students of racial

animus.  Yet, CARE purports to have investigated civil rights violations; Title VI of the Civil

Rights Act of 1964, and the DC Human Rights Act of 1977.  CARE's statement of what it was

investigating:

> The grievance alleges that School Without Walls at Francis-Stevens (SWWFS)
> student, J.C., has made racist comments to and about his classmates
> including, but not limited to, using the "N-word," stating that slavery was
> good for America's economy and that it should be brought back, and stating
> another student was "woke."

45.     This statement does not respond to J.H.C.'s grievance.  This is not civil rights

case.  It is a whistleblower action.

46.     CARE's response does, however, address whether J.H.C. did, in fact, espouse

racist, white supemacist rhetoric.  All told, J.H.C. stands accused of:

(1)    Stating that another student looked "woke;"
(3)    Stating that African-American classmates "look like monkeys;"
(2)    Using the "N-word;"
(4)    Championing slavery;
(5)    Championing Trayvon Martin's death; and
(6)    Opposing Black History Month.

47.    CARE's Report concluded that all charges were "valid and reliable."  While the "racial slurs," were not "consistent" or "pervasive enough" to constitute a civil rights violation, according to the Response, "DCPS will implement a progressive discipline approach" if he does it again.

48.    However, all charges are obviously false, as set forth below.

49.    *Woke*.  This is the first of CARE's 10 *Findings of Fact*:

Finding 1
On February 4, 2020, Teacher N.E.'s theatre class was conducting a lesson unit entitled "Culture Shock," which is a unit designed to analyze how different groups of people are presented in the media.  During the class discussion, Student E was sitting next to two students of color.  Student J.C. stated that Student E looked "woke."  Use of this term was corroborated by thirteen of the students interviewed.

50.    The genesis of the belief that the "woke" comment had been racist was Ms. Ervin's indignation at what she declared to the class was "racist rhetoric."  The undersigned has twice sought defendants to proffer their theory of how saying that someone looks woke could possibly have been be racist rhetoric.  Defendants have yet to respond.

51.    *Monkeys*.  Defendants knew from reading the written accounts from EZ and ES, as well as from ES's interview, that it was ES who had made this comment, that it had been "acting like," not "look like," and that it had not been racist.  But that did not diminish defendants Trogisch and Eaves from prosecution of this charge against J.H.C., or ES.  CARE entirely omitted this accusation from its *Finding of Fact*.

52.    ***N-Word***.  This allegation was made by the same student who had lied about the monkeys comment, in the same email.  Defendants were well aware of this fact, but ignored that one false charge obviously impugns the veracity of the two others made by the same student.  CARE interviewed 15 students and two teachers, posits that J.H.C. used the "N-word"  "all the time," but only one student is said to have ever heard it.  The student never told anyone until shortly after Ms. Ervin had declared to the class that J.H.C. had uttered "racist rhetoric" and J.H.C. had reported defendant Ervin's various misconduct.

53.    ***Slavery***.   Numbers 4, 5, and 6 in CARE's *Findings of Fact* accuse J.H.C. of championing slavery.

54.    CARE's Findings 4 and 5:

> Finding 4
> At least three students stated J.C. made comments along the lines of "slavery was good for America and should be brought back."  All three students stated this happened in Teacher E.F.'s English Language Arts classroom.

> Finding 5
> Teacher C.O. also stated J.C. has made a comment similar to "slavery was good for America" during class, which prompted a class discussion about slavery being a human rights issue.

55.    CARE was tasked with determining what J.H.C. said.  These are ostensibly *Findings of Fact*.  "Made comments along the lines of," and "made a comment similar to," are not facts.  They are opinions.  Moreover, J.H.C. could not have advocated for bringing slavery back without uttering the words, "slavery should be brought back."  Where an individual is accused of espousing white supremacist rhetoric, due process requires more than opinions of three listeners.  It requires the facts of what the accused is alleged to have said.

56.     Findings 4 and 5 regard two separate class discussions, in two separate classes, English and Geography.  Class discussions are group communications, among more than 25 people, over half of whom CARE interviewed.  CARE reports in Finding 4, the English class discussion, that J.H.C. had "made comments along the lines of" slavery should be brought back, but only three recall it, none of them remember what he said, and none of them, or anyone else, reported it, to anyone.   CARE declined to interview the teacher, Mr. Felinger.

57.     In Geography, here too, of the 15 witnesses interviewed, only Ms. Ogunshakin is said to have recalled J.H.C. saying that slavery was good for America, she too does not recall exactly what he said, but, whatever it was, it was a "comment similar to."  EZ had sketched Martin Luther King, Jr. in Geography, and Ms. Ogunshakin had showed the "racist" drawing to defendant Ervin, and to Ms. Young.   And the "class discussion about slavery" was a follow-up to a homework assignment, and was not "prompted" by anything that J.H.C. had said.

58.     Finding 6 at least has a specific assertion, rather than "made comments along the lines of" or "made a comment similar to."  It relates that a group of students, J.H.C. among them, had opined that "slavery was good for the beginning of America's economy."  But only J.H.C. meant it to be racist, in DCPS's official view.  The other students, but not J.H.C., "prefaced that… slavery, in and of itself, was not right:"

> Finding 6
> One student stated that other students in addition to J.C. have stated that slavery was good for the beginning of America's economy; however, they prefaced that the other students have stated that slavery, in and of itself, was not right.  At least four students state they had not heard J.C. make comments regarding slavery being good for America's economy. J.C. denies making this statement.

59.     And J.H.C. did not deny making this statement because he was never asked. The undersigned listened in on his interviews and CARE did not ask any such question.

60.     CARE interviewed 14 students besides J.H.C., and asked each whether they had heard J.H.C. champion slavery.  Yet, it reported that "four students state they had not heard" the comments, omitting whether the other 10 students had also denied having heard any such thing.

61.   ***Trayvon Martin.***

    Finding 7
    At least two students stated they have heard J.C. make comments along the lines of "Trayvon Martin was a disappointment" or "Trayvon Martin was a thug and that he should have been shot."

62.     Contrary to DCPS's recitation, J.H.C.'s remarks about the Trayvon Martin case were made in front of around 25 other students and his English teacher Eric Felinger, not "at least two students."  During that class discussion, J.H.C. read from the police report from a book that he had been reading that he happened to have in his backpack at the time, showing that, before Martin had been shot, Zimmerman had suffered injuries, which had been sufficient to prove in his criminal trial his defense of self-defense.  Big mistake.

63.     J.H.C. did not say anything "along the lines of" Martin "was a thug and that he should have been shot."  Rather, he opined that Zimmerman had acted in self-defense.  If CARE even asked the other 12 witnesses that it interviewed, or Mr. Felinger, what J.H.C. had said during that class discussion, it did not share those results.  J.H.C. did not say that "Trayvon Martin was a disappointment," and he does not know what that statement means, or refers to.

64.     CARE interviewed 14 students besides J.H.C., and asked each whether they had heard J.H.C. champion Martin's death, and two students stated that he had.  Here too CARE omits the accounts of the other 12 students.

65.     CARE prefaces all student witness numbers with the clause, "at least." This is a curious insertion in a *Findings of Fact*.  Finding 4 is "at least three students," and Findings 7 and 9 are "at least two students."  CARE interviewed each student to corroborate the charges, took notes, but does not disclose how many of the 14 classmates did, or did not, corroborate.  Apparently, "at least two" means two.

66.     ***Black History Month.***
         Finding 9
         At least two students stated that J.C. has outwardly questioned why there is a
         Black History Month.

67.     The undersigned has heard J.H.C. complain about Black History Month.  So too regarding English class, math, geography, history, art, physical education, and the dress code.  The "at least" two students would appear to have believed that J.H.C.'s "outwardly questioning" was founded on a racial animus, as CARE concluded.  This charge is wholly founded on the notion is J.H.C. is a racist.  But he is not, contrary DCPS's official position.

68.     DCPS's final *Finding of Fact* charge is devoid of facts:

         Finding 10
         One student stated that J.C. has made other racially insensitive and/or
         offensive comments in the past and added "we let things slide."  Additionally,
         the student stated that they "let things slide" because they have "experienced
         worse" behavior by other people.

69.     "Other racially insensitive and/or offensive comments" is a characterization, only.  Again, CARE declines to disclose what J.H.C. said that had been interpreted as "racially insensitive and/or offensive"—a flagrant due process violation, again.

70.     CARE wrote that "there was a total of 15 students interviewed," which it numbered at the beginning of its Response.  But it does not identify by number which witnesses it cites in any of its 10 *Findings of Fact*.  The largest number of corroborating witnesses in any Finding is in number 4—three students.  Findings 7 and 9 related the accounts of two students, and 6, 8, and 10 rely on one.   But CARE declines to state how many of its *Findings of Fact* are based on the statements made by the same witness.  Are the only accusers the "three Black students who became upset" at the "woke" comment in Ms. Ervin's class, after she had misinformed them that it was a racial slur (one of whom lied to her parent that J.H.C. "regularly used" the "N-word," as well as having said his black classmates "look like monkeys")?

71.     CARE did not even disclose the total number of accusing students.

72.     Not one of DCPS's accusations are true:

| | | |
|---|---|---|
| (1) | Stating that African-American classmates "look like monkeys" | FALSE |
| (2) | Stating that another student looked "woke" | NOT RACIALLY MOTIVATED |
| (3) | Using the "N-word" | FALSE |
| (4) | Championing slavery | FALSE |
| (5) | Championing Trayvon Martin's death | FALSE |
| (6) | Opposing Black History Month | NOT RACIALLY MOTIVATED |

73.     Conspicuously absent from CARE's Response is any mention of Ms. Irvin's tirade to the class at J.H.C.'s having made the "woke" comment.

74.     Conspicuously absent from CARE's Response is any mention of what defendants Trogisch and Ervin had said, who it listed as among the witnesses it interviewed.

75.     Conspicuously absent from CARE's Response is any mention of the existence of a second email, this one sent to defendant Trogisch about two weeks later, while CARE was conducting interviews.  It was from a parent of classmate BW .  It accused J.H.C. as having had said, verbatim, "Slavery was good for America," to BW, only.  So, CARE interviewed J.H.C. a second time.  BW had claimed that J.H.C. voiced this white supremacist rhetoric to her while sitting next to him in Geography.  CARE learned that BW's assigned seat was not at J.H.C.'s table, so this allegation had been discredited, seemingly.

76.     CARE implies that plaintiff had admitted some of the allegations against him, writing that plaintiff "denied making <u>some</u> of the allegedly racially insensitive comments."

77.     While CARE was tasked with reporting what J.H.C. said, the only two verbatim quotes it relates are the "N-Word," and "woke."   The first is a patent lie, and the second simply cannot be interpreted as racist.

78.     Here, the email had accused plaintiff of (1) the "monkeys" comment, (2) the use of the "N-word,"  and (3) championing slavery.  Defendants knew from the get-go that the first two were false.  CARE conspicuously omits any mention the first charge, purports to have established "N-word" charge on the word of one student, and claims that the slavery charge was true, based on the accounts of just three of the several dozen witnesses who would have heard it.  None of the three remembered what plaintiff said, except that one did recall that plaintiff had been among a group of students who had all opined that it may have been "good for the beginning of America's economy."  CARE included defendant Trogish's initial charges of (1) opposing Black History Month and (2) having made some sort of "racially insensitive and/or offensive comment" that the listener had "let slide.'" And CARE added championing Trayvon Martin's death, based on the accounts of just two of

the several dozen witnesses who would have heard that.  In its *Finding of Fact* 1, by
contrast, CARE related that "the use of this term [woke] was corroborated by thirteen of
the students interviewed."

79.     Here, EZ wrote that defendant Ervin "jumps straight to conclusion and
portrays something that was not intended to be hate speech a form of hate speech," and
provided the examples of (1) the use of the word, "woke," (2) his drawing of Martin Luther
King, Jr., and (3) the "monkeys" charge.  *Infra* ¶ 19.  Undaunted, defendants Trogish and
Eaves prosecuted all three of these items as hate speech.

80.     Here, there were no reports of racism against any Eighth grade students until
February 7, the very day that three students—J.H.C., ES, and EZ—each submitted to
defendant Trogisch written reports of teacher misconduct against a black teacher who had
announced to the class, falsely, that J.H.C. had uttered "racist rhetoric."  The charges were
levelled only against J.H.C., ES, and EZ.  Prior to this time, in DCPS's view, J.H.C. had been
spewing white supremacist rhetoric for some time, but there had been no reaction
whatsoever, from anyone, until J.H.C. said, "woke."  No student had complained to any
authority at the school, there had been no complaints to, or by, any teacher, or to the
Principal, or to the Assistant Principal, or to the counselor, or to any parents, including the
undersigned.

81.     The sudden emergence of the patently false racism charges, made only
against J.H.C., EZ and ES, occurred on the very day that they each had submitted written
accounts of a black teacher's misconduct, as defendant had instructed.  This was no
coincidence.  By the close of school day on February 6, defendants Trogisch, Eaves, and
Ervin all knew that J.H.C., EZ and ES, were to submit written accounts of Ms. Ervin's threats,

the next morning.  Given this chronology of events, plaintiff avers, upon information and

belief, that the charging email had been made at the behest of defendants Trogisch, Eaves,

and Ervin, or some combination of these defendants.

82.     While plaintiff knows the genesis of the false charges, he does not yet know

who initiated them, or the particulars of that communication, including which named

defendant had made the request to the reporting student, or to her parent.  Plaintiff will

seek leave to amend his Complaint by specifying those particulars when the same has been

ascertained, and may substitute the names of other actors in the place and stead of the

fictitious name, Jane Doe.

83.     ***Bifurcation***.  Here, according to DCPS, the veracity of the racism allegations

has nothing to do with the reports of teacher misconduct.   They are wholly unrelated, in its

view, and it bifurcated the matter into two, separate, grievances.  J.H.C. disagrees.  As he

noted on February 10, this is one matter, not two:

> On Friday morning, February 7, Mr. Trogisch called me and told me that he
> would be conducting two separate investigations, one into the conduct of
> theater teacher Ms. Naelis Ervin, and one into the conduct of my son, J.H.C....
> Both matters are serious.  But they are not "separate."

84.     CARE followed defendant's approach.  In its Response to Grievance No. 3682,

a copy of which is attached as Exhibit 3, CARE states the purview of this investigation:

> It is alleged that on February 6, 2020, School Without Walls at Francis-
> Stevens Teacher N.E. made threats to Student J.C., Student B, and Student C,
> including, "next time I will slap some sense into you" and "don't roll your
> eyes at me again or I'll knock your teeth out" when approaching the students
> about allegedly making racist comments.  Additionally, it is alleged that
> Principal R.T. used questionable methods to investigate the alleged
> comments, such as interrogating Student J.C., Student B, and Student C for up
> to five hours, falsely reporting that the students' peers described them as
> racist, threatening to expel, and failing to interview witnesses.

85.    J.H.C.'s charge is that defendant *knowingly and falsely accused* three students of racist misconduct, to cover up teacher wrongdoing, but that is not apparent in CARE's statement.

86.    Moreover, the facts as stated are false and misleading.  Defendant was not investigating Ms. Ervin's "alleged comments."  All but a few minutes of the three hours of interrogations were entirely devoted to racism accusations against the three reporting students.  Teacher misconduct was addressed only at the students' insistence, each of whom pleaded during interrogations, "What about Ms. Ervin?"  And CARE recites that "it is alleged" that Ms. Ervin threatened J.H.C..  No, it is not.  Only defendant Trogisch threatened J.H.C., with expulsion.

87.    On May 6, 2020, J.H.C. administratively appealed the two Responses to his single grievance.  A copy of that appeal attached hereto as Exhibit 4.

88.    The DC Public Schools *Grievance Procedures for Parents, Guardians and Visitors* provides that DCPS had 10 days to respond to this appeal:

> Step 5: Appeal – Investigation and Resolution Grievance Coordinator will compile case investigation information and forward to appropriate Instructional Superintendent.  Instructional Superintendent will review documentation, speak to relevant parties and determine the need for additional investigation.  Upon completion of review Instructional Superintendent will issue a Letter of Resolution-Appeal level 1 to all relevant parties, including the Principal within ten school days of receipt of the appeal.

https://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/attachments/Grievance%20Policy%2017-18.pdf at p. 11.

89.    DCPS has not responded to plaintiffs' appeal, submitted over four months ago.  Thus, plaintiff has constructively exhausted any administrative remedies that may be a condition precedent to prosecuting this action.

**Count I**
**(Defendants Richard Trogisch and Silean Eaves—**
**Violation of the First Amendment to the United States Constitution)**

90.     Plaintiff restates paragraphs one through 89 as if fully repeated here.

91.     Plaintiff's report concerned matters of public safety.  His report had been consistent with his understanding of his duties as a good citizen.

92.     Constitutionally intolerable speech-based animus was at the core of the probe conducted by defendants Trogisch and Eaves.  Defendants' purposes were to:

(1)     Impugn the veracity of plaintiff's account of teacher malfeasance;
(2)     Deflect attention away from that misconduct; and
(3)     Retaliate against plaintiff for his submission of a written account of the teacher's threats.

93.     Defendants knew that the allegations of racial animus were false.  The probe was undertaken in bad faith.  Prior to the commencement of their interrogations, defendants knew that that the "monkeys" accusation, and the charge of use of the "N-word," were false.  They knew that virtually all charges, if true, would have been corroborated by several dozen student witnesses.  And they knew that, had any student ever uttered white supremacist, racist, rhetoric, such conduct would have been immediately brought to their attention.

94.     Defendants' affirmative actions were undertaken under color of law.  These officials acted while carrying out their responsibilities in accordance and compliance with District of Columbia law, with the apparent authority of the state.

95.     Defendants' conduct was in willful, wonton, and reckless disregard of plaintiff's First Amendment rights.  As a direct and proximate cause of the actions of these state actors, plaintiff was deprived his rights guaranteed by the First Amendment to the United States Constitution.

**(Defendant District of Columbia and DCPS—**
**Violation of the First Amendment to the United States Constitution)**

96.     DCPS's *Finding of Fact* approves and adopts the individual defendants' decision, and the wrongful basis for that decision.

97.     Defendant DCPS facilitated the deprivation of plaintiff's rights guaranteed by the First Amendment to the United States Constitution.

**Count II**
**(Defendants Richard Trogisch and Silean Eaves—**
**Violation of the Fifth and Fourteenth Amendments to the United States Constitution)**

98.     Plaintiff restates paragraphs one through 97 as if fully repeated here.

99.     The procedures employed by the individual defendants violated plaintiff's due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

100.     Due process mandates the right to receive fair notice of the accusations. Here, defendants lulled plaintiff into believing that he was to give witness to allegations of teacher malfeasance, then surprised him with charges of espousing racist rhetoric.

101.     Due process also mandates the right of the accused to confront the witnesses against him. Defendants found guilt based on unspecified testimony, provided by an unknown number of witnesses, the identities of whom were, and still are, secret.

**(Defendant District of Columbia and DCPS—**
**Violation of the Fifth and Fourteenth Amendments to the United States Constitution)**

102.     DCPS's conduct similarly violates due process.

103.     CARE's *Finding of Fact* also relies on secret testimony, and here too it deprived plaintiff the ability to confront his accusers. The *Finding of Fact* withholds even the total number of accusing students.

104.    DCPS declined to provide plaintiff with either of the two accusing emails, even in redacted form.  Plaintiff was adjudged culpable based on secret evidence.

105.    DCPS's *Finding of Fact* is almost entirely void for vagueness.  Most of the ten findings charge plaintiff's with racist rhetoric by virtue of his having "made comments along the lines of" or "made a comment similar to."  Due process requires factual allegations, not mere opinions.  *Finding of Fact* 10 even charges that "one student stated that J.C. has made other racially insensitive and/or offensive comments."  Plaintiff cannot defend against such unspecified and nebulous charges.

106.    Only two of the charges disclose verbatim quotes—the "woke" charge, and the use of "the N-Word on multiple occasions."  The first cannot rationally be construed as racist, and the second is patently untrue.

### Count III
### Civil Conspiracy
### <u>(Defendants Richard Trogisch, Silean Eaves and Naelis Ervin)</u>

107.    Plaintiff restates paragraphs one through 106 as if fully repeated here.

108.    Wrongful acts alleged herein were overt acts of two or more defendants in furtherance of the common goal of undermining plaintiff's report as untrue and having been motivated by racial animus.  The facts alleged constitute a civil conspiracy.

109.    The continuous and persistent course of defendants' intentional wrongful conduct establishes that the entire course of conduct was a single continuing action.

110.    Because plaintiff's' damages are the reasonably foreseeable, necessary or natural consequences of the conspiracy, each member of that conspiracy is liable for plaintiffs' damages simply by virtue of his or her participation in that conspiracy.

111.    While plaintiff is currently unable to specify what role defendant Ervin played in this conspiracy, given the sequence of events, plaintiff avers, upon information and belief, that all individual defendants played a role in the false allegations of racial animus that suddenly emerged on the very day that the whistleblowers submitted testimony regarding defendant Ervin's misconduct.

112.    Each defendant designated herein is responsible in some way for overt acts of his or her fellow conspirators.  Accordingly, each allegation against an individual named defendant should be read to be made against all defendants, and all defendants are jointly and severally liable for all of plaintiffs' compensatory damages.

**Count IV**
**Declaratory Relief**
**(Defendant District of Columbia and DCPS)**

113.    Plaintiff restates paragraphs one through 112 as if fully repeated here.

114.    Plaintiff seeks a Declaratory Judgment, or *Findings of Fact and Conclusions of Law*, (1) determining which of DCPS's *Findings of Fact* are void for vagueness, and (2) exonerating him of these despicable charges.

WHEREFORE, plaintiff J.H.C., by his father and next friend, respectfully prays:

I.    That judgment be entered in Plaintiff's favor under 42 U.S.C. § 1983:
    A.    Against all Defendants, jointly and severally, compensatory damages in the amount of $100,000;
    B.    Against Defendants Trogisch, Eaves, and Irvin, separately, punitive damages in the amount of $100,000; and
    C.    For costs and reasonable attorney fees associated with the prosecution of this action;

II.    That the Court issue Findings of Fact and Conclusions of Law pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a):
    A.    Invalidating DCPS's *Findings of Fact* that are void for vagueness, and, for the charges that survive that scrutiny;
    B.    Exonerating Plaintiff of the disgraceful charges levelled against him.

PLAINTIFF DEMANDS TRIAL BY JURY.

DATE: September 10, 2020.

Respectfully submitted,


_____/s/_____
John H. Clarke   Bar No. 388599
1629 K Street, NW
Suite 300
Washington, DC  20006
(202) 344-0776
john@JohnHClarkeLaw.com