Law Office<br>
**John H. Clarke**<br>
1629 K Street, NW<br>
Suite 300<br>
Washington, DC  20006<br>
**(202) 344-0776**<br>
John@JohnHClarkeLaw.com

Also Admitted in Virginia
and Maryland

FAX:  (202) 332-3030

May 6, 2020

By email dcps.care@k12.dc.gov
cc:    richard.trogisch@k12.dc.gov, jerry.jellig@k12.dc.gov,
       Eric.Fehlinger@k12.dc.gov, Cicely.Ogunshakin@k12.dc.gov

Comprehensive Alternative Resolution & Equity (CARE) Team
Office of the Chief Operating Officer
Innovation and Systems Improvement
District of Columbia Public Schools
1200 First Street, NE
First Floor
Washington, DC  20002

    Re:  Appeal of Response to Grievance No. 3686

Dear Ladies and Gentlemen:

    CARE's April 29 letter responds to a grievance of violations of Title VI of the Civil Rights Act of 1964, and the DC Human Rights Act of 1977.  However, my February 10 letter, which was the only document that investigators reviewed, alleged no violations of Title VI of the Civil Rights Act, nor of the DC Human Rights Act.  I attach a copy of that grievance.

    It alleges that the genesis of the matter was a concerted effort by a teacher, her mother, and other school personnel, to undermine, deflect attention away from, and retaliate against, three students for their submissions of written accounts regarding a black teacher's misconduct, by falsely accusing all three students of racial animus.  The grievance has nothing to do with Title VI of the Civil Rights Act, and the actions alleged do not implicate any of the DC Human Rights Act's anti-discrimination provisions.  Rather, my complaint alleges retaliation, First Amendment violations, and defamation, and is akin to a whistleblower protection grievance.

**Exhibit 4**

***Investigative jurisdiction***.  CARE's statement of what it was investigating:

> The grievance alleges that School Without Walls at Francis-Stevens (SWWFS) student, J.C., has made racist comments to and about his classmates including, but not limited to, using the "N-word," stating that slavery was good for America's economy and that it should be brought back, and stating another student was "woke."

Again, this would not appear to be referring to ▇▇▇ grievance.

CARE's Report addresses five of the six charges against ▇▇▇ and concluded that all were "valid and reliable."  While the "racial slurs," were not "consistent" or "pervasive enough" to constitute a civil rights violation, "DCPS will implement a progressive discipline approach" if he does it again.  The allegations are:

(1) Stating that African-American classmates "look like monkeys;"
(2) Stating that another student looked "woke;"
(3) Using the "N-word;"
(4) Championing slavery;
(5) Championing Trayvon Martin's death; and
(6) Opposing Black History Month.
(These last two would appear to be encompassed by the statement's "including but not limited to" language).

**(1) African-American classmates "look like monkeys"**

My grievance recounts that on Friday morning, February 6, Principal Trogisch read to me the charges that had been emailed to him.

> On Friday morning, February 6, Mr. Trogisch called me and told me that he… had a written complaint from a parent reporting that his or her child had recounted that ▇▇▇ had regularly used the "n word," had said that "slavery is the best thing that ever happened to this country," and remarked that some of his African-American classmates that they "look like monkeys."

CARE entirely omitted from its Report the "look like monkeys" charge.  But it is relevant.

That matter was addressed in my grievance:

> ▇▇▇ was next. This confrontation lasted just under an hour. The subject of Ms. Ervin's threats were discussed for less than five minutes, just like ▇▇▇ interrogation. ▇▇▇ was charged with having called the girls who were upset over the telephone game's end-product, "▇▇▇ is woke," as having "looked like monkeys." He repeatedly explained that he said they were "acting like monkeys." In ▇▇▇ view, the statement "looked like monkeys" would have been racist, but "acting like monkeys" is not. In any event, he explained, he did not mean it in any way to be racist, and he had already explained that to the girls, and had apologized to them.

Mr. Trogisch instructed ▇▇▇ to put his account of threatening behavior in writing. ▇▇▇ included:

> Then when we were going down the stairs to go to the auditorium I told the girls that we were not laughing at the racist comment but at you, "How they were jumping around like monkeys," but right after I realized what I said was not right in that situation. I said sorry and that I didn't mean it in that racist way and that I meant it in a way off like very jumpy and moving around too much. Also I am black so I know of all those racist comments that were directed to our kind so I would never mean it in that way.

Before Mr. Trogisch commenced the surprise interrogations, he had read all three accounts of the teacher threats, including ▇▇▇ Thus, he knew that the "looked like monkeys" comment against ▇▇▇ was false, and misdirected, and that it was "acting like," not "look like." Yet, that did not diminish his prosecution of this charge against ▇▇▇ Nor did he seem to recognize, or care, that one false charge impugns the veracity of the two others, at least where all accusations had been made by the same student.

Regarding the email, I wrote:

> While I am aware that the school is obligated to withhold the identity of the reporting student and his or her parents on privacy grounds, at least for now, due process mandates that the accused know the allegations against him. So, please provide me with a copy of the parent's email, with all identifying information redacted.

DCPS initially agreed to provide that email, but was later changed its position.  DCPS has no basis to withhold that record, and it asserts none.

### (2) Stating that another student looked "woke"

CARE's Report levels DCPS charges in ten, numbered, *General Findings of Fact*, all of which are, in its view, "valid and reliable."  The first two findings are accurate, but omit the most relevant reaction to the initial "woke" statement.  CARE writes:

1. On February 4, 2020, Teacher N.E.'s theatre class was conducting a lesson unit entitled "Culture Shock", which is a unit designed to analyze how different groups of people are presented in the media. During the class discussion, Student E was sitting next to two students of color. Student J.C. stated that Student E looked "woke." Use of this term was corroborated by thirteen of the students interviewed.
2. One student stated they took slight offense to the word "woke" being used after realizing what it meant; however, they did not believe that J.C. meant it as a racist comment.

The remark had been occasioned by ▬▬▬ wearing a scarf, indoors.  While "one student" may have taken "slight offense" over ▬▬▬ having remarked, "▬▬▬ you look very woke," as DCPS relates, it declined to reveal that Ms. Ervin was outraged.  *See* grievance:

> Ms. Ervin stopped the rehearsal and said, "I need to remember that I am a teacher first."  The balance of the exchange went something like this.
>
> Ms. Ervin:   ▬▬▬ What makes you think it's okay to say what you said to ▬▬▬   What did you say to ▬▬▬
> ▬▬▬   I said "▬▬▬ you look very woke."
> Ms. Ervin:   Why did you say that to ▬▬▬   Was it because he was sitting next to two black people?
> ▬▬▬   No.
> Ms. Ervin:   Really?  Well then what was it?
> ▬▬▬   Well like a person who cares a lot about being politically correct, uh, uh, and like…
>
> After Ms. Ervin berated ▬▬▬ some more, ▬▬▬ read the definition aloud.  Ms. Ervin repeated the definition.

      Ms. Ervin:    Alert to injustice in society, especially racism. (Emphasis on racism). I'm alert to injustice in society especially racism. I am very woke. Now next time you should know what a word means before you call someone that! (To ▮▮▮▮ I'm so sorry that he said that to you. (To the class) Racist rhetoric will not be tolerated.

    ▮▮▮▮ written account to Mr. Trogisch of the berating:

    She was furious and yelling. The whole time my heart was thumping and racing. A friend of mine who was right next to me later described me as "looking like I was about to cry" and "scared."

    Thus, the genesis of the belief that ▮▮▮▮ had made a racist comment was Ms. Ervin's indignation at what she declared to the class was "racist rhetoric." As I related on February 8, "I am still perplexed how Ms. Ervin, Mr. Trogisch, and Ms. Eaves conclude that saying someone looks woke, or alert to injustice in society, is racist." CARE wrote, "As defined by Merriam-Webster: aware of and actively attentive to important facts and issues (especially issues of racial and social justice)."

    But that does not respond to the question. By what reasoning is that racist? Media pundits use the word in a derogatory context, meaning myopic, or misguided, or pretentious. Progressives describe as woke Democrats who advocate social justice issues while ignoring economic justice, while their conservative counterparts use the term in disparaging the importance of social issues. My inability to discern by what theory the comment was racist implicates due process. Again, by either its dictionary definition, or in its conversational use, by what reasoning is saying someone looks woke "racist rhetoric"?

    In an "effort to address what appear to be some issues of racial intolerance or hostility," CARE reports, "[o]n February 13, 2020, SWWFS staff facilitated a restorative circle with Teacher N.E.'s 1st period class," where students were encouraged to share their feelings about recent events beginning with ▮▮▮▮ having used the word "woke." ▮▮▮▮ remained silent, on advice of counsel. "Maybe it was just the way he was raised," one student surmised. Three adults in the room and it occurred to none to raise the question of how or why "you look woke" could possibly have been racist.

>Finding 3
>On February 6, 2020, during N.E.'s class, students participated in a game called "Telephone." This was corroborated by at least nine of the students interviewed. The final message at the end of the game was "▮▮▮▮ is woke." This caused at least three of the Black students to become upset.

The three girls upset by the word's resurgence had accepted Ms. Ervin's pronouncement that it was racist rhetoric.

**(3)   Use of "N-word"**

>Finding 8
>One student stated J.C. has used the "N-word" on multiple occasions. At least ten students stated they have not personally heard J.C. use the "N-word." J.C. stated he has never used the "N-word."

Here, DCPS posits that ▮▮▮▮ used the "N-word on multiple occasions," or "regularly" according to her parent's email, to one student, but not one of their 25 classmates ever heard it, even once. The witness never told anyone until the evening of the very day that Ms. Ervin had announced to the class that ▮▮▮▮ had uttered "racist rhetoric." This claim was in the same email that had alleged that ▮▮▮▮ had said that his African-American classmates "look like monkeys," which had been known from the get-go to have made by ▮▮▮▮ not ▮▮▮▮ and actually had been "act like monkeys." And why did CARE write that the ten students had not "personally" heard ▮▮▮▮ say it? Is it saying that any of the ten had heard from others that ▮▮▮▮ had used this epithet?

I wrote, "Perhaps Mr. Trogisch assumed that the student would not allege such a patently verifiable allegation unless it was true… Not believing the classmate's account, I asked whether he had corroboration, and he responded, 'Not yet.'"

>I for one have never heard ▮▮▮▮ make any remark that could possibly be interpreted as racist or disparaging regarding any minority. Hence my initial question to Mr. Trogisch of whether there had been any corroboration, a question which has not yet been answered.

CARE's *General Finding of Fact* includes the answer: No corroboration whatsoever.

**(4)    Championing slavery**

Finding 4
At least three students stated J.C. made comments along the lines of "slavery was good for America and should be brought back." All three students stated this happened in Teacher E.F.'s English Language Arts classroom.

This is ostensibly a finding of fact.  CARE was tasked with determining what ▇▇▇ said.  "Made comments along the lines of" is not a fact.  It is an opinion, a characterization.  Would saying that white southern landowners prospered under slavery be "along the lines of" saying that it was good for America?  No.  Would some listeners characterize that as being along the lines of slavery was good for America?"  Yes.  And what could anyone have said to advocate for bringing slavery back without uttering the words, "slavery should be brought back."  Is that what CARE alleges?  CARE finds racial animus based on the opinion of three listeners.  Again, what did ▇▇▇ say?

Findings 4 and 5, both of which allege championing slavery, regard two separate class discussions, in two separate classes, English and Geography.  Class discussions are group communications.  They were among 25 or so people, over half of whom CARE interviewed.  CARE reports in Finding 4, the English class discussion, that ▇▇▇ had said that slavery should be brought back, but only three recall it, and none of them, or anyone else, reported it, to anyone?  If I had heard anyone that I knew say something like that I would remember, and I would recall exactly what he said.  But here, according to CARE, all three witnesses recall only that ▇▇▇ "made comments along the lines of."  What about the teacher?  CARE did not ask Mr. Felinger.

CARE was not able to compare the specifics of one witness's account with two others, because none remember what ▇▇▇ said, only that his "comments were along the lines of."  Did all three remember that ▇▇▇ had said something "along the lines of" slavery had been "good for America," and that it "should be brought back," or do these two charges differ among the three?  Did CARE ask whether these witnesses had spoken each other about what they were to say when interviewed?

CARE wrote that "there was a total of 15 students interviewed," which it numbered at the beginning of its Response. But it does not identify by number which witnesses it cites in any of its 10 Findings. The largest number of corroborating witnesses in any Finding is in number 4—three students. Findings 7 and 9 related the accounts of two students, and 6, 8, and 10 rely on one. But CARE declines to state how many of its Findings are based on the statements made by the same witness. Are the only accusers the "three Black students who became upset" at the "woke" comment in Ms. Ervin's class, after she had misinformed them that it was a racial slur (one of whom lied to her parent that ▮▮▮▮ "regularly uses the N-word" and said his black classmates "look like monkeys")? CARE should have identified its witnesses by the number it assigned to them, and disclosed the total number of accusing students.

Nor Did CARE ask whether any of these three witnesses whether they were aware that three of their classmates had visited the office twice during that school day to report Ms. Ervin's behavior, and had all been told to put it in writing. CARE listed Ms. Ervin, Ms. Eaves, and Mr. Trogisch as among the witnesses it interviewed, but CARE's Report does not mention anything that any of them said. When did Ms. Ervin first learn from her mother, Assistant Principal Eaves, that Mr. Trogisch had told the three reporting students to reduce their statements in writing? Are Ms. Ervin or Ms. Eaves friends with the author of the accusing email, or friends with the parents of the other two of Finding 4's witnesses?

Nor did CARE employ even the most rudimentary investigative techniques, as I had asked:

> A complete investigation would include separate interviews of all witnesses to the charges of the use of the n-word, as well as to the slavery remark—the same procedure employed for the interviews of ▮▮▮▮ ▮▮▮▮ and ▮▮▮▮ These witnesses can be quizzed on the particulars of the statements—where each occurred, what was said exactly, the catalyst for the statement (what was said immediately prior), who heard it, what did the interviewee do or say in response, what did the other witnesses do or say in response, did the interviewee tell anyone and if so who, and those accounts should be corroborated via inquiries to any such recipients… All witness statements should be compared to each other…

And what about the second email? Two weeks after my February 8 letter, Mr. Trogisch called me a second time, relating that he had just received another email, this one from ▮▮▮▮ ▮▮▮▮ parent, relating that ▮▮▮▮ had said, verbatim,

"Slavery was good for America," to ▮▮▮ only.  Mr. Trogisch provided the email to the CARE personnel who were there that day interviewing witnesses.  So, CARE interviewed ▮▮▮ a second time.

▮▮▮ had claimed that ▮▮▮ voiced this white supremacist rhetoric to her while sitting next to him in Geography.  CARE learned that ▮▮▮ assigned seat was not at ▮▮▮ table, so this allegation had been discredited, seemingly.  But CARE omitted this charge from its Report, just like the "monkeys" allegation.  Absent word from DCPS to the contrary, I will assume that it also declines to disclose this email to me, at least until compelled by the court to do so.

CARE prefaces all is student witness numbers with the clause "at least."  This is a curious insertion in a *Finding of Fact*.  Finding 4 is "at least three students," and Findings 7 and 9 are "at least two students."  CARE interviewed each student to corroborate the charges, took notes, but does not know exactly how many of the 15 students corroborated?  Is "at least" meant to bolster its Findings?  Does "at least two" mean two?

> Finding 5
> Teacher C.O. also stated J.C. has made a comment similar to "slavery was good for America" during class, which prompted a class discussion about slavery being a human rights issue.

Regarding the class discussion in Geography, here too, of the fifteen witnesses interviewed, only Ms. Ogunshakin is said to have recalled ▮▮▮ saying that slavery was good for America, she too does not recall exactly what he said, but, rather, he "made a comment similar to."  Also, the "class discussion about slavery" was a follow-up to a homework assignment, and was not "prompted" by anything that ▮▮▮ had said.

> Finding 6
> One student stated that other students in addition to J.C. have stated that slavery was good for the beginning of America's economy; however, they prefaced that the other students have stated that slavery, in and of itself, was not right.  At least four students state they had not heard J.C. make comments regarding slavery being good for America's economy.  J.C. denies making this statement.

Finding 6 at least has a specific assertion, rather than "made comments along the lines of," or "made a comment similar to."  It relates that a group of students, ▇ among them, had opined that "slavery was good for the beginning of America's economy."  But only ▇ meant it to be racist, in CARE's view.  The other students, but not ▇ "prefaced that… slavery, in and of itself, was not right."

And ▇ did not deny making this statement because he was never asked. I listened in on his interviews and CARE did not ask any such question.

CARE interviewed 14 students besides ▇  Why did it report that "at least four students state they had not heard" the comments?  Why didn't it ask the other 10?

**(5)   Championing Trayvon Martin's death**

> Finding 7
> At least two students stated they have heard J.C. make comments along the lines of "Trayvon Martin was a disappointment" or "Trayvon Martin was a thug and that he should have been shot."

Contrary to CARE's recitation, ▇ remarks about the Trayvon Martin case was made in front of around 25 other students and his English teacher Eric Felinger, not "at least two students."  During that class discussion, ▇ read from the police report from a book that he had been reading that he happened to have in his backpack at the time, showing that, before Martin had been shot, Zimmerman had suffered injuries, which had been sufficient to prove in his criminal trial his defense of self-defense.

▇ did not say anything "along the lines of" Trayvon "was a thug and that he should have been shot."  Rather, he opined that Zimmerman had acted in self-defense.  If CARE asked the other 12 witnesses that it interviewed, or Mr. Felinger, what ▇ had said during that class discussion, it did not share those results. ▇ relates that he did not say that "Trayvon Martin was a disappointment," and he does not know what that statement means, or refers to.  I don't know either.

How did ▇ and her two friends, feel about ▇ defending Trayvon Martin's killer?  What did Ms. Ervin think when she learned of it?  Did this solidify accusing students' belief that ▇ was a racist?  Did that belief influence their other allegations?  CARE made no inquiry.

### (6) Opposition to Black History Month

<u>Finding 9</u>
At least two students stated that J.C. has outwardly questioned why there is a Black History Month.

My letter addresses ▋ response to this claim during his interrogation:

> Mr. Trogisch: Did you ever say that fade to black is bad or that we spend too much time on black history?
> ▋ No. I might have said that we don't spend enough time on some important things.
> Mr. Trogisch: What do you mean?
> ▋ Well we didn't go over a single word of the Constitution 'till eighth grade.

I have heard ▋ complain about Black History Month. I have also heard him complain about English class, math, geography, history, art, physical education, and the dress code. Did either of these "at least" two students believe that ▋ "outwardly questioning" was founded on a racial attitude, as CARE posits? This charge is wholly founded on the notion is ▋ is a racist. But he is not, contrary DCPS's official position.

<u>Finding 10</u>
One student stated that J.C. has made other racially insensitive and/or offensive comments in the past and added "we let things slide." Additionally, the student stated that they "let things slide" because they have "experienced worse" behavior by other people.

This finding of fact is devoid of facts. "Other racially insensitive and/or offensive comments" is a characterization, only. Once again, what did ▋ say that was racially insensitive, "and/or" offensive?

---

CARE's findings of *General Finding of Fact* are not "verified and reliable." Rather, they are all false:

| | | |
|---|---|---|
| (1) | Said African-American classmates "look like monkeys" | False |
| (2) | Said that another student looked "woke" | Not racist |
| (3) | Using the "N-word" | False |
| (4) | Championing Trayvon Martin's death | False, championed Zimmerman's defense |
| (5) | Opposing Black History Month | Not racially motivated |

The remaining accusation, championing slavery, is alleged to have been made during the course of two class discussions, in separate classes, each attended by around 25 people, yet CARE could find only three students to corroborate, none of whom remember what ▓▓▓▓ said, except that one did describe a discussion of the economic aspects of slavery, wherein several students opined that it had been good for the economy, but only ▓▓▓▓ view had been racist.

CARE was tasked with determining whether ▓▓▓▓ had, in fact, spewed racial epithets and other white supremacist views.  It purports to have determined that he did.  But in ten *Findings of Fact*, CARE provides only two verbatim quotes—the "N-word" and "woke."  The first is a patent lie, and the second simply cannot be construed as racist.

Here, there were no reports of racism against any eighth grade students until February 5, the very day that three students, ▓▓▓▓ ▓▓▓▓ and ▓▓▓▓ each submitted to Mr. Trogisch written reports of teacher misconduct against a black teacher who had announced to the class that ▓▓▓▓ had used "racist rhetoric."  The charges were levelled only against ▓▓▓▓ ▓▓▓▓ and ▓▓▓▓

Prior to this time, in DCPS's view, ▓▓▓▓ had been spewing white supremacist rhetoric for some time, but there had been no reaction whatsoever, from anyone, until ▓▓▓▓ said "woke." No student had complained to any authority at the school, there had been no complaints to, or by, any teacher, or to the Principal, or to the Assistant Principal, or to the counselor, or to any parents, including me.

The charges levelled against ▓▓▓▓ and ▓▓▓▓ were equally frivolous.  ▓▓▓▓ was charged with saying that his classmates "looked like monkeys."  But ▓▓▓▓ interrogators were well aware that he had been explaining to the girls that "we were

not laughing at the racist comment but at you… jumping around like monkeys, but right after I realized what I said… I said sorry."

███ was charged with having sketched Martin Luther King, Jr., with big ears.  "I was personally offended," said Ms. Young.  "Why would you associate with ███ the racist?" Mr. Trogisch asked.  Ms. Ogunshakin, in whose class the sketch had been drawn, had shown the "racist" drawing to Ms. Ervin.  Perhaps Ms. Ervin is not the only teacher who sees racism in the shadows.  Ms. Ogunshakin, the only adult among ███ accusers, doesn't remember what ███ had said in her class, but whatever it was it was a "comment similar to" slavery being good for America.



### Denial of Admission to School Without Walls High School

"What is so disastrous here," I wrote, "is ███ exposure to being denied admission to School Without Walls High School."

> After ten years at the school, with an excellent chance of acceptance into the feeder, the day before he takes the entrance exam for the High School, ███ is wrongfully accused of being a racist, spewing racial epithets, and threatened with expulsion.

Eighth grade students who are advanced two years ahead of grade level in mathematics take that class at the High School ("Walls").  Last year, all of the advanced math students were accepted into Walls.  This year, only one of the three was not accepted, ███  He is 80th on a wait list of 86.  He was accepted to the other magnet high school, Benjamin Banneker, which has the same entrance standards as Walls.  He is almost a straight-A student, tested as reading above an 11th grade level in DCPS testing, did well on his written test, and his interview went fine.

In February I wrote that I was "confident that any objective review of the evidence will reveal that ███ is not even slightly racist, he has never championed slavery, and he has *never* used the n-word.  Thus, I am not in the slightest bit concerned whether ███ will be exonerated of these false, and despicable, charges."  In asking DCPS lawyers to send someone to the school to investigate, I observed that "the conduct of the current investigators in this case is among the

issues to be resolved, so an independent fact finder would seem appropriate." Nothing has changed, except for adding the issue of whether retaliation was a contributing factor in DCPS's rejection of ▇▇▇ from Walls, where Mr. Trogisch is also the Principal.

### Appeal of Grievance No. 3682

CARE's statement of this investigation:

> It is alleged that on February 6, 2020, School Without Walls at Francis-Stevens Teacher N.E. made threats to Student J.C., Student B, and Student C, including, "next time I will slap some sense into you" and "don't roll your eyes at me again or I'll knock your teeth out" when approaching the students about allegedly making racist comments. Additionally, it is alleged that Principal R.T. used questionable methods to investigate the alleged comments, such as interrogating Student J.C., Student B, and Student C for up to five hours, falsely reporting that the students' peers described them as racist, threatening to expel, and failing to interview witnesses.

Here too CARE completely misses the mark. My charge is that Mr. Trogisch *knowingly and falsely accused* three students of racist misconduct, but that is not apparent in CARE's statement.

Moreover, the facts stated are utterly false and misleading. Mr. Trogisch was not investigating Ms. Ervin 's "alleged comments." All but a few minutes of the three-plus hours of interrogations were entirely devoted to racism accusations against the three reporting students. Teacher misconduct was addressed only at the students' insistence, each of whom pleaded during interrogations, "What about Ms. Ervin?"

CARE states that "It is alleged" that Ms. Ervin threatened ▇▇▇ No, it is not. Only Mr. Trogisch threatened ▇▇▇ with expulsion. Nor did Ms. Ervin threaten "Student B," ▇▇▇ He too was threatened with expulsion, unless he "cooperated." "Why are you protecting racists?" Mr. Trogisch queried ▇▇▇

And the statement omits any review of the conduct of Ms. Eaves, Ms. Young, or Ms. Beer. Nor does it include the incident of Ms. Ervin's having made a threatening gesture to a student with scissors in hand, nor of her announcement to her afternoon class that ▇▇▇ ▇▇▇ and ▇▇▇ were all opposed to the school's celebration of Black History Month.

As I noted on February 10, this is one matter, not two:

> On Friday morning, February 6, Mr. Trogisch called me and told me that he would be conducting two separate investigations, one into the conduct of theater teacher Ms. Naelis Ervin, and one into the conduct of my son, ▆▆▆▆ Both matters are serious. But they are not "separate."

Here, the final disposition of grievance No. 3686 should largely determine the outcome of grievance No. 3682. Since DCPS is following Mr. Trogisch's lead in bifurcating ▆▆▆▆ grievance, please also note his appeal in grievance No. 3682, and kindly include this correspondence, with its attachments, in the administrative record in that case. The record in both matters should also include the two emails, ▆▆▆▆ sketch, Ms. Eaves' typed notes during the three hours of interrogations, as well as Ms. Young's handwritten notes.

The Labor Management and Employee Relations review should at least be apprised of my view that DCPS employees falsely, and knowingly, accused three students of racism, to cover up their own wrongdoing, and to retaliate against them for reporting teacher malfeasance. In the absence of a developed administrative record in the matter, as well as review of DCPS's statements of investigative jurisdiction, LMER might very well conclude that Mr. Trogisch and company had simply been too vigilant in their quest to prosecute an otherwise well-founded racism probe. That is not true.

Absent word from DCPS to the contrary, I will assume that I have no choice but to seek redress in court to clear ▆▆▆▆ of these despicable accusations, and to seek injunctive relief to gain his admission into Walls.

Sincerely,

/s/
John H. Clarke

Enclosures