UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.H.C., ) | |
|     Plaintiff, ) | |
|     v. ) | Case No. 20-1761 (CRC) |
| DISTRICT OF COLUMBIA, et al., ) | |
|     Defendants. ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

COMES NOW Plaintiff, J.H.C., by counsel, and respectfully opposes defendants' Motion to Dismiss this case.

**Memorandum of Points and Authorities**

**Background**

> This case arises out of a concerted effort by a teacher, her mother, and other DCPS school personnel, to undermine, deflect attention away from, and retaliate against, three students for their submissions of written accounts regarding a black teacher's misconduct, by falsely accusing all three students of racial animus.

Amended Complaint, ECF No. 16 ("*Compl.*") ¶ 3.

**1.   Municipal Liability**

While the government accurately recites the law that a municipality's liability ordinarily requires implementation or execution of a policy or custom that caused the

deprivation of plaintiff's constitutional rights,[1] it omits that it can also be held liable under 42 U.S.C. 1983 by ratification of the wrongful conduct, as the Supreme Court pronounced in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion).  *See Municipal Liability under 42 U.S.C. 1983 and the Ratification Theory of City of St. Louis v. Praprotnik: An Analysis of Federal Circuit Treatment*, at 361-62, 365-66 (footnotes omitted):

> One theory that civil rights attorneys have used to establish § 1983 liability is a ratification theory.  Under a ratification theory, the plaintiff argues, that because the municipality subsequently approved of conduct by its officials that deprived the plaintiff of his constitutional rights, the municipality should be liable under §1983.  In *City of St. Louis v. Praprotnik,* a plurality in the United States Supreme Court accepted this theory:  when a final policy maker "approve[d] a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality."
>
> \*   \*   \*
>
> The Supreme Court plurality issued its decision in *Praprotnik* for the express purpose of clarifying a confusion in the circuit courts as to when "a decision on a single occasion may be enough to establish an unconstitutional municipal policy."  In his concurrence, Justice Brennan, however, argued that the plurality holding effectively closed the door on municipal liability for single occasions of subordinate misconduct authorized by the municipality. He stated that municipal policymakers (authorized by state law to make policy) could promulgate constitutional policies, but then delegate their policymaking authority to subordinates and refuse to review the subordinate's unconstitutional conduct for conformity with the original policy.  This would effectively protect the municipality from all liability because, under the plurality's ruling that policymaking authority was a question of state law rather than fact, only conduct done in conformity with the announced policy could subject the municipality to liability.  The

---

[1] Defendant's Motion to Dismiss, ECF No. 19 ("*Motion*") at 12-13:

> [The] plaintiff must show that the District implemented or executed a policy or custom that caused the deprivation of plaintiff's constitutional rights. *Monell v. Dept. of Social Svcs*, 436 U.S. 658, 690–91 (1978); *Rogala v. District of Columbia*, 161 F.3d 44, 56 (D.C. Cir. 1998) (*per curiam*). Plaintiffs thus have the burden of proving "(1) that they were deprived of constitutional rights, and (2) that the deprivation was caused by a policy or custom of the District." *Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008)…. Here, JHC has not pled a constitutional violation or that the violation was caused by a District policy or custom."

subordinate official, not authorized to make policy by state law, could not subject the municipality to liability.

The plurality responded to Justice Brennan's criticism by pointing out different ways in which the Civil Service Commission could have created municipal liability for violating Praprotnik's constitutional rights:

> It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker.  It would also be a different matter if a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware.  In both those cases, the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official.

This passage lays out two particular ways a final policymaker may subject the municipality to liability:  (1) if the policymaker consents to a custom or usage which causes a constitutional injury; or (2) if the policymaker approves a decision of a subordinate.  The second manner of creating municipal liability is referred to in this Note as the ratification theory.

The plurality made clear that, to establish liability under the ratification theory, more than "[s]imply going along with discretionary decisions made by one's subordinates" is required.  Furthermore, the plurality held that a final policymaker's ratification of an unconstitutional act will be chargeable to the municipality only if the plaintiff presents evidence that the final policymaker had "approved [the] subordinate's decision and the basis for it'."  The final policymaker's approval, therefore, has to be a deliberate one.  Where the final policymaker has announced a constitutional policy, the "mere failure to investigate the basis of a subordinate's discretionary decisions" is not enough to create liability. The failure to investigate is consistent with the final policymaker's presumption that subordinates are faithfully carrying out the policies that guide them.

Nevertheless, if the policymaker has knowledge of an unconstitutional rationale, motive, or effect of the subordinate's conduct, a policymaker's "[refusals to carry out stated policies could obviously help to show that a municipality's actual policies were different from the ones that had been announced."  In such a situation, the policymaker will have ratified the unconstitutional conduct of the subordinate and subject the municipality to liability.

This matter mirrors *Praprotnik*, as the municipality here ratified the wrongful

conduct.  Plaintiff's Exhibit 1 to his *Compl*. is his February 10, 2020 letter to DCPS, through

its general counsel.  It is a complete recitation of the facts, together with the written accounts of the three student whistleblowers.  The nine-page letter recounts that plaintiff's accusers knew that it had not been J.H.C. who had been accused of the "monkeys" remark, that if J.H.C. had, in fact, used the N-Word "all the time," or said that "slavery is the best thing that ever happened to this country and it should be brought back" in class discussions, there would be some corroboration.

And the letter pleaded that, given the chronology, the entire matter should considered together.  "On Friday morning, February 7, Mr. Trogisch called me and told me that he would be conducting two separate investigations, one into the conduct of theater teacher Ms. Naelis Ervin, and one into the conduct of my son, J.H.C... Both matters are serious. But they are not "'separate.'" *Id*. at 2.  CARE followed defendant Trogisch's approach, and treated the issue of teacher misconduct, and student misconduct, as entirely separate.

In *Praprotnik,* the plurality held that a final policymaker's ratification of an unconstitutional act will be chargeable to the municipality only if the plaintiff presents evidence that the final policymaker had "approved [the] subordinate's decision and the basis for it'."  That is exactly what happened here.  "Plaintiff suffered a deprivation of Constitutional right by virtue of the actions of individuals acting under color of state law. Thereafter, DCPS Comprehensive Alternative Resolution & Equity Team adopted individual defendants' decision, and its wrongful basis." *Compl*. ¶ 93.

Plaintiff's letter "request[ed] that it [DCPS] consider sending someone over to the school to investigate.  The conduct of the current investigators in this case is among the

issues to be resolved, so an independent fact finder would seem appropriate." *Compl.* Exhibit 1 at 7.

DCPS agreed. "The General Counsel acceded to the request, and two investigators from the DCPS Comprehensive Alternative Resolution & Equity Team, or "CARE," investigated." *Compl.* ¶ 41.

"On May 6, 2020, J.H.C. administratively appealed the two Responses to his single grievance… DCPS has not responded to plaintiffs' appeal." *Compl.* ¶¶ 87, 89. Thus, the municipality subsequently approved of conduct by its officials that deprived the plaintiff of his constitutional rights. The policymaker approved a decision of a subordinate and, thus, the municipality is liable under *Praprotnik.*

### 2.   **Qualified Immunity**

Contrary to defendants' position, plaintiff's cause does not lend itself to a qualified immunity defense. Defendants cite *Plumhoff v. Rickard*, 572 U.S. 765, 770 (2014) for its observation that "An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."

Here, this authority could be dispositive, if defendants had, in fact, in good faith "reasonably believed that the accusations" against plaintiff "should be investigated," as they claim. *Motion* at 13. Plaintiff pleads otherwise. Moreover, plaintiff avers that defendants were not "investigating." Rather, they were seeking to undermine and neutralize the whistleblower's accounts as untrue and motivated by racial animus, as pled:

> The School had no plans to query the students about Ms. Ervin's misconduct. Rather, over the course of *over three hours* of grueling, separate, surprise interrogations, the school accused each of racist behavior, lied to each that their classmates had called them racist, and tried over and over again to have

    one inculpate the others.  Defendants <u>accused each of racist misconduct
    which they knew to be false</u>.  Defendants sought to:
     (a) Undermine and neutralize the students' accounts of teacher
       misconduct as untrue and having been motivated by racial
       animus;
     (b) Deflect attention away from the teacher's threats of physical
       harm; and
     (c) Retaliate against the three for their written explanations of
       what events had occurred.

*Compl.* ¶ 31, emphasis added.

"Defendants had read, and studied, the students' accounts, which had been submitted by 8:30 a.m." (*Compl.* ¶ 28), and "knew full well that allegations that they made against the other two whistleblowers, ES and EZ, were frivolous.  *Compl.* ¶¶ 33, 35.

So too in plaintiff's surprise interrogation.  Defendants accused him of the "monkeys" remark even while they knew that the allegation had been made against a different whistleblower, and was false.  And defendants knew that, had plaintiff espoused the white supremacist views in class discussions, championing slavery or Trayvon Martin's death, or used the n-word "all the time," such conduct would have immediately brought to their attention, and would have been corroborated.  *See, e.g.*, *Compl.* ¶ 80:

> Here, there were no reports of racism against any Eighth grade students until February 7, the very day that three students—J.H.C., ES, and EZ—each submitted to defendant Trogisch written reports of teacher misconduct against a black teacher who had announced to the class, falsely, that J.H.C. had uttered "racist rhetoric." The charges were levelled only against J.H.C., ES, and EZ.  Prior to this time, in DCPS's view, J.H.C. had been spewing white supremacist rhetoric for some time, but there had been no reaction whatsoever, from anyone, until J.H.C. said, "woke." No student had complained to any authority at the school, there had been no complaints to, or by, any teacher, or to the Principal, or to the Assistant Principal, or to the counselor, or to any parents, including the undersigned.

Regarding the "woke" charge, it is incumbent on defendants to proffer their view on how that remark could possibly have been racist.  *See, Compl.* Exhibit 2 at 2, "Student J.C.

stated that Student E looked 'woke;'" *Compl.* ¶ 37, quoting defendant Eaves, "So you see that you laughing that DE is woke was racist."

Defendants' view of the matter, that defendants "Trogisch and Eaves reasonably believed" that the charges of uttering racist rhetoric should be investigated (*Motion* at 13) is the opposite of plaintiff's view, based on all the facts.

Similarly, defendants' view that "There are no allegations of coercion in the first meeting" (*id.*) ignores the allegations:

> The School had no plans to query the students about Ms. Ervin's misconduct. Rather, over the course of *over three hours* of grueling, separate, surprise interrogations, the school accused each of racist behavior, lied to each that their classmates had called them racist, and tried over and over again to have one inculpate the others.
>
> Dissatisfied with his repeated denials, defendant Trogisch threatened to expel EZ. But, he continued, if EZ would cooperate, things would go easier on him.

*Compl.* ¶¶ 30, 33.

In sum, qualified immunity is unavailable given the facts pled. *See, e.g., Compl.* ¶¶ 92-93:

> Defendants knew that the allegations of racial animus were false. The probe was undertaken in bad faith. Prior to the commencement of their interrogations, defendants knew that that the "monkeys" accusation, and the charge of use of the "N-word," were false. They knew that virtually all charges, if true, would have been corroborated by several dozen student witnesses. And they knew that, had any student ever uttered white supremacist, racist, rhetoric, such conduct would have been immediately brought to their attention.
>
> Defendants' affirmative actions were undertaken under color of law. These officials acted while carrying out their responsibilities in accordance and compliance with District of Columbia law, with the apparent authority of the state.

### 3.  Injury-in-fact

While recognizing that the Supreme Court held in *Carey v. Piphus*, 435 U.S. 247 (1978) that procedural due process is "absolute," and that its denial may occasion the award of nominal damages even in the absence of actual injury, defendant posits that plaintiff is not entitled to even nominal damages.  It claims that plaintiff has alleged no injury-in-fact, he has no personal stake in the outcome of this action because a favorable judicial decision would provide no redress, and that plaintiff was afforded due process.

First, defendant Ervin announced to the class—falsely—that plaintiff had uttered "racist rhetoric." *Compl.* ¶ 11:

> For reasons that still remain a mystery, defendant Ervin took the comment as "racist rhetoric."  She was outraged.  She berated J.H.C., screaming, "J.H.C., what makes you think it's okay to say what you said to DE?  Was it because he was sitting next to two black people?" Stunned, and unaware of who DE had been sitting next to, J.H.C. responded, "No." Unconvinced, Ms. Irvin yelled, "Really?" and continued to berate J.H.C.  "She was furious and yelling," J.H.C. wrote.  "The whole time my heart was thumping and racing. A friend of mine who was right next to me later described me as 'looking like I was about to cry' and 'scared.'"  She ended her tirade with the declaration to the class, "Racist rhetoric will not be tolerated!"

Defendants Trogisch and Eaves "doubled down" on the false charges.  Thereafter, CARE followed suit.  Virtually every one of plaintiff's classmates, as well as faculty and staff at the school, knows that plaintiff has been accused of voicing white supremacist rhetoric.  Defendant queried 14 of plaintiff's classmates, and asked each whether they had witnessed plaintiff say that his African-American classmates "look like monkeys," or used the n-word, or championed slavery, or praised Trayvon Martin's death, or opposed Black History Month, or stated that another student looked "woke" (as if the use of that term had somehow been racist).

"[D]efendant Ervin [also] told her entire afternoon class that J.H.C., EZ, and ES are all against the school's celebration of Black History Month." *Id.* ¶ 38.

Plaintiff's emotional distress is not limited to his initial reaction upon being surprised with the charges.[2] Since this time, one School Without Walls High School ("Walls") classmate repeatedly called him a racist on a social media platform (a group chat or "discord server"), and sought to have him removed, several times.

Plaintiff's best friend from kindergarten through Fourth grade, who is black, told plaintiff that he believes that plaintiff is racist. Another former friend asked, "Why can't you stop being racist?"

---

[2]  *See Compl.* ¶ 36:

J.H.C. was last to be interviewed. It began after he had been waiting in the outer office for five hours. It began at around 1:00 p.m., and lasted about an hour. Here too defendant knew full-well that the accusations against J.H.C. were frivolous. It was traumatic. Parts of that exchange went something like this.

| | |
|---|---|
| Mr. Trogish: | Well your friends say "yeah that's just J.H.C. He's racist."... |
| J.H.C.: | (Crying) One of my friends said that? Well don't you think that if my friends thought I was a racist they wouldn't want to be friends with me? |
| Ms. Eaves: | Well I disagree, I think they would just accept you're a racist and try to look past it. |

\*   \*   \*

| | |
|---|---|
| Mr. Trogish: | One of them even said J.H.C. that said "slavery was the best thing to happen to America" and that we should "bring it back." J.H.C. also called black girls "monkeys and says nigger all the time." |
| J.H.C.: | (Crying) And you're sure that it was one of my friends? |
| Mr. Trogish: | Well I can't really disclose that information. |
| Mr. Trogish: | Are you saying that you didn't say any of this? |
| J.H.C.: | (Crying) Yes. |
| Mr. Trogish: | So why do you think they said this? |
| J.H.C.: | (Crying) Maybe it's because they don't like me… |

Defendant's position that a favorable judicial decision would provide no redress is frivolous.  He deserves to be exonerated of the disgraceful charges levelled against him.  His reputation has clearly suffered.

Moreover, according to defendant, plaintiff was not denied due process.  He *"was given an opportunity to be heard."*  (*Motion* at 9, emphasis in original).  But due process mandates more than just an opportunity to deny the charges, based on secret evidence, during surprise interrogation, as plaintiff alleged:

> Due process mandates the right to receive fair notice of the accusations. Here, defendants lulled plaintiff into believing that he was to give witness to allegations of teacher malfeasance, then surprised him with charges of espousing racist rhetoric.  Due process also mandates the right of the accused to confront the witnesses against him.  Defendants found guilt based on unspecified testimony, provided by an unknown number of witnesses, the identities of whom were, and still are, secret
>
> DCPS's conduct similarly violates due process. CARE's *Finding of Fact* also relies on secret testimony, and here too it deprived plaintiff the ability to confront his accusers.  The *Finding of Fact* withholds even the total number of accusing students.  DCPS declined to provide plaintiff with either of the two accusing emails, even in redacted form.  Plaintiff was adjudged culpable based on secret evidence

*Compl.* ¶¶ 99-103.

Additionally, at least one charge was levelled for the first time in response to plaintiffs' administrative appeal.  "CARE added championing Trayvon Martin's death, based on the accounts of just two of the several dozen witnesses who would have heard that." *Id*. ¶ 77.

Defendant hides even the total number of accusing students:

> CARE wrote that "there was a total of 15 students interviewed," which it numbered at the beginning of its Response.  But it does not identify by number which witnesses it cites in any of its 10 *Findings of Fact*.  The largest number of corroborating witnesses in any Finding is in number 4—three students. Findings 7 and 9 related the accounts of two students, and 6, 8, and

> 10 rely on one.  But CARE declines to state how many of its *Findings of Fact* are based on the statements made by the same witness.  Are the only accusers the "three Black students who became upset" at the "woke" comment in Ms. Ervin's class, after she had misinformed them that it was a racial slur (one of whom lied to her parent that J.H.C. "regularly used" the "N-word," as well as having said his black classmates "look like monkeys")?

*Id.* ¶ 69.

The government asserts that "[t]here are no allegations of coercion."  *Motion* at 13.  Plaintiff alleges otherwise:  "Dissatisfied with his repeated denials, defendant Trogisch threatened to expel EZ.  But, he continued, if EZ would cooperate, things would go easier on him."  *Compl.* ¶ 33.

While CARE expressly adjudicated all charges as being "valid and reliable," defendant's view now is that plaintiff was just "<u>not expressly exonerated</u> by CARE's findings."  *Motion* at 9, emphasis added.  Defendant's motion now calls the racial slurs "purported" (*id*.), while DCPS's unequivocal position is that plaintiff is guilty on all charges.

Defendant also avers, "The appeal remains pending, Am. Compl. ¶¶ 86-87, which fortifies the District's position that JHC has not articulated a concrete injury in fact or a due process violation."  Plaintiff has received not even an acknowledgement of receipt of either of his two appeals.  As far as plaintiff knows, DCPS simply ignored his appeal.  If this is not so, and there are administrative appeals in progress, defendant should so inform the plaintiff, and the Court.

CARE declared that the "racial slurs were not consistent or pervasive enough to constitute a civil rights violation."  *Compl*. Exhibit 2 at 3.  On the one hand, defendant found that plaintiff had championed slavery, called African American students monkeys, and used the n-word "all the time," to such an the extent that a parent felt that her child was not safe around plaintiff.  Ms. Young agreed, telling plaintiff, "So you're making it so they don't feel

safe around you." *Compl*. ¶ 36.  While the conduct alleged would seem to be a civil rights violation—students "don't feel safe"—CARE found that it was not.  It would appear that defendant found no civil rights violation because the allegations are patently false, and not due to any absence of consistency.

So too with defendant's pronouncement regarding whether plaintiff violated "the D.C. Human Rights Act of 1977 which, in part, prohibits discrimination on the basis of race and color." *Compl*. Exhibit 2 at 1.  Defendant found plaintiff guilty of ten instances of discriminatory conduct on the basis of race and color, yet, found no discrimination on the basis of race and color.  Here too defendant found no D.C. Human Rights Act violation because the allegations are patently false.

Nor does defendant's due process analysis include that defendant Trogisch had sought to trick the whistleblowers to inculpate each other, or into confessing, using evidence that he knew to be false—EZ had been "repeatedly confronted with the claim that his friends call him racist, and asked to explain why" (*Compl*. ¶ 34), and defendant also lied to plaintiff, "Well your friends say 'yeah that's just JHC.  He's racist." *Id*. ¶ 36

4. **Civil Conspiracy**

In defendants' view, plaintiff's civil conspiracy should be dismissed for failure to allege facts with sufficient specificity.  Rather, according to defendants, plaintiff's inferences "are based on surmise and conclusory statements… without any specific facts to support these assertions… but the most circumstantial…" *Motion* at 14.

However, courts allow conspiracies to be proven by "inferences that may fairly be drawn from the behavior of the alleged conspirators." *Michelman v. Clark-Schwebel Fiber*

*Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976).  Here, that behavior includes a telling chronology of events:

> Here, the chronology of these matters begs scrutiny.  Ms. Ervin threatened students with bodily harm, the genesis of which is her mistaken belief that the students had engaged in racist behavior.  On Thursday, three students complained to the administration about the threats.  They are told to put it in writing.  They did, and provided the accounts the next day, Friday, at which time the administration wrongfully accused the three, and only those three, of racist misconduct.  The school detained the students for up to five hours, during which time it surprised each with charges of racism in separate, hours-long interrogations, employing such tactics as falsely reporting to each that their friends had described them as racist and asking them to explain, repeatedly, and offering to plea bargain to avoid suspension if one would inculpate the others.  The untoward appearance of these events is not helped by the fact that Ms. Eaves, an accuser and second-in-command at the school, is Ms. Ervin's mother.

*Compl.* Exhibit 1 at 7.

*See also Compl.* ¶ 80:

> Here, there were no reports of racism against any Eighth grade students until February 7, the very day that three students—J.H.C., ES, and EZ—each submitted to defendant Trogisch written reports of teacher misconduct against a black teacher who had announced to the class, falsely, that J.H.C. had uttered "racist rhetoric." The charges were levelled only against J.H.C., ES, and EZ.  Prior to this time, in DCPS's view, J.H.C. had been spewing white supremacist rhetoric for some time, but there had been no reaction whatsoever, from anyone, until J.H.C. said, "woke."  No student had complained to any authority at the school, there had been no complaints to, or by, any teacher, or to the Principal, or to the Assistant Principal, or to the counselor, or to any parents, including the undersigned.

Where a party opposing summary judgment introduced evidence which would permit a jury to "infer from the circumstances" that an actionable conspiracy had taken place, the moving party's "failure to foreclose" that possibility mandates denial of the motion.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-58, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970).

### 5. Injunctive relief

Defendants seeks dismissal of plaintiff's prayer that the Court find that the charges against plaintiff void-for-vagueness, because plaintiff had not been found guilty of violating the criminal law.

Defendant cites no authority in support of its position, and advances no reason why this should be so.

Defendant investigated alleged violations of the D.C. Human Rights Act's prohibition of discrimination on the basis of race and color. It found plaintiff guilty of all ten items that it probed (but somehow found that there was no such discrimination). Here, "[o]nly two of the charges disclose verbatim quotes—the 'woke' charge, and the use of 'the N-Word' on multiple occasions." *Compl.* ¶ 105. Other charges are that plaintiff had "made comments along the lines of," or "made a comment similar to," or "outwardly questioned why there is a Black History Month," or made "racially insensitive and/or offensive comments." *See, e.g.*, *Compl.* ¶¶ 54, 68:

> CARE was tasked with determining what J.H.C. said. These are ostensibly *Findings of Fact*. "Made comments along the lines of," and "made a comment similar to," are not facts. They are opinions. Moreover, J.H.C. could not have advocated for bringing slavery back without uttering the words, "slavery should be brought back." Where an individual is accused of espousing white supremacist rhetoric, due process requires more than opinions of three listeners. It requires the facts of what the accused is alleged to have said.
>
> "Other racially insensitive and/or offensive comments" is a characterization, only. Again, CARE declines to disclose what J.H.C. said that had been interpreted as "racially insensitive and/or offensive"—a flagrant due process violation, again.

So, even at this stage, plaintiff does not know the particulars of almost anything that he has been found guilty of saying. He cannot defend or rebut the mere opinions of defendant's witnesses. His prayer for equitable relief is well-founded.

WHEREFORE, Plaintiff J.H.C. respectfully prays that Defendants' Motion to Dismiss be denied.

Date:   December 11, 2020.

>Respectfully submitted,
>
>   /s/   John H. Clarke
> John H. Clarke   Bar No. 388599
> 1629 K Street, NW
> Suite 300
> Washington, DC  20006
> (202) 344-0776
> John@JohnHClarkeLaw.com