**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**J.H.C.**, by his father and next friend John
Harrison Clarke,

               Plaintiff,

               v.

**DISTRICT OF COLUMBIA,** *et al.*,

               Defendants.

Case No. 20-cv-1761 (CRC)

---

## MEMORANDUM OPINION

While an eighth-grader at a local public school, plaintiff J.H.C. was scolded by his theater teacher for making what she perceived to be a racially insensitive remark during class. The following day, the school informed J.H.C. that the parent of a fellow student had also accused him of making racist comments. A subsequent investigation by the D.C. public school system found the accusations against J.H.C. credible.

Seeking to turn the tables, J.H.C.'s father, an attorney, filed this lawsuit on his son's behalf. The suit alleges that the investigation of J.H.C. was in fact a procedurally flawed "cover-up" orchestrated by a cabal of administrators, teachers, and students to punish J.H.C. for exposing supposed misconduct on the part of the theater teacher. In a four-count amended complaint, J.H.C. alleges direct constitutional violations under the First, Fifth, and Fourteenth Amendments; charges the defendants with engaging in a civil conspiracy; and asks the Court to set aside the investigation's findings as "void for vagueness."

Finding that J.H.C. lacks standing to assert the alleged constitutional violations and has otherwise failed to state a claim, the Court will grant defendants' motion to dismiss.

I.     **Background**

A.     <u>Factual Background</u>

The Court assumes the truth of the facts alleged in the complaint for purposes of resolving the motion to dismiss.  <u>See, e.g.</u>, <u>Int'l Bhd. of Teamsters v. Atlas Air, Inc.</u>, 435 F. Supp. 3d 128, 135 (D.D.C. 2020) (Cooper, J.).

At the time of the complaint, J.H.C. was an eighth grader at School Without Walls, a public school in Washington, D.C.  Am. Compl. ¶ 4.  On February 4, 2020, J.H.C. was in theater class when he told another student, D.E., that he "look[ed] very woke," which J.H.C. believed to mean "pretentious" or "politically correct."  <u>Id.</u> ¶ 10.  Naelis Ervin,[1] J.H.C.'s theater teacher and a defendant in this case, demanded to know whether J.H.C. made that comment "because [D.E.] was sitting next to two black people[.]"  <u>Id.</u> ¶ 11.  "Stunned" by this response, J.H.C. responded in the negative.  <u>Id.</u>  According to J.H.C., he called D.E. "woke" because he was "wearing a scarf . . . indoors[.]"  <u>Id.</u>  In fact, J.H.C. claims that he was "unaware of who [D.E.] had been sitting next to" when he commented on his appearance.  <u>Id.</u>  Unconvinced, Ms. Ervin purportedly berated J.H.C. for what she perceived to be "[r]acist rhetoric."  <u>Id.</u>  During this interaction, J.H.C. claims that his "heart was thumping and racing," and he alleges that a friend later told him that he appeared to be near tears.  <u>Id.</u>

Two days later, a substitute teacher had some of the eighth graders play the game "telephone," <u>id.</u> ¶ 12, in which a phrase is whispered from one student to another in order to illustrate how messages can become distorted after being passed on repeatedly.  At the end of the

---

[1] J.H.C. is inconsistent in his spelling of the defendants' names in this case.  <u>See</u> Am. Compl. ¶ 8 (referring to defendant as Ms. Ervin); <u>id.</u> ¶ 11 (referring to defendant as Ms. Irvin); <u>id.</u> ¶ 6 (referring to defendant as "Mr. Trogisch" and "Mr. Trogish").  For the sake of clarity, the Court adopts the spellings used in the case caption.

2

game, the initial phrase had somehow morphed into "[D.E.] is woke," prompting several students to laugh.  Id.  Later in the day, Ms. Ervin encountered J.H.C. and a few of his classmates in the hallway and demanded to know "what had happened . . . with the substitute teacher."  Id. ¶ 13. J.H.C. claims that, upon learning what occurred during the telephone game, Ms. Ervin told the students that "if something like [that] happened again" she would give them "zeros," place the incident on their "permanent records," and "call the police for hate speech[.]"  Id.

Later that day, J.H.C. "inquired in the [s]chool's office whether teachers were permitted to threaten students."  Id. ¶ 15.  Thereafter, J.H.C. and two of his classmates reported that Ms. Ervin had threatened them.  Id.  Richard Trogisch, the principal at the time and also a defendant in this lawsuit, asked the students to put their accusations against Ms. Ervin in writing.  Id. ¶ 16. The next morning, J.H.C. and two fellow students came to school with written statements alleging that Ms. Ervin had engaged in extensive misconduct.  Id. ¶ 17.  Among the accusations were claims that Ms. Ervin violently threatened her students, was prone "outbursts," and tended to "exaggerat[e] the term 'racist'" and "throw[] [the] term out of proportion."  Id. ¶¶ 18–25.

Forty-five minutes after the students submitted their statements, Mr. Trogisch called J.H.C.'s father and informed him that he had received an email from a parent of one of J.H.C.'s classmates accusing J.H.C. of making racist remarks.  Id. ¶ 29.  Mr. Trogisch then read the email message to J.H.C.'s father.  It stated that J.H.C. uses the n-word "all the time, says that slavery is the best thing that ever happened to this country and that it should be brought back, and says his black classmates look like monkeys."  Id.  Mr. Trogisch informed J.H.C.'s father that the school would be conducting an investigation into the accusations regarding both J.H.C. and Ms. Ervin. Id.

Later that afternoon, four school administrators—including Ms. Ervin's mother, Silean Eaves, who was the school's assistant principal and is another defendant in this case—questioned J.H.C. for approximately one hour.  Id. ¶ 36.  J.H.C. alleges that, over the course of the interview, he became emotional as the administrators informed him that his friends and classmates had accused him of racist behavior.  Id.  He further alleges that Mr. Trogisch knew that these accusations were baseless but nonetheless "announced his intention to suspend J.H.C., feigning to believe the accusations of racist misconduct."  Id. ¶ 37.  That same afternoon, J.H.C. claims that Ms. Ervin told her class that J.H.C. was "against the school's celebration of Black History Month."  Id. ¶ 38.

The following Monday, J.H.C.'s father contacted the District of Columbia Public Schools ("DCPS") Office of General Counsel to request that an independent factfinder investigate the incident.  Id. ¶ 40; see Am. Compl. Ex. 1.  The General Counsel acceded to the request, and two investigators from the DCPS Comprehensive Alternative Resolution & Equity ("CARE") team began an inquiry.  Id. ¶ 41; see Am. Compl. Ex 2.  Over the course of the next eleven weeks, the investigators interviewed fourteen students, four parents, three school administrators, two teachers, J.H.C., and J.H.C.'s father.  See Am. Compl. Ex. 2 at 1–2.  "At least three students" and one teacher reported that J.H.C. had "made comments along the lines of 'slavery was good for America and should be brought back.'"  Id. at 3.  All three students indicated that the comments were made during an English Language course.  Id.  Additionally, "[a]t least two students" stated that J.H.C. made "comments along the lines of 'Trayvon Martin was a disappointment,' or 'Trayvon Martin was a thug and that he should have been shot[.]'"  Id.  Two students also said that J.H.C. had "outwardly questioned why there is a Black History Month."  Id.  While one student reported that J.H.C. used the "'n-word,' on multiple occasions[,]" ten

other students stated that they had not personally heard J.H.C. use that word.  Id.  J.H.C. denied

ever using the n-word and having made the remarks about slavery and Trayvon Martin.  Id.

     DCPS concluded that the claims against J.H.C. were "valid and reliable" and stated that

it would "implement a progressive discipline approach . . . if [it] find[s] future evidence of

[J.H.C.] communicating slurs based on actual or perceived race or color."  Am. Compl. Ex. 2 at

3; see also Am. Compl. ¶ 46.  J.H.C. does not allege, however, that any disciplinary action was

ultimately taken.  On May 6, 2020, J.H.C. filed an administrative appeal challenging the DCPS

investigation, which he says remains pending although the deadline for DCPS to respond has

long since passed.  Id. ¶¶ 86–88.

     B.    Procedural Background

     J.H.C.'s father initiated this lawsuit on his son's behalf on June 29, 2020, see Notice of

Removal, and filed the operative amended complaint on October 21, 2020, see Am. Compl.  The

complaint names as defendants the District of Columbia, former School Without Walls Principal

Richard Trogisch, Assistant Principal Silean Eaves, teacher Naelis Ervin, and an unspecified

number of "Jane Does."  Id.  The complaint's first two counts allege that DCPS's investigation

of J.H.C. violated his rights under the First, Fifth, and Fourteenth Amendments.  Count III

contends that defendants committed civil conspiracy by orchestrating a baseless investigation of

J.H.C. as retaliation for his "whistleblow[ing]" regarding Ms. Ervin's misconduct.  Id. ¶ 44, 106–

111.  And Count IV seeks "a declaratory judgment or Findings of Fact and Conclusions of Law,

determining which of DCPS's Findings of Fact are void for vagueness."  Id. ¶ 113.  Defendants

moved to dismiss for lack of standing and failure to state a claim.  The motion is ripe for the

Court's resolution.

## II.   Legal Standards

To survive a Rule 12(b)(1) motion to dismiss for lack of standing, the complaint "must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." Humane Soc'y of the U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015).  "While the Court must accept the factual allegations in the complaint as true, the plaintiff's factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim[.]" Smallwood v. U.S. Dep't of Just., 266 F. Supp. 3d 217, 219  (D.D.C. 2017) (Cooper, J.) (cleaned up).[2]

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  A claim is facially plausible if it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  When evaluating whether this standard has been satisfied, the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012).

---

[2] Defendants recite the legal standard for resolving motions under Rule 12(b)(6) but not Rule 12(b)(1).  "Because standing is jurisdictional," however, "the Court will apply the standard of a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1)" as it pertains to defendants' standing argument. Smallwood, 266 F. Supp. 3d at 219; see also, e.g., Ellis v. Holy Comforter Saint Cyprian Cmty. Action Grp., 153 F. Supp. 3d 338, 340 (D.D.C. 2016).

## III.  Analysis

Defendants argue that Counts I and II should be dismissed for lack of standing and that Counts III and IV should be dismissed for failure to state a claim.  The Court first addresses the standing argument and then considers whether J.H.C. has otherwise stated a claim.[3]

A.  Standing

To establish a cognizable injury in fact, "a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Spokeo, Inc. v. Robbins, 578 U.S. 330, 136 S. Ct. 1540, 1548 (2016) (internal quotation marks omitted).

J.H.C. alleges that defendants violated his First, Fifth, and Fourteenth Amendment rights by launching a retaliatory investigation into baseless allegations that he had made racist remarks. See Compl. ¶¶ 89–96 (First Amendment claim); ¶¶ 97–105 (Fifth and Fourteenth Amendment claims).  J.H.C. fails to identify any injury that resulted from this legal violation, instead focusing primarily on what he perceives to be the procedural faults in the school's investigation.  He contends that the investigation relied on "secret evidence" because it concealed the identity of J.H.C.'s accusers and was "void for vagueness" because a handful the racist statements attributed to J.H.C. were not "verbatim quotes."  Id. ¶¶ 103–05.  But even if these failings violated J.H.C.'s

---

[3] The Court notes that "[a]lthough *pro se* complaints are liberally construed, they still must present a claim upon which relief can be granted by the court."  Solomon v. Univ. of S. Cal., 360 F. App'x 165, 166 (D.C. Cir. 2010) (per curiam) (cleaned up).  Additionally, where (as here) the *pro se* plaintiff is an attorney, he "is not automatically subject to the very liberal standards afforded to a non-attorney *pro se* plaintiff because an attorney is presumed to have a knowledge of the legal system and need less protections from the court."  Curran v. Holder, 626 F. Supp. 2d 30, 33 (D.D.C. 2009).

constitutional rights—which the Court doubts—J.H.C. is still required to allege a cognizable injury.  He has not done so.

Seeking to avoid this conclusion, J.H.C. points to the allegations in the complaint that his "heart was thumping and racing" when Ms. Ervin accused him of making a racist comment in theater class and that his friend later told him that he "look[ed] like [he] was about to cry[.]" Mot. to Dismiss Opp. at 8 (quoting Am. Compl. ¶ 11). [4]  To the extent these allegations ae designed to assert emotional distress as an Article III injury, the effort comes up short. "[E]motional harm—in and of itself—is not sufficient to satisfy Article III's injury in fact requirement." Al–Aulaqi v. Obama, 727 F. Supp. 2d 1, 25 (D.D.C. 2010); see also Humane Soc'y of U.S. v. Babbitt, 46 F.3d 93, 98 (D.C. Cir. 1995) ("[G]eneral emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes.").  Consequently, emotional distress only satisfies Article III's injury-in-fact requirement where the "alleged harm stems from the infringement of some legally protected, or judicially cognizable, interest that is either recognized at common law or specifically recognized as such by the Congress." Armstrong v. Navient Sols., LLC, 292 F. Supp. 3d 464, 474 (D.D.C. 2018).  J.H.C. fails to make this showing.

Additionally, J.H.C. argues in his opposition to defendants' motion to dismiss that "his reputation has clearly suffered" because it is now well-known that he was "accused of voicing white supremacist rhetoric."  Opp. at 8, 10.  To the extent that J.H.C. is attempting to assert a reputational injury, this effort also fails.  For starters, no such assertions appear in his complaint or in any personal declaration supporting standing; he takes this position only in his opposition to

---

[4] Because J.H.C. neglected to paginate his brief, the Court relies on the pagination automatically generated by the court document filing system.

the motion to dismiss.  Yet, "[i]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss."  Durand v. District of Columbia, 38 F. Supp. 3d 119, 129 (D.D.C. 2014).  The Court therefore cannot consider these briefing arguments at this stage.

Regardless, any attempt to claim reputational injury would fail on its merits.  In some cases, "reputational injury that derives directly from government action will support Article III standing to challenge that action."  Foretich v. United States, 351 F.3d 1198, 1214 (D.C. Cir. 2003).  By contrast, "[p]urely speculative or conclusory assertions of the consequences of [an] alleged stigma do not satisfy the Supreme Court's requirement for specific, concrete facts demonstrating a particularized injury."  Alamo v. Clay, 137 F.3d 1366, 1370 (D.C. Cir. 1998).

Here, J.H.C.'s theory of reputational injury, which, again, appears only in his briefing, rests on the following events:  At some point following the incidents described in the complaint, a "classmate repeatedly called [J.H.C.] a racist on a social media platform."  Opp. at 9. Additionally, a childhood friend has told J.H.C. that he "believes he is racist," and "[a]nother former friend asked, 'Why can't you stop being racist?'"  Opp. at 9.  Elsewhere, J.H.C. complains that "[v]irtually every one of [J.H.C.'s] classmates, as well as faculty and staff at the school, knows that [he] has been accused of voicing white supremacist rhetoric."  Opp. at 8.

To the extent these events constitute an Article III injury at all, they are not fairly traceable to the alleged legal violations.  In Count I, J.H.C. alleges that defendants interviewed him regarding accusations that he was racist despite knowing "that the allegations were false." Am. Compl. ¶ 92.  As this allegation recognizes, however, J.H.C. had *already* been accused of making racist remarks prior to being questioned by the school's administration.  These accusations are detailed in the complaint:  On at least three occasions, Ms. Ervin accused J.H.C. of racist conduct in front of his classmates.  Id. ¶¶ 11, 13, 38.  Additionally, a classmate's parent

informed the school that J.H.C. used the n-word "regularly," said "that slavery is the best thing that ever happened to this country," and had opined that 'his black classmates look like monkeys." Id. ¶ 29. J.H.C. insists that he was misunderstood by Ms. Ervin and that his classmate was lying. See, e.g., Am. Compl. ¶ 11 (claiming that Ms. Ervin perceived J.H.C.'s "woke" comment to be racist "[f]or reasons that still remain a mystery"); id. ¶ 69 (claiming that J.H.C.'s classmate "lied to her parent"). But that is irrelevant to whether the legal violations alleged in the complaint—the interrogation of J.H.C. following his arguments with Ms. Ervin and the procedural flaws in the DCPS investigation—*caused* J.H.C.'s reputational injury. According to the events as portrayed in the complaint, they did not.

Nor can any impact on J.H.C.'s reputation be fairly traced to Count II, in which J.H.C. alleges that the DCPS investigation violated due process because it concealed the identities of his accusers and only partially relied on verbatim quotes. Id. ¶¶ 100, 105. These purported defects are untethered to J.H.C.'s claimed reputational injury. First, as described above, J.H.C. was accused of making racist remarks prior to the DCPS investigation. J.H.C. does not demonstrate that the students who have since accused him of racism did so in response to the DCPS investigation rather than the accusations that were lodged prior to that investigation. He does not claim, for instance, that any of his classmates—let alone the three classmates that identified in J.H.C.'s opposition brief—were permitted to view the findings of the DCPS investigation. In fact, those findings appear to have been addressed only to J.H.C.'s father. See Am. Compl. Ex. 2.

Moreover, J.H.C. appears to argue that his injury stems from the mere *existence* of the DCPS investigation rather than the purported *defects* in that investigation that form the basis for Count II. He complains that, as a result of questions posed pursuant to the DCPS investigation,

"every one of [his] classmates, as well as faculty and staff at the school, knows that plaintiff has been accused of voicing white supremacist rhetoric." Opp. at 8. This injury would at best be unaffected by J.H.C.'s requested relief under Count II, which would among other things compel DCPS to disclose the identity of J.H.C.'s accusers so that he could "confront the witnesses against him." Am. Compl. ¶¶ 100, 102, 104. Further proceedings regarding this matter would only increase J.H.C.'s classmates' awareness that he had been accused of racism (even if he were ultimately exonerated).

Finally, J.H.C. argues that his procedural due process claim must survive defendants' motion to dismiss under Carey v. Piphus, 435 U.S. 247 (1978). In Carey, the Supreme Court observed that "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of the claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed . . . the denial of procedural due process [is] actionable for nominal damages without proof of actual injury." Id. at 266; see Opp. at 8.

J.H.C.'s reliance on Carey is misplaced. For starters, he has not asked for nominal damages. Instead, he requests $200,000 in compensatory and punitive damages "jointly and severally" from each defendant. Am. Compl. II; see, e.g., Winstead v. Dist. of Columbia, 720 F. Supp. 2d 44, 50–51 (D.D.C. 2010) (rejecting plaintiff's argument that Carey removed plaintiff's burden to prove damages stemming from due process violation where plaintiff sought compensatory rather than nominal damages). In any event, "[t]he first inquiry in every [procedural] due process challenge is whether the plaintiff has been deprived of a protected interest in liberty or property." Budik v. United States, 949 F. Supp. 2d 14, 25 (D.D.C. 2013) (alteration in original); see also Sargeant v. Dixon, 130 F.3d 1067, 1070 (D.C. Cir. 1997). That

is so because "the due process clause is triggered when the government deprives an individual of

life, liberty, or property." Scott v. Solis, No. CV 12-2055 (EGS), 2014 WL 984387, at *1

(D.D.C. Mar. 14, 2014) (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 459–60

(1989). J.H.C. has not alleged any cognizable deprivation in this case. He does not claim, for

instance, that he was expelled, suspended, or refused admission to his preferred high school. In

fact, J.H.C. has not alleged that the school took *any* disciplinary action as a result of the

investigation—let alone one that might trigger the Due Process Clause. J.H.C.'s procedural due

process claim therefore fails for this independent reason.

     Accordingly, the Court grants defendants' motion to dismiss Count I and II.

     B.    <u>Failure to State a Claim</u>

     J.H.C. next alleges that defendants committed civil conspiracy (Count III) and that

DCPS's investigation is "void for vagueness" (Count IV). Am. Compl. ¶ 107, 113. Defendants

urge dismissal of both claims under Rule 12(b)(6) for failure to state a claim. The Court agrees.

     *1.*    *Civil conspiracy*

     According to J.H.C., the individual defendants committed civil conspiracy by lodging

"false allegations of racial animus" against him. Am. Compl. ¶ 110. This claim fails for at least

two reasons. First, civil conspiracy is not actionable as a stand-alone claim. <u>Nader v.</u>

<u>Democratic Nat. Comm.</u>, 567 F.3d 692, 697 (D.C. Cir. 2009); <u>see also</u> <u>Mpoy v. Fenty</u>, 870 F.

Supp. 2d 173, 183 (D.D.C. 2012) ("[T]here is no recognized independent tort action for civil

conspiracy."). Instead, "civil conspiracy depends on performance of some underlying tortious

act." <u>Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.</u>, 749 A.2d 724, 738 (D.C. 2000); <u>see also</u>

<u>id.</u> (civil conspiracy is "not independently actionable" but instead "a means for establishing

12

vicarious liability for the underlying tort").  Because J.H.C. fails to state a claim for any underlying tort, his civil conspiracy claim necessarily founders.

Regardless, a plaintiff stating a claim for civil conspiracy under D.C. law must allege: "(1) an agreement between two or more persons; (2) to commit an unlawful action, or to commit a lawful act by unlawful means; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) the overt act was done pursuant to a common scheme." Bush v. Butler, 521 F. Supp. 2d 63, 68 (D.D.C. 2007); see also Griva v. Davison, 637 A.2d 830, 848 (D.C. 1994).  J.H.C. has failed to make this showing.

J.H.C.'s civil conspiracy claim rests on the following allegation: "[w]hile plaintiff is currently unable to specify what role defendant Ervin played in this conspiracy, given the sequence of events, plaintiff avers, upon information and belief, that all individual defendants played a role in the false allegations of racial animus that suddenly emerged on the very day that the whistleblowers submitted testimony regarding defendant Ervin's misconduct."  Am. Compl. ¶ 110.  J.H.C. argues that this allegation, along with the facts advanced in the complaint, support an inference that the school's investigation was in retaliation for his decision to report Ms. Ervin's supposed misconduct.  See Opp. at 12–13.  He explains that "there were no reports of racism . . . until February 7, the very day that . . . J.H.C. . . . . submitted to defendant Trogisch written reports of teacher misconduct against a black teacher who had announced to the class, falsely, that J.H.C. had uttered 'racist rhetoric.'"  Id. at 13 (quoting Am. Compl. ¶ 80).  This assertion is belied by the allegations in the complaint.

According to J.H.C., Ms. Ervin accused J.H.C. of making a racist statement on February 4, 2020—that is, three days prior to J.H.C. lodging any complaint against her.  Am. Compl. ¶ 10. Two days later, J.H.C. alleges that Ms. Ervin again accused J.H.C. of racist conduct and

threatened to put any further racist remarks on his "permanent record[.]"  Id. ¶ 12–13.  It was not

until the *following day* that J.H.C. submitted a written complaint against Ms. Ervin and was

subsequently questioned by the school's administration.  Id. ¶ 17.  And at some point prior, a

parent of J.H.C.'s fellow student informed the school that J.H.C. made several racist comments

in class and "regularly used the N-word."  Id. ¶ 69.  While J.H.C.'s baldly asserts that this

student "lied to her parent," id., he alleges *no* facts to support an inference that this student had

entered into a civil conspiracy against J.H.C.

In sum, the complaint fails to create a reasonable inference that defendants engaged in a

civil conspiracy.  Even if such a claim were independently actionable, it would therefore fail

nonetheless.

### 2.    *Declaratory relief*

Finally, in Count IV, J.H.C. seeks a "Declaratory Judgment, or Findings of Fact and

Conclusions of Law, determining which of DCPS's Findings of Fact are void for vagueness."

Am. Compl. ¶ 113.  This claim, too, must be dismissed.  The Declaratory Judgment Act does not

create an independent right of action.  Ali v. Rumsfeld, 649 F.3d 762, 778 (D.C. Cir. 2011).  Nor

does the void-for-vagueness doctrine apply here.  "[T]he void-for-vagueness doctrine requires

that a penal statute define the criminal offense with sufficient definiteness that ordinary people

can understand what conduct is prohibited and in a manner that does not encourage arbitrary and

discriminatory enforcement."  Beckles v. United States, 137 S. Ct. 886, 892 (2017).  J.H.C.

argues that the doctrine governs the investigations of DCPS into a student's misconduct and

requires that these investigations reveal the identities of all involved and rely exclusively on

"verbatim quotes."  Opp. at 14; see Am. Compl. ¶ 54.  There is simply no basis for this

application of the void-for-vagueness doctrine.  The Court therefore dismisses Count IV of the complaint.

### IV.   Conclusion

For the foregoing reasons, the Court will grant defendants' Motion to Dismiss.  A separate Order will follow.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  September 29, 2021